UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION,

FEMHEALTH USA, INC., d/b/a CARAFEM,

MILO WORLDWIDE LLC,

PEOPLE FOR THE ETHICAL TREATMENT        No. 1:17-cv-_____
  OF ANIMALS, INC.,

                    Plaintiffs,

         v.

WASHINGTON METROPOLITAN AREA
  TRANSIT AUTHORITY,

PAUL J. WIEDEFELD,

                    Defendants.

---

**MEMORANDUM IN SUPPORT OF PLAINTIFF MILO WORLDWIDE LLC'S
MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff MILO Worldwide LLC has filed a motion for a preliminary injunction ordering

Defendant Washington Metropolitan Area Transit Authority to re-display, for the remaining 18

days of a 28-day advertising campaign, a set of advertisements for the book *Dangerous* by Milo

Yiannopoulos that it approved, received full payment for, posted, and then precipitously

removed after receiving complaints from members of the public. It files this memorandum in

support of that application and that motion.

**STATEMENT OF FACTS**

*"The display of this ad is consistent with Metro's policy of remaining content-
neutral when accepting advertising. Although Metro understands that feelings
and perceptions will vary among individuals within the community, we cannot
reject advertising because some find it inappropriate or offensive."*
      -- Response by WMATA Customer Relations staff to complaints about
         Milo Worldwide's advertisements, before WMATA changed its mind
         and removed the advertisements.

\*     \*     \*

Milo Yiannopoulos is a public figure who is known for his iconoclastic opinions about contemporary issues. Part of his distinct media personality and brand is to engage provocatively with various matters of public concern. Plaintiff MILO Worldwide LLC ("Milo Worldwide") is a corporation through which Mr. Yiannopoulos carries out his activities as an author, journalist, and public speaker. Milo Worldwide is the publisher of Mr. Yiannopoulos' new book, *Dangerous*. Declaration of Alexander Macris ("Macris Decl."), ¶ 2.

Defendant Washington Metropolitan Area Transit Authority ("WMATA") is a governmental entity created by an interstate compact between Maryland, Virginia, and the District of Columbia. *See* D.C. Code § 9-1107.01 (the WMATA Compact). WMATA operates the second largest heavy rail transit system, the sixth largest bus network, and the fifth largest paratransit service in the United States, with an annual budget of nearly three billion dollars. *See* WMATA, FY2017 Approved Budget, at 8, 14, *available at* https://www.wmata.com/upload/FY2017-Approved-Budget-2.pdf. Defendant Paul J. Wiedefeld is the General Manager and CEO of WMATA. The Defendants are referred to collectively in this memorandum as WMATA.

WMATA sells advertising opportunities in Metrorail stations, in Metrorail cars, and in and on Metrobuses, earning approximately $23 million in advertising revenue in the current fiscal year. *See id*. at 21, 25. Advertising on WMATA has deep market penetration in the Washington, D.C. metropolitan area. WMATA estimates that its exterior bus advertising alone reaches 90% of the population on a daily basis. *See* WMATA, Advertising Opportunities, https://www.wmata.com/about/business/advertising.cfm.

Prior to May 28, 2015, WMATA advertising space was available for a wide variety of commercial and non-commercial advertising. The D.C. Circuit had held that WMATA's advertising space was a public forum. *Lebron v. WMATA*, 749 F.2d 893, 896 (D.C. Cir. 1984).

On May 28, 2015, in response to the submission of an advertisement WMATA did not wish to accept, WMATA closed its advertising space to "all issue-oriented advertising . . . until the end of the calendar year." *American Freedom Defense Initiative v. WMATA*, No. 15-cv-1038, 2017 WL 1167197 at *2 (D.D.C. 2017), *appeal pending,* No. 17-7059 (D.C. Cir. filed April 7, 2017).

On November 19, 2015, WMATA formally amended its Guidelines Governing Commercial Advertising ("Guidelines"). The new Guidelines restrict the advertising that WMATA accepts for its advertising space. They contain fourteen numbered restrictions. The application of Guidelines Nos. 9 and 14 are at issue in this motion:

> No. 9:  Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited.

> No. 14: Advertisements that are intended to influence public policy are prohibited.[1]

In this lawsuit, the validity and application of those guidelines (and two others) are challenged by four Plaintiffs: the American Civil Liberties Union Foundation, whose advertisements displaying the text of the First Amendment in English, Spanish, and Arabic were rejected; Carafem, a nonprofit women's health provider whose advertisement about an FDA-approved method of medical abortion was rejected; People for the Ethical Treatment of Animals, whose advertisements encouraging a vegan diet and informing viewers about the victimization of animals in military training were rejected; and Milo Worldwide, whose advertisements for

---

[1] The Guidelines are available at
https://www.wmata.com/about/records/upload/Advertising_Guidelines.pdf.

*Dangerous* were accepted and posted but then removed after complaints from some riders. The instant motion is brought only by Milo Worldwide, and involves only the application of Guidelines 9 and 14 to its advertisements.

The publication date for *Dangerous* was July 4, 2017. In conjunction with its publication, Milo Worldwide wished to advertise the book in WMATA advertising spaces. Macris Decl. ¶¶ 2-3.

In June 2017, Milo Worldwide submitted its proposed advertisements to WMATA's agent, Outfront Media, Inc. ("Outfront"). The advertisements simply displayed Mr. Yiannopoulos's face, the book's title ("Milo's Dangerous"), an invitation to "Pre-Order Now," and, across the top, one of four short quotations from different book reviews. *Id.* ¶ 5.

The advertisements were accepted without hesitation, and on June 21, 2017, Milo Worldwide executed two contracts with Outfront (one for production, one for display) and paid $27,690 for the production and display of 45 large posters (46" H x 60" W) in Metro stations, and 200 "car cards" (22" H x 21" W) in Metrorail cars on a space-available basis, for four weeks beginning on June 26, 2017.  The advertisements were posted on that date. *Id.* ¶¶ 5-6. As posted, one of them looked like this:



Shortly thereafter, some WMATA riders began complaining about the advertisements. Initially, WMATA's Customer Relations staff responded to complaints with the following message: "The display of this ad is consistent with Metro's policy of remaining content-neutral

when accepting advertising. Although Metro understands that feelings and perceptions will vary among individuals within the community, we cannot reject advertising because some find it inappropriate or offensive." *Id*. ¶¶ 7-8.

But on July 6—ten days into the 28-day advertising campaign—Outfront informed Milo Worldwide that the advertisements "are being removed at the direction of the Washington Metropolitan Area Transit Authority. They're claiming you cannot run this as it violates guidelines #9 and #14." Outfront noted that it had expressed "concern to the fairness of this ruling," but "must be cautious to our partnership [with WMATA]." *Id*. ¶ 9. When pressed by news media to explain "what, precisely, about the ads violate[d] the guidelines," "Metro declined to answer." *Id*. ¶¶ 9-10.

Outfront informed Milo Worldwide that WMATA had instructed it to draw up a contract cancellation and refund the money that had been paid. It requested written permission to do so. Milo Worldwide responded, "You do NOT have our written permission. . . . [W]e consider this to be a violation of our First Amendment rights. If WMATA is intent on pursuing this unconstitutional course of action they should expect to face the full consequences of that." *Id*. ¶ 11.

*Dangerous* has been selling briskly since its release on July 4, 2017. It has been #4 or #5 on the New York Times hardcover non-fiction best-seller list for the past three weeks (July 23, 30, and August 6). It has been on the Wall Street Journal non-fiction best-seller list for the past four weeks, reaching #2 for the week ended July 9 and #1 for the week ended July 23. It has also been on the Publisher's Weekly hardcover non-fiction best seller list for the past four weeks, reaching #1 on the July 24 list. On the Amazon.com non-fiction best-seller list it was #5 for the

week of July 9 and #9 for the week of July 23. Its entire first print run has already shipped, and a second printing has begun to be shipped. *Id*. ¶ 13.

Advertising contributes to the sales of new books. Milo Worldwide has lost and continues to lose sales of *Dangerous* by having its advertisements censored by WMATA. Re-posting of Plaintiff's advertisements for the remaining 18 days of the advertising run it already paid for will contribute to the book's continued sales. *Id*. ¶ 14.

## APPLICABLE LEGAL STANDARD

Preliminary relief is warranted where the party seeking relief makes a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of equities in its favor, and accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). "In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks omitted). For that reason, where there is likely success on the merits, the court will "view more favorably [Plaintiff]'s arguments regarding irreparable injury, the balance of the equities, and the public interest." *Id*.[2]

## ARGUMENT

As a governmental entity, WMATA is of course subject to the First Amendment's command that it "make no law . . . abridging the freedom of speech." But as an entity created by

---

[2] In this Circuit, courts have traditionally applied these factors on a "sliding scale," where a stronger showing on some factors can compensate for a weaker showing others. *See, e.g.*, *Davenport v. Int'l Brotherhood of Teamsters*, 166 F.3d 356, 360 (D.C. Cir. 1999). It has been suggested, but not decided, that a likelihood of success on the merits may be required. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (citing *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20-22 (2008)). Under either approach, however, Plaintiff makes the necessary showing here.

a compact between Maryland, Virginia, and the District of Columbia, the path to enforcement of that command is slightly complicated.

First, courts have held that WMATA is entitled to the Eleventh Amendment immunity of Maryland and Virginia. *See Barbour v. WMATA*, 374 F.3d 1161, 1163 (D.C. Cir. 2004); *Morris v. WMATA,* 781 F.2d 218, 219-20 (D.C. Cir. 1986). But the Compact affirmatively waives the application of Eleventh Amendment immunity to suits against WMATA regarding its proprietary functions. D.C. Code § 9-1107.01, ¶ 80. And "[t]he rental of commercial advertising space is clearly a proprietary function. Thus, WMATA, under the clear language of section 80, has waived its Eleventh Amendment immunity in this case." *Lebron v. WMATA*, 665 F. Supp. 923, 935 (D.D.C. 1987). Additionally, the Compact affirmatively provides that "[t]he United States District Courts shall have original jurisdiction . . . of all actions brought by or against the Authority." D.C. Code § 9-1107.01, ¶ 81. The Eleventh Amendment is therefore no bar to the maintenance of this lawsuit.

Second, to the extent WMATA is a state entity, rather than a District of Columbia entity, the First Amendment's protections apply to it through the Due Process Clause of the Fourteenth Amendment. *See, e.g., Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) ("The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'") That makes no substantive difference, for the Fourteenth Amendment "imposed the same substantive limitations on the States' power to legislate that the First Amendment had always imposed on the Congress' power." *Wallace v. Jaffree*, 472 U.S. 38, 49 (1985).

Finally, courts in this District have held that WMATA is not a "person" for purposes of 42 U.S.C. § 1983. *See, e.g., Headen v. WMATA*, 741 F. Supp. 2d 289, 294 (D.D.C. 2010).[3] But under the doctrine of *Ex parte Young,* 209 U.S. 123 (1908), "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Injunctive relief may therefore be entered against defendant Wiedefeld in his official capacity. *See Hedgepeth v. WMATA*, 386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004).

We turn next to the merits.

## I.  Plaintiff Milo Worldwide Has a Clear Likelihood of Success on the Merits Because WMATA's Action Violated its First Amendment Rights

Analysis of a person's right to engage in public expression on government property generally begins by determining what category of "forum" is involved—a traditional, designated, limited, or non-public forum—because the government's ability to restrict speech varies according to the type of forum. In *Lebron v. WMATA*, 749 F2d. 893 (D.C. Cir. 1984), the D.C. Circuit (Bork, Scalia & Starr, JJ.) expressed "no doubt that the poster at issue here conveys a political message; nor is there a question that WMATA has converted its subway stations into public fora by accepting other political advertising." *Id.* at 896. More recently, this Court has held WMATA's advertising spaces to be a nonpublic forum. *American Freedom Defense Initiative v. WMATA*, No. 15-cv-1038, 2017 WL 1167197 at *3 (D.D.C. 2017).

It is not necessary in considering this motion to determine what type of forum is involved, because even in a limited or nonpublic forum, "[o]nce it has opened [the forum], the

---

[3] That issue is currently before the Court of Appeals in *American Freedom Defense Initiative v. WMATA*, No. 17-7059 (D.C. Cir. filed April 7, 2017).

State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum, nor may it discriminate against speech on the basis of its viewpoint." *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) (internal quotation marks and citations omitted).[4] WMATA's treatment of Plaintiff's advertisements violates each of the three principles set out in *Rosenberger*.

### A. WMATA has not respected the lawful boundaries it has itself set

The Interstate Compact creating WMATA authorizes it to "[a]dopt, amend and repeal rules and regulations respecting the exercise of the powers conferred by this [Compact.]"  D.C. Code § 9-1107.01 ¶ 12(c). Pursuant to that power, WMATA's Board of Directors duly adopted the Guidelines Governing Commercial Advertising in November 2015. It must now "respect the lawful boundaries it has itself set." *Rosenberger,* 515 U.S. at 829; *accord Christian Legal Society v. Martinez*, 561 U.S. 661, 663 (2010); *Women's Health Link, Inc. v. Fort Wayne Public*

---

[4] The D.C. Circuit's forum nomenclature differs somewhat from the Supreme Court's. The Supreme Court generally refers to three types of forums: (i) traditional public forums, (ii) designated public forums, and (iii) limited public forums, sometimes also called nonpublic forums. *See, e.g., Christian Legal Society v. Martinez*, 561 U.S. 661, 679 (2010); *American Freedom Defense Initiative v. King County*, 136 S. Ct. 1022 (2016) (Thomas, J., dissenting from denial of certiorari); *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017). The D.C. Circuit, by contrast, sometimes refers to (i) traditional public forums, (ii) limited or designated public forums, and (iii) nonpublic forums, *Oberwetter v. Hilliard*, 639 F.3d 545, 551 (D.C. Cir. 2011); sometimes to (i) traditional public forums, (ii) designated public forums, and (iii) nonpublic forums, *Initiative & Referendum Institute. v. U.S. Postal Service*, 685 F.3d 1066, 1070 (D.C. Cir. 2012); and most recently to (i) traditional and designated public forums, and (ii) nonpublic forums, *Hodge v. Talkin*, 799 F.3d 1145, 1157–58 (D.C. Cir. 2015). *See generally* Marc Rohr, *First Amendment Fora Revisited: How Many Categories Are There?,* 41 Nova L. Rev. 221 (2017).

*Oberwetter* aside, however (and there it made no difference), there is no disagreement that in forums that are neither traditional nor designated, the rules set out in *Rosenberger* and its progeny apply.

*Transportation Corp.*, 826 F.3d 947, 953 (7th Cir. 2016); *Davison v. Loudoun County Bd. of Supervisors*, No. 16-CV-932, 2016 WL 4801617, at *7 (E.D. Va. Sept. 14, 2016).

The Seventh Circuit's decision in *Women's Health Link* is directly on point. There, a city transit company prohibited advertisements that "express or advocate opinions or positions upon political, religious, or moral issues." 826 F.3d at 949. It rejected an advertisement that "did not express or advocate any such opinion or position," *id.*, but that was sponsored by a pro-life organization. *Id.* at 950. The court (per Judge Posner) made short work of the transit system's rejection. Observing that "[n]othing in Health Link's proposed ad violates *any* of the restrictions," *id.* at 952, and that "[o]nce a government entity has created a facility (the ad spaces in and on its buses, in this case) for communicative activity, it 'must respect the lawful boundaries it has itself set,'" *id.* at 953 (quoting *Rosenberger*, 515 U.S. at 829), the court concluded that "Citilink's refusal to post the ad was groundless discrimination against constitutionally protected speech." *Id.*[5]

Judge Cacheris' recent decision in *Davison* follows the same path. There, a citizen's critical comment posted on the Loudoun County Board of Supervisors' Facebook page "was 'quickly hidden' by someone operating the Board's Facebook page." *Davison*, 2016 WL 4801617, at *1. The parties and the court agreed that the County's Facebook page was a limited public forum, *id.* at *6, which "encourage[d]" visitors "to submit questions, comments and concerns" regarding "matters of public interest in Loudoun County," *id.* at *7, with some restrictions, such as "vulgar language" or "spam." *Id.* at *6. Holding that the rule about

---

[5] The court also noted that there was no need "to decide which type of forum makes the best fit with the display surfaces in and on Citilink's buses; for its refusal to allow Health Link's ad to be displayed is an unjustifiable, because arbitrary and discriminatory, restriction of free speech." *Id.* at 951.

"'respect[ing] the lawful boundaries it has itself set' . . . applies as much to Defendants' Facebook page as to any other limited public forum," *id*. at 7 (quoting *Rosenberger*, 515 U.S. at 829), the court held that "unless Plaintiff's comments pertained to other than 'matters of public interest in Loudoun County' or violated an enumerated rule, [he] was entitled to post them on the County's Facebook page." *Id*.

Likewise, in *Vaguely Qualified Productions LLC v Metropolitan Transportation Authority*, No. 15 Civ. 04952, 2015 WL 5916699 (S.D.N.Y. Oct. 7, 2015), *appeal dismissed*, No. 15-3695 (2d Cir. Feb. 18, 2016), the New York MTA adopted a rule prohibiting advertisements that are "political in nature," defined to include "any message that expresses a viewpoint about a disputed economic, political, moral, religious or social issue, or some matter related to such issues." *Id*. at *3. When plaintiff Vaguely Qualified Productions sought to run a series of advertisements for a humorous documentary film called *The Muslims Are Coming!*, the MTA rejected the ads as political. Judge McMahon held that the advertiser's desire "to capitalize on controversy" did not make the advertisements political in nature, *id*. at *10, and enjoined their rejection.

This case is the same. Plaintiff's advertisements for Mr. Yiannopoulos' book are innocuous on their face, and violate none of the Guidelines. The objections that resulted in their removal were apparently based on third parties' reactions to Mr. Yiannopoulos' image and identity. WMATA was not constitutionally entitled to act based on the reactions of such third parties. It was required to "respect the lawful boundaries it has itself set." WMATA properly recognized when it first accepted the advertisements, and when it first received complaints, that its Guidelines provided no ground for rejecting Plaintiff's speech—a judgment confirmed by

WMATA's inability to explain what about the advertisements violated the Guidelines. Macris Decl. ¶ 10.[6]

### B. WMATA's removal of Plaintiff's advertisements was viewpoint-discriminatory

Even in a limited or nonpublic forum, "'viewpoint discrimination' is forbidden." *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (Alito, J.). "[I]t is well-settled law that . . . viewpoint discrimination is prohibited in any forum." *Morgan v. Swanson*, 659 F.3d 359, 413 (5th Cir. 2011). WMATA's rejection of Plaintiff Milo Worldwide's advertisements for *Dangerous* violated this bedrock standard.

The timeline of WMATA's actions makes clear what went on here. Innocuous advertisements for a book were accepted and displayed. Then some riders complained about the viewpoints of the book's author on current political and social issues, or perhaps about the presumed viewpoint expressed in his book. For example, one complainant quoted in the media said, "WMATA does not have to advertise hate speech." A complaint tweeted at WMATA and reproduced in the Washington Post, said, "Hey @wmata why are there milo yionwlopsooe posters all over the metro? He is a literal nazi." Macris Decl. ¶ 7.[7]

---

[6] WMATA's actions also violated the fundamental principle that government agencies must follow their own rules, often called the *Accardi* doctrine after *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954). Whether applicable to WMATA as a matter of federal law, *see Elcon Enterprises v. WMATA,* 977 F.2d 1472, 1479–80 (D.C. Cir. 1992), or as a matter of District of Columbia law, *see Dankman v. D.C. Board of Elections and Ethics*, 443 A.2d 507, 513 (1981), the principle provides a complimentary ground for enjoining WMATA's action in this case.

[7] Of course even actual Nazis have First Amendment rights. *See National Socialist Party of America v. Village of Skokie*, 432 U.S. 43 (1977) (per curiam); *Colin v. Smith*, 578 F.2d 1197 (7th Cir.), *cert. denied*, 439 U.S. 916 (1978).

Initially, WMATA responded appropriately, explaining that "[t]he display of this ad is consistent with Metro's policy of remaining content-neutral when accepting advertising. Although Metro understands that feelings and perceptions will vary among individuals within the community, we cannot reject advertising because some find it inappropriate or offensive." *Id.* ¶ 8.

But after a few more days of complaints, WMATA caved. Shrugging off its constitutional responsibilities, it took down the advertisements on the pretense that they now violated the Guidelines with which they had previously complied. When asked to explain how the advertisements violated the Guidelines, WMATA declined to respond. *Id.* ¶¶ 9-10.

"If the Supreme Court's First Amendment jurisprudence makes anything clear, it is that speech may not be disfavored by the government simply because it offends." *Davison*, 2017 WL 3158389, at *11 (citing *Matal*, 137 S. Ct. at 1763). In Justice Alito's epigram, "Giving offense is a viewpoint." *Matal*, 137 S. Ct. at 1763. And "the fact that [Metro riders] may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *FCC v. Pacifica Foundation*, 438 U.S. 726, 745 (1978).

That the viewpoint deemed offensive by WMATA was that of Mr. Yiannopoulos, rather than anything on the face of the advertisements, does not change the analysis. If anything, prohibiting a person's present expression based on what he or she has said in the past is a greater violation. *See Near v. Minnesota*, 283 US 697, 712-13 (1931) (prohibiting a publisher from circulating future issues of his newspaper because prior issues were "malicious, scandalous and defamatory" is "the essence of censorship").

Prohibiting Mr. Yiannopoulos' expression based on perceptions about him as a person is equally impermissible. As the Supreme Court has recognized, "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 340 (2010). For that reason, "[t]he First Amendment protects speech and speaker, and the ideas that flow from each." *Id*. at 341. *Cf. Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*, 502 U.S. 105 (1991) (striking down statute burdening publication by accused or convicted criminals).

WMATA's viewpoint-discriminatory ground for removing Plaintiff Milo Worldwide's advertisements requires that its action be enjoined.

### C.  WMATA's exercise of unfettered discretion was unreasonable and viewpoint-based

*Rosenberger*'s third prohibition on government regulation of speech in limited or nonpublic forums is that the state "may not exclude speech where its distinction is not reasonable in light of the purpose served by the forum." 515 U.S. at 829. One of the classic examples of an unreasonable exclusion of speech is an exclusion imposed in the exercise of an official's unbridled or unfettered discretion: "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license" must contain "narrow, objective, and definite standards to guide the licensing authority." *Shuttlesworth v. Birmingham,* 394 U.S. 147, 150–51 (1969). Otherwise, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great." *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553 (1975).

In the seminal public transit advertising case, the Supreme Court noted that "the policies and practices governing access to the transit system's advertising space must not be arbitrary, capricious, or invidious." *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974). Subsequently, the Court confirmed that the "arbitrary, capricious, or invidious" standard

captured the meaning of "unreasonable" in a limited or nonpublic forum. *See United States v. Kokinda*, 497 U.S. 720, 725–26 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business, but its action is valid in these circumstances unless it is unreasonable, or, as was said in *Lehman,* 'arbitrary, capricious, or invidious.'"). The Ninth Circuit has applied the same standard of unreasonableness in a public transit advertising case. *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 979 (9th Cir. 1998) (per Justice White, sitting by designation).

Equally important, one of the main reasons a regulation of speech that gives unfettered discretion to administrators runs afoul of the First Amendment is that "'[w]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he [or she] will favor or disfavor speech based on its content.'" *A.N.S.W.E.R. Coalition v. Jewell*, 153 F. Supp. 3d 395, 408 (D.D.C. 2016), *aff'd*, 845 F.3d 1199 (D.C. Cir. 2017) (quoting *Thomas v. Chicago Park District*, 534 U.S. 316, 323 (2002)).

WMATA's application of the unfettered discretion afforded by its Guidelines here resulted in a speech restriction that was both unreasonable and viewpoint-based.  The two Guidelines WMATA has cited to justify its removal of Plaintiff's advertisements are No. 9, prohibiting "Advertisements intended to influence members of the public regarding an issue on which there are varying opinions," and No.14, prohibiting "Advertisements that are intended to influence public policy." Neither provides an objective or definite standard, as demonstrated by WMATA's acceptance and subsequent rejection of Plaintiff's advertisements even though their content had not changed.

In *Vaguely Qualified Productions v. MTA*, the court relied on the fact that the New York MTA had accepted a variety of other advertisements that were at least as political as the rejected

advertisement to conclude that the MTA's rejection of plaintiff's advertisement was "not reasonable." *See* 2015 WL 5916699 at *11-12. For example, the MTA had accepted advertisements for CNN's coverage of a presidential debate featuring quotations from candidates, *id*. at *11, and advertisements for a television show with headlines such as "CORPORATIONS OWN YOUR MINDS." *Id*.

So too here. In recent months, WMATA has accepted and displayed advertisements for a gambling casino, for alcoholic beverages, for a "hookup" website marketed to gay men, and for a movie showing women ogling a male stripper. *See* Complaint Exhibits E, F, K, and O. WMATA's apparent decision that these advertisements do not involve "issue[s] on which there are varying opinions," while Plaintiff's advertisement for a book does, was arbitrary, capricious, or invidious, and shows the unreasonableness of Guideline No. 9 as applied to Plaintiff's advertisement. Likewise, WMATA has accepted and displayed advertisements by military contractors touting the virtues of their products, and an advertisement showing a crowd of demonstrators holding signs with "Black Lives Matter," "Stand for Justice," and similar slogans. *See* Complaint Exhibits D and C.  WMATA's apparent decision that these advertisements are not "intended to influence public policy," while Plaintiff's advertisement for a book is, was arbitrary, capricious, or invidious, and shows the unreasonableness of Guideline No. 14 as applied to Plaintiff's advertisement. Like the rejection of the movie advertisements in the New York MTA case, WMATA's rejection of Plaintiff's book advertisements here was "not reasonable," and was therefore unconstitutional even in a limited or nonpublic forum.

For similar reasons, the application of the Guidelines to reject Plaintiff's advertisements was also viewpoint-discriminatory. The examples of accepted advertisements given just above demonstrate that in applying the unfettered discretion afforded under its vague Guidelines,

WMATA accepted some viewpoints while rejecting others. In particular, on the question of what consumable media riders should purchase or patronize, WMATA's rejection of Plaintiff's advertisements for a book, when it has accepted advertisements for other consumable media expressing various other points of view, *see* Complaint ¶ 62 and Exhibits N and O, indicates that WMATA's unfettered discretion resulted in viewpoint discrimination against Milo Worldwide. *See Vaguely Qualified Productions,* 2015 WL 5916699 at *11 (refusing to approve plaintiff's advertisement on the ground that it was political "cannot be deemed viewpoint neutral when the MTA has approved other advertisements addressing issues of cultural import that are similarly, or far more, 'political.'"). Other examples from the Complaint underscore how readily the Guidelines invite viewpoint discrimination. For example, Plaintiff PETA's advertisement showing a pig saying "I'm ME, not MEAT" was rejected, while a restaurant's advertisement showing a delicious (to carnivores) pork dish and captioned "PORKADISE FOUND" was accepted. *See* Complaint ¶¶ 69-71, 76 and exhibits P and T.[8]

*   *   *

For each of the reasons given above, Plaintiff Milo Worldwide has demonstrated a clear likelihood of success on the merits.

## II. Plaintiff Milo Worldwide is Suffering and Will Continue to Suffer Irreparable Harm in the Absence of Relief

If the Court finds that Plaintiff Milo Worldwide has shown a likelihood that its constitutional rights are being violated, it follows that Plaintiff is suffering irreparable harm. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of

---

[8] In *American Freedom Defense Initiative v. WMATA,* No. 15-cv-1038, 2017 WL 1167197 (D.D.C. 2017), *appeal pending,* No. 17-7059 (D.C. Cir. filed April 7, 2017), this Court held that WMATA's advertising Guidelines are not unconstitutional on their face. As noted earlier, the instant motion presents only an as-applied challenge to Guidelines 9 and 14.

time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d

1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976)); *accord*

*American Freedom Defense Initiative v. WMATA,* 898 F. Supp. 2d 73, 84 (D.D.C. 2012)

("Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the

irreparable nature of the harm may be presumed.") (quoting *Bronx Household of Faith v. Board*

*of Education of City of New York*, 331 F.3d 342, 349-50 (2d Cir. 2003)); *Student Press Law*

*Center v. Alexander*, 778 F. Supp. 1227, 1234 (D.D.C. 1991) ("The Court presumes that

irreparable harm will flow to plaintiffs from a continuing constitutional violation.").

Although lost profits from book sales may be recoverable in damages, lost profits are far

from the only injury that Plaintiff is suffering. Its publication and sale of *Dangerous* is an effort

to reach people with a message and to persuade them that the message has validity. Every lost

sale therefore represents a lost opportunity to communicate, and perhaps to persuade. The book

is a piece of advocacy on contemporary political and social issues, and thus lies near the core of

the First Amendment, which "'was fashioned to assure unfettered interchange of ideas for the

bringing about of political and social changes desired by the people.'" *New York Times Co. v.*

*Sullivan*, 376 U.S. 254, 269 (1964) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

This remains true even if the speech is "not always with perfect good taste." *Id.* (quoting *Bridges*

*v. California*, 314 U.S. 252, 270 (1941)).

Even aside from the non-monetary consequences of lost book sales, the advertisements

themselves convey a First-Amendment-protected communication of what Mr. Yiannopoulos

looks like and the fact that he has published a book. That some Metro riders were moved to

complain about the mere fact that the advertisements were posted proves the point that they were

communicating cogent content.

*Dangerous*, which was first released on July 4, 2017, is still very much on the market. As noted above, it has been and remains on the New York Times, Wall Street Journal, and Publisher's Weekly hardcover non-fiction best-seller lists. Milo Worldwide had 18 days remaining in the WMATA advertising campaign it paid for, and every day its advertisements remain censored it will continue to suffer the irreparable harms described above.

### III. The Balance of Equities and the Public Interest Favor Entering Relief

If the Court finds that Plaintiff has shown a likelihood that its First or Fifth Amendment rights are being violated, it likewise follows that the balance of equities and the public interest weigh in Plaintiff's favor.

As this Court has noted, "[t]he Government cannot suffer harm from an injunction that merely ends an unlawful practice." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (internal quotation marks omitted). Nor will WMATA suffer financial harm or opportunity costs, as Milo Worldwide has paid WMATA its usual commercial advertising rates.[9]

Requiring WMATA to re-post Plaintiff's advertisements may, of course, lead to renewed complaints from some Metro riders. But some people's unhappiness about the government's failure to censor other people's speech is not a harm about which the government can legitimately complain: "Many are those who must endure speech they do not like, but that is a necessary cost of freedom." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 575 (2011). In its most recent First Amendment decision, the Supreme Court reiterated that "[s]peech may not be banned on the ground that it expresses ideas that offend," *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017), and that "the proudest boast of our free speech jurisprudence is that we protect the

---

[9] Indeed, to the extent Plaintiff's advertisements may replace the many unpaid pubic service advertisements visible in Metro stations and trains, an injunction will help fill WMATA's depleted coffers.

freedom to express 'the thought that we hate.'" *Id*. at 1764 (plurality opinion) (quoting *United States v. Schwimmer,* 279 U.S. 644, 655 (1929) (Holmes, J., dissenting)).

For reasons like these, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (quoting *Abdah v. Bush*, No. 04-cv-1254, 2005 WL 711814 at *6 (D.D.C. Mar. 29, 2005)); *accord Lamprecht v. F.C.C.*, 958 F.2d 382, 390 (D.C. Cir. 1992) ("a [government] policy that is unconstitutional would inherently conflict with the public interest"); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("injunctions protecting First Amendment freedoms are always in the public interest"). At a minimum, "[t]he public interest in this case will be served by ensuring that plaintiffs' First Amendment rights are not infringed before the constitutionality of the [Guidelines] has been definitively determined." *Stewart v. District of Columbia Armory Board*, 789 F. Supp. 402, 406 (D.D.C. 1992).

## CONCLUSION

For the reasons given above, Plaintiff Milo Worldwide's motion for a preliminary injunction, ordering WMATA to re-display Plaintiff's advertisements for the remaining 18 days of the contracted 28-day advertising campaign, should be granted.[10]

---

[10] Because the entry of an injunction will not harm WMATA financially (and may help, *see* n.7, above), the security required by Fed. R. Civ. P. 65(c) should be set at zero or at a nominal amount, such as $10. *See, e.g., Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) ("The district court retains discretion as to the amount of security required, *if any.*") (internal quotation marks omitted) (emphasis in original); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) ("the district court did not abuse its discretion in dispensing with the bond").

Proposed orders are filed herewith.

August 9, 2017

Respectfully submitted,

/s/ *Arthur B. Spitzer*

_____
Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
  of the District of Columbia
4301 Connecticut Avenue, N.W. Suite 434
Washington, DC 20008
(202) 457-0800
aspitzer@acludc.org

Lee Rowland
Brian Hauss
American Civil Liberties Union Foundation
125 Broad Street, 18th floor
New York, NY 10004
(212) 549-2500
lrowland@aclu.org

Leslie Mehta
American Civil Liberties Union Foundation
  of Virginia
701 East Franklin Street, Suite 1412
Richmond, VA 23219
(804) 644-8022
lmehta@acluva.org

*Attorneys for Plaintiff MILO Worldwide LLC*

Jeffrey P. Weingart
Stephen B. Meister
Meister Seelig & Fein LLP
125 Park Avenue – 7th Floor
New York, New York 10017
(212) 655-3500

*Of Counsel to Plaintiff MILO Worldwide LLC*