**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **AMERICAN CIVIL LIBERTIES UNION FOUNDATION,** | § § § | |
| **FEMHEALTH USC, INC., d/b/a CARAFEM,** | § § § | |
| **MILO WORLDWIDE LLC,** | § § | |
| **PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.** | § § § | |
| **Plaintiffs,** | § § | |
| | § | **CIVIL ACTION NO. 1:17-cv-01598-TSC** |
| **v.** | § § | |
| **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al.,** | § § § | |
| **Defendants.** | § | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF MILO WORLDWIDE LLC'S
MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT..................................................................................................1

FACTUAL BACKGROUND ..................................................................................................3

      A.    WMATA's Decision To Close Its Advertising Space...................................3

      B.    Since Amending The Guidelines in 2015, WMATA Has Regularly
          Rejected Issue-Oriented Ads........................................................................5

      C.    Plaintiff's Ads Were Improperly Accepted By OUTFRONT
          Without WMATA Approval; Upon Its Review, WMATA Rejected
          Them Because They Violate Its Guidelines. ................................................6

ARGUMENT ............................................................................................................................8

    I.    THE HIGH STANDARDS FOR A MANDATORY PRELIMINARY
        INJUNCTION...........................................................................................................8

    II.    PLAINTIFF CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON
        THE MERITS. ..........................................................................................................9

      A.    WMATA Followed Its Guidelines When It Rejected The
          Dangerous Ads. ..........................................................................................10

      B.    WMATA Did Not Engage In Viewpoint Discrimination. ...........................14

      C.    WMATA's Policy Is Not Unconstitutionally Vague...................................16

    III.    PLAINTIFF HAS NOT SHOWN IT WILL SUFFER ANY
        IRREPARABLE HARM IF AN INJUNCTION DOES NOT ISSUE. .................21

    IV.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST
        WEIGH AGAINST INJUNCTIVE RELIEF. ......................................................23

CONCLUSION........................................................................................................................24

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Am. Commc'ns Ass'n v. Douds*,
  339 U.S. 382 (1950) ............................................................................................ 17

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Regional Transp.*,
  698 F.3d 885 (6th Cir. 2012) ................................................................. 10, 18, 21

*Am. Freedom Def. Initiative v. WMATA*,
  No. 1:15-cv-01038-GK, 2017 WL 1167197 (D.D.C. Mar. 28, 2017) ................. 9, 18

*Bryant v. Gates*,
  532 F.3d 888 (D.C. Cir. 2008) .......................................................................... 16, 17

*Cate v. Oldham*,
  707 F.2d 1176 (11th Cir. 1983) ............................................................................ 22

*Chaplaincy of Full Gospel Churches v. England*,
  454 F. 3d 290 (D.C. Cir. 2006) ............................................................................. 22

*Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*,
  561 U.S. 661 (2010) ............................................................................................. 10

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*,
  15 F. Supp. 2d 1 (D.D.C. 1997) ............................................................................. 9

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
  473 U.S. 788 (1985) ............................................................................................... 9

*Davison v. Loudoun County Bd. of Supervisors*,
  No. 16-CV-932, 2016 WL 4801617 (E.D. Va. Sept. 14, 2016) ............................. 14

*Dorfmann v. Boozer*,
  414 F.2d 1168 (D.C. Cir. 1969) .............................................................................. 8

*Ebel v. City of Corona*,
  698 F.2d 390 (9th Cir. 1983) ................................................................................. 22

*FCC v. Pacifica Foundation*,
  438 U.S. 726 (1978) ............................................................................................. 15

*Freeman United Coal Mining Co. v. Federal Mine Safety & Health Review Commission*,
  08 F.3d 358 (D.C. Cir. 1997) ............................................................................... 16

*Goldie's Bookstore v. Superior Ct.*,
739 F.2d 466 (9th Cir. 1984 .............................................................. 22

*Hohe v. Casey*,
868 F.2d 69 (3d Cir 1989)................................................................. 22

*In re Navy Chaplaincy*,
516 F. Supp. 2d 119 (D.D.C. 2007) ...................................................... 9

*Lehman v. City of Shaker Heights*,
418 U.S. 298 (1974)....................................................................... 18

*Matal v. Tam*, 1
37 S. Ct. 1744 (2017)..................................................................... 15

*Navistar, Inc. v. EPA*,
No. 11cv449, 2011 WL 3743732 (D.D.C. Aug. 25, 2011) ................................. 8, 21

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983)......................................................................... 9

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992)........................................................................ 9

*Ridley v. Mass. Bay Transp. Auth.*,
390 F.3d 65 (1st Cir. 2004) ............................................................... 21

*Rushia v. Town of Ashburnham*,
701 F.2d 7 (1st Cir. 1983) ................................................................ 22

*Shuttlesworth v. Birmingham*,
394 U.S. 1407 (1969)...................................................................... 16

*Southeastern Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975)....................................................................... 16

*Tracy Rifle & Pistol LLC v. Harris*,
118 F. Supp. 3d 1182 (E.D. Cal. 2015) ............................................... 22, 23

*Tracy Rifle & Pistol LLC v. Harris*,
637 F. App'x 401 (9th Cir. 2016)......................................................... 23

*United States Telecom Ass'n v. FCC*,
825 F.3d 674 (D.C. Cir. 2016) ........................................................... 16

*Vaguely Qualified Productions LLC v Metropolitan Transportation Authority*,
No. 15 Civ. 04952, 2015 WL 5916699 (S.D.N.Y. Oct. 7, 2015) ............................ 13

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008).................................................................................................................. 8

*Women's Health Link, Inc. v. Fort Wayne Public Transportation Corp.*,
  826 F.3d 947 (7th Cir. 2016)........................................................................................... 12, 13

## OTHER AUTHORITIES

Department of Defense Instruction 5120.4 § 4.11 (1997) ........................................................ 17

## PRELIMINARY STATEMENT

Since 2015, Washington Metropolitan Area Transit Authority's ("WMATA") advertising space has been a nonpublic forum closed to issue-oriented advertising.  Per the WMATA Board of Directors' ("Board") resolution issued at that time, WMATA prohibits "issue-oriented ads, including political, religious and advocacy ads."  Declaration of Lynn Bowersox ("Bowersox Decl."), ¶ 7, Exh. A.  WMATA's amended Guidelines Governing Commercial Advertising ("Guidelines") prohibit, *inter alia*, "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions" and "[a]dvertisements that are intended to influence public policy. . . ."  *Id.*, ¶¶ 15-16, Exh. B.  Plaintiff MILO Worldwide, LLC's ("Plaintiff") ads violate both these prohibitions.

Describing its book *Dangerous*, which is the subject of the ads, Plaintiff makes three admissions that compel denial of the preliminary injunction it seeks:

- "The book is a piece of advocacy on contemporary political and social issues." Memorandum in Support of Plaintiff's Motion for Preliminary Injunction ("PI") at 18.

- "[P]ublication and sale of *Dangerous* is an effort to reach people with a message and to persuade them that the message has validity." *Id.*

- "Every lost sale therefore represents a lost opportunity to communicate, and perhaps to persuade." *Id.*

Plaintiff thus admits that the book it sought to advertise in WMATA's transit system is a piece of advocacy that seeks to influence public opinion on political and social issues.  On top of that, the book's author, Milo Yiannopoulos, who is also featured in the ads, is a well-known political provocateur; Yiannopoulos has crafted a political identity completely intertwined with his advocacy.  Because the purpose of the ads is to promote the book and its author, the ads are inseparable from the book's and author's political advocacy.  The ads, therefore, violate WMATA's Guidelines prohibiting issue-oriented ads.

Ignoring its own admissions, Plaintiff makes three arguments trying to establish a likelihood of success on the merits. None pass muster.

First, Plaintiff argues that WMATA failed to follow its own Guidelines when rejecting the ads because allegedly the ads convey no political message. But Plaintiff contradicts that argument by admitting that the book featured in the ads "is a piece of advocacy on contemporary political and social issues." PI at 18. Plaintiff's attempt to separate the ads from the book and author they promote is as untenable as asserting that an ad promoting *Conscience of a Conservative* by Barry Goldwater or Chairman Mao's *Little Red Book* is not completely intertwined with the author's political advocacy.

Second, Plaintiff maintains that WMATA engaged in viewpoint discrimination by removing the advertisement after WMATA riders and others complained. This reflects a flawed understanding of the facts. WMATA learned of the ads only when viewers complained because its advertising contractor accepted the ads without submitting them to WMATA for review. As soon as WMATA learned of the ads, it conducted the review that it would ordinarily have performed before acceptance of the ads. The review panel concluded that the ads violated the Guidelines, so they were then rejected and removed. That is not viewpoint discrimination; WMATA just followed its own Guidelines.

Third, WMATA's policy is not unconstitutionally vague. The Guidelines fairly describe the ads that are prohibited. Although Plaintiff attempts to equate its rejected ads with a handful of select ads that had been accepted, it wildly overreaches. An ad selling beer or a burger is not the same as Plaintiff's advocacy ads. PI at 18.

For these reasons, Plaintiff has failed to establish a likelihood of success on the merits – an outcome fatal to its request for a preliminary injunction.

In addition, Plaintiff has not shown it will suffer irreparable harm without an injunction. Plaintiff's own evidence proves that the book is selling well and on numerous best-seller lists. Moreover, Plaintiff has ample other means to advertise *Dangerous* and its author in the Washington, D.C. area.  It has failed to show that these alternatives are inadequate.

The balance of the equities and public interest also weigh against a preliminary injunction.  The minimal harm to Plaintiff, if any, is outweighed by the community and employee opposition to issue-oriented ads, the security risks the ads pose, the likelihood the ads will trigger vandalism, and the administrative burdens they impose on WMATA.

Accordingly, the preliminary injunction should be denied.

## FACTUAL BACKGROUND

### A.   WMATA's Decision To Close Its Advertising Space.

WMATA operates one of the nation's largest transit systems, serving customers in Maryland, Virginia, and the District of Columbia.   Complaint ¶¶ 1, 12.  To help fund its operations, WMATA provides advertising space for commercial ads.  Bowersox Decl., ¶ 3. Commercial advertisers can purchase advertising space in WMATA's transit system.  *Id.*

In the 1970s, WMATA's Board of Directors established a policy governing ads in WMATA's advertising space.  *Id.*, ¶ 4.  As part of that policy, WMATA's advertising space was considered a designated public forum.  *Id.*

In 2010, WMATA began to reconsider its policy.  *Id.*, ¶ 5.  Almost every month, WMATA was faced with complaints from employees, riders, elected officials, and community and business leaders about ads in WMATA's advertising space.  *Id.*  Ads engendering complaints covered a wide variety of public policy subjects and reflected different viewpoints, including ads from PETA showing animal cruelty; ads related to marijuana legalization; ads regarding sexual

3

orientation; an ad by the Airline Association related to rules and regulations governing
international aviation; and ads expressing opinions on government health care policies. *Id.*, ¶ 6.

WMATA ultimately concluded that the economic benefits of such issue-oriented ads
were outweighed by four considerations: community and employee opposition, security risks,
vandalism, and administrative burdens. *Id.*, ¶ 9. First, issue-oriented ads led to community
opposition and complaints, adverse publicity for WMATA, and claims from some community
leaders that WMATA was perpetuating discrimination by carrying certain messages from certain
advertisers. *Id.*, ¶ 10. WMATA also received complaints from employees, who were exposed to
issue-oriented ads over extended periods. *Id.*

Second, issue-oriented ads sparked concerns about security. Both the Metro Transit
Police Department and the U.S. Department of Homeland Security feared that certain ads, due to
external world events, would incite individuals to perpetrate violence on the system and to harm
WMATA employees and customers. *Id.*, ¶ 11. For example, a proposed ad featuring a cartoon
depiction of the Prophet Mohammad raised concerns in light of violent reactions to such
depictions in the past. *Id.*; *see also* Declaration of Jessica M. Weisel ("Weisel Decl."), Exhs. G,
H.

Third, the ads led to vandalism. Bowersox Decl., ¶ 12. Sometimes, the vandals wrote
messages contrary to the messages being advocated in the ads. *Id.*

Fourth, issue-oriented ads created an administrative burden. *Id.*, ¶ 13. WMATA was
spending substantial time reviewing proposed ads and responding to the problems noted above.
*Id.*

As a result, on May 28, 2015, the Board unanimously adopted a motion ("Motion") that
changed WMATA's advertising space to a nonpublic forum. *Id.*, ¶ 7, Exh. A. The Motion closed

"WMATA's advertising space to any and all issue-oriented advertising, included but not limited to, political, religious, and advocacy advertising until the end of the calendar year." *Id.* Also, the Motion stated that the Board would "review what role such issue-oriented advertising has in WMATA's mission to deliver, safe, equitable and reliable transportation services to the Nation's Capital, and will seek public comment and participation for its consideration before making a final policy determination." *Id.*

Before making a final determination, WMATA staff conducted a survey of the public's views on issue-oriented ads. *Id.*, ¶ 14. The results included findings that: (1) 98% of the public was familiar with the types of ads found on buses, in trains, and in stations; (2) 58% opposed issue-oriented ads while 41% supported such ads; and (3) 46% were extremely opposed to issue-oriented ads while 20% were extremely supportive of such ads. *Id.*

In November 2015, WMATA's Board made a final decision to close the advertising space to ads that "are issue-oriented, including political, religious, and/or advocacy in nature. . . ." *Id.*, ¶ 15, Exh. B. Among the Guidelines that the WMATA Board adopted were:

> 9.      Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited.
>
> …
>
> 14.     Advertisements that are intended to influence public policy are prohibited.

*Id.*, ¶ 16, Exh. B. The Board's decision applied equally to all parties seeking to run issue-oriented advertising, *i.e.*, it was viewpoint neutral. *Id.*, ¶¶ 17-19, Exhs. C-E.

**B.    Since Amending The Guidelines in 2015, WMATA Has Regularly Rejected Issue-Oriented Ads.**

Since promulgating the new policy, WMATA has regularly rejected ads that contain issue-related advocacy – political, religious, or otherwise. Bowersox Decl., ¶ 17, Exh. C. Rejected ads cover subjects that include: (1) anti-poaching and wildlife trafficking (from

5

WildAid and the U.S. Fish and Wildlife Service); (2) pro-Israel and pro-Egypt (from Birthright

Israel and the Egyptian Embassy, respectively); (3) pro-science (from the American Association

for the Advancement of Science); (4) refugee support (from Doctors Without Borders); (5)

celebrating the failure of the June 2015 Turkish coup attempt (from Musiad USA, a Turkish

American association); and (6) anti-prostitution (from End Demand Illinois). *Id*.

      Consistent with WMATA's viewpoint-neutral policy, it also has rejected pro- and anti-

LGBTQ ads. *Id*., ¶ 18, Exh. D (Human Rights Campaign ad stating "Show Your Pride," and

Parents and Friends of Ex-Gays and Gays ad stating "Ex-Gays prove change *is* possible")

(emphasis in original)). Although WMATA has accepted commercial ads from squirt.org

(Complaint, Exh. K), a gay dating site, it rejected a proposed advocacy ad for that site stating:

"Dear Mr. President[,] Let's Make America Gay Again[.]" *Id*., ¶ 19, Exh. E.

      **C.**    **Plaintiff's Ads Were Improperly Accepted By OUTFRONT Without WMATA Approval; Upon Its Review, WMATA Rejected Them Because They Violate Its Guidelines.**

      Plaintiff's characterization of the facts surrounding WMATA's rejection of its ads for

*Dangerous* rests on unfounded assumptions. WMATA did not reject the ads because they were

unpopular.

      To contain costs, WMATA contracts with an outside contractor, OUTFRONT Media, Inc.

("OUTFRONT"), to handle the day-to-day logistics of its commercial advertising transactions.

Proposed ads are submitted by prospective advertisers directly to OUTFRONT, which contracts

directly with the advertisers. Bowersox Decl., ¶ 20. OUTFRONT is paid for each ad that runs in

WMATA advertising space. *Id.* OUTFRONT is authorized to run ads that it deems are clearly in

compliance with the Guidelines and to reject ads that it deems clearly in violation of the

Guidelines without submitting the ads to WMATA for review. *Id.,* ¶ 21. Before accepting or

rejecting ads that may raise concerns under the Guidelines, however, OUTFRONT is supposed to submit them to WMATA. *Id.* Such ads are then reviewed by a panel of three attorneys and WMATA's Director of Marketing, who makes a final determination on whether the ads comply with the Guidelines. *Id.*

OUTFRONT did not submit Plaintiff's ads for *Dangerous* to WMATA for review before running them. *Id.*, ¶ 22. On or about July 5, 2017, WMATA's Office of Customer Service, which monitors customer information requests and WMATA's reputation on social media, informed its Assistant General Manager for Customer Service, Communications, and Marketing, Lynn Bowersox, that ads were running in the transit system for *Dangerous. Id.*, ¶ 23. That was the first time WMATA became aware of the *Dangerous* ads. *Id.*

In response, Ms. Bowersox read an excerpt of the book online and concluded that it appeared to be issue-oriented. *Id.*, ¶ 24. She immediately submitted the ads to WMATA's review panel, which determined that the ads violated WMATA's Commercial Advertising Guidelines 9 and 14. *Id.*, ¶ 25.

WMATA then directed OUTFRONT to inform the advertiser of its decision to reject the ads. *Id.*, ¶ 26. WMATA also directed OUTFRONT to remove the ads and to refund to Plaintiff all monies it paid for the advertising. *Id.* Between July 6 and July 8, 2017, all of the *Dangerous* ads were removed from WMATA's advertising space. *Id.*, ¶ 27.

When WMATA's customer service representatives respond to advertising complaints, they use a form response. *Id.*, ¶ 28. In response to one of the complaints about *Dangerous*, a customer service representative erroneously used an outdated form that had been drafted and used when WMATA's advertising space was still a designated public forum. *Id.* That error was

corrected and all other complaints received the appropriate and current form response, which

states:

> Dear Customer Name:
>
> Thank you for your recent correspondence regarding "xxxx" advertisement on the Metro System. WMATA reviewed the advertisement and determined that it is prohibited by the Commercial Advertising Guidelines which may be found on our website at:
> https://www.wmata.com/about/records/public_docs/upload/Advertising_Guidelin es.pdf
>
> Thanks again for your inquiry.

*Id.*, ¶ 29.

## ARGUMENT

## I.  THE HIGH STANDARDS FOR A MANDATORY PRELIMINARY INJUNCTION.

The standards for a preliminary injunction are well-settled.  The moving party "must

establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable

harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and

[4] that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555

U.S. 7, 20 (2008).  "It is particularly important for the movant to demonstrate a substantial

likelihood of success on the merits" because, "absent a substantial indication of likely success on

the merits, there would be no justification for the court's intrusion into the ordinary processes of

administration and judicial review."  *Navistar, Inc. v. EPA*, No. 11cv449, 2011 WL 3743732, at

*3 (D.D.C. Aug. 25, 2011) (citation omitted).

Courts also caution that a preliminary injunction is "an extraordinary remedy that may

only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter*, 555

U.S. at 22, and "[t]he power to issue a preliminary injunction, especially a mandatory one,

should be sparingly exercised," *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969)

(internal quotation marks omitted).  "[W]here an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act—the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction."  *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (internal quotation marks and citations omitted), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998); *see also In re Navy Chaplaincy*, 516 F. Supp. 2d 119, 123 (D.D.C. 2007).

## II.    PLAINTIFF CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS.

Since 2015, WMATA's advertising space has been a nonpublic forum; indeed, Plaintiff acknowledges that this Court recently so held.  PI at 8 (citing *Am. Freedom Def. Initiative v. WMATA* ("*AFDI v. WMATA*"), No. 1:15-cv-01038-GK, 2017 WL 1167197, at *3 (D.D.C. Mar. 28, 2017), appeal pending, No. 17-7059 (D.C. Cir. filed April 7, 2017)).  As such, the First Amendment does not guarantee unlimited expression in that forum.  Instead, the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).  Access to a nonpublic forum can be restricted as long as the restrictions are viewpoint neutral and reasonable.  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985).[1]  Plaintiff does not dispute WMATA's right to restrict its advertising space.

---

[1]  Plaintiff refers to the advertising space as a "limited public forum," but whether that term or "nonpublic forum" is used, the same First Amendment test applies.  *Compare R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 n.6 (1992) (noting that in "nonpublic forums," the government can engage in "reasonable and viewpoint neutral content-based discrimination"), *with Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v.*

Rather, it contends – wrongly – that WMATA has not followed the Guidelines, acted in a manner that was not viewpoint neutral in removing the *Dangerous* ads, and enacted Guidelines that are impermissibly vague. None of these arguments has merit.

### A. WMATA Followed Its Guidelines When It Rejected The *Dangerous* Ads.

Plaintiff first argues that WMATA failed to follow its own Guidelines in rejecting the *Dangerous* ads, but WMATA has regularly applied the prohibition on issue-oriented ads (including here) since it closed its advertising space in 2015. Plaintiff's argument and authority provide no basis to find otherwise.

Plaintiff's sole argument is that the *Dangerous* ads were "innocuous on their face" and violate none of the Guidelines, so their removal was improper. PI at 11. That argument is flatly contradicted by Plaintiff's admission that *Dangerous* "is a piece of advocacy on contemporary political and social issues." PI at 18. Moreover, as the Sixth Circuit has held, "[t]o substantiate our understanding of the apparent message of the advertisement, we may look beyond the four corners" of the ad. *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Regional Transp.* ("*SMART*"), 698 F.3d 885, 894 (6th Cir. 2012). There, the court examined a website referenced in the ad that confirmed the anti-Islamic message of the ad. *Id.* Here, WMATA considered the book being displayed in the ads and confirmed that it seeks to influence public policy, as Plaintiff admits.

It also defies common sense to suggest, as Plaintiff does, that when considering whether an ad promoting a book violates the Guidelines, WMATA and this Court must turn a blind eye to the content of the book and the message it conveys. By Plaintiff's logic, in considering whether

---

*Martinez*, 561 U.S. 661, 679 n.11 (2010) (noting that in "limited public forums," the government "may impose restrictions on speech that are reasonable and viewpoint neutral").

to accept an ad for *Conscience of a Conservative* by Barry Goldwater or Chairman Mao's *Little Red Book*, WMATA would have to ignore the political messages for which the underlying books and authors are known.   Under Plaintiff's reading of the Guidelines, as long as the ad listed only the book title and author, WMATA would be forced to run the ad.   But an ad promoting a manifestly political book is itself political advocacy.

Moreover, even if this Court were to disregard the content of the book being promoted in the ads, and focused only on the other content of the ads themselves, they would still violate the Guidelines.   Those ads feature the likeness of the book's author, Milo Yiannopoulos, and refer to him, for example, as "The Most Hated Man on the Internet."   So the ads directly promote Yiannopoulos, whose image in inextricably intertwined with his notorious political advocacy.

Plaintiff admits as much, stating that Mr. Yiannopoulos "is a public figure who is known for his dissident opinions about contemporary issues" and has a "distinct media personality and brand [which] is to engage provocatively with various matters of public concern."   Complaint ¶ 49.   Plaintiff's own website describes him as "leading the battle for the soul of western civilization" and says that his name "commands the attention of millions of fans and millions of angry detractors."   Weisel Decl., Exh. I (adding that Mr. Yiannopoulos is "hated by everyone from feminists to islamists, but along the way has stood up for free speech — not to mention everyone that the PC police ignores and sidelines").

In a press release announcing Plaintiff's formation, Mr. Yiannopoulos stated:

"I will spend every waking moment of the rest of my life making the lives of journalists, professors, politicians, feminists, Black Lives Matter activists and other professional victims a living hell.

. . . .

"I've realized that I'm really, really important. There's a war being waged out there for free speech and I'm the only one who can win it for the forces of light.

"With this investment, I will lead the charge against censorious campus feminists, thuggish Antifa activists, elitist professors, lying journalists and the assorted enemies of free expression in media, academia and Hollywood.

. . . .

I will do more damage to the political left than anyone else in American culture.

Weisel Decl., Exh. J.  Indeed, Mr. Yiannopoulos is so well-known as a political provocateur that

his mere appearance at colleges and universities has sparked protests and violence.  Weisel Decl.,

Exhs. K-O.

Mr. Yiannopoulos has established that he and his political message are inseparable.  He

promotes himself as a political figure leading a culture war against the political left.  Thus, by

prominently featuring Mr. Yiannopoulos in the ads under phrases such as "THE MOST HATED

MAN ON THE INTERNET," "THE ULTIMATE TROLL," "THE KANYE WEST OF

JOURNALISM," and "INTERNET SUPERVILLAIN" (Complaint, Exh. L), the *Dangerous* ads

advocate the political message synonymous with his image.

Plaintiff also ignores the fact that the book's title, *Dangerous*, echoes the title –

"Dangerous Faggot" – of Mr. Yiannopoulos' recent tour of college campuses where he railed

against political correctness.  Weisel Decl., Exhs. J, M, Y**.**  That tour was marred by protests and

violence from those who supported and those who protested Mr. Yiannopoulos' message, and

received significant media attention.  *Id.*, Exhs. K-O.  The similarity in titles appears designed to

invoke the tour.  The same is true of the ad displaying the book's title, which is a reminder of the

political message and controversy that Mr. Yiannopoulos brought to college campuses.

The ads' promotion of *Dangerous* and Mr. Yiannopoulos is political advocacy that

renders this case fundamentally different from the cases cited by Plaintiff.  For instance, in

*Women's Health Link, Inc. v. Fort Wayne Public Transportation Corp.*, 826 F.3d 947 (7th Cir.

2016), the Seventh Circuit held that a transit agency impermissibly rejected as prohibited

advocacy of political, religious, or moral issues an ad merely advertising free health services to women.  Although the health services provider was pro-life and counseled women against abortion (among other health care services it provided), the ad itself said nothing about abortion.  *Id.* at 949-50.  Nor did the website to which women were directed.  *Id*. at 950 (stating that although website used the phrase "life affirming healthcare," that phrase was not defined and did not refer to abortion, which was not discussed anywhere else on the website).  Moreover, *Women's Health Link* did not involve an advertiser so closely associated with its pro-life views that the provider and its politics were indistinguishable in the mind of the public.  If the ad had been submitted by National Right to Life and featured its name prominently, however, the message offering free health services to women would have a very different meaning to the viewer.

*Vaguely Qualified Productions LLC v Metropolitan Transportation Authority*, No. 15 Civ. 04952, 2015 WL 5916699 (S.D.N.Y. Oct. 7, 2015), appeal dismissed, No. 15-3695 (2d Cir. Feb. 18, 2016), also fails to support Plaintiff.  That case involved a series of satirical ads to promote a movie called *The Muslims are Coming* that made humorous statements about Muslims that were intended to counter a series of ads that an anti-Muslim group had announced it would be purchasing.  *Id.* at *3-4.  The transit agency rejected the ads because it deemed them "political in nature," which it defined, *inter alia*, as "'prominently or predominately advocate[ing] or express[ing] a political message.'"  *Id.* at *5.  The district court found the rejection unconstitutional because the focus of the ads was humor and to promote the film, and merely referring to Muslims did not "prominently or predominately" advocate or express a political viewpoint.  *Id*. at *9-10.

13

*Vaguely Qualified*, like *Women's Health Link*, did not involve an advertiser who is so closely linked to particular political views that promoting its name or image alone constitutes political advocacy.  That fact alone distinguishes this case.  WMATA's Guidelines, moreover, contain no language analogous to the requirement that the political message be advocated or expressed "prominently or predominately"—another distinguishing fact.  In any event, because the appeal was dismissed, the district court's decision in *Vaguely Qualified* escaped appellate review.  The Second Circuit may well have come to a different conclusion, *i.e.,* that an ad about Muslims intended to counter anti-Muslim political ads is "political in nature" in the current political climate, even though it employs humor or refers viewers to a website for a film.  In any event, *Vaguely Qualified* is not controlling in this Court.

While an agency that establishes guidelines for speech in a nonpublic forum must abide by them, these cases do not provide any reason to conclude that WMATA has departed from its Guidelines in rejecting the *Dangerous* ads.[2]  Thus, Plaintiff has not established a likelihood that it will succeed in proving that WMATA failed to follow its Guidelines.

### B.      WMATA Did Not Engage In Viewpoint Discrimination.

Based entirely on its unfounded assumptions about WMATA's actions, Plaintiff contends that WMATA engaged in viewpoint discrimination by allegedly "caving" to pressure from complainants and removing the *Dangerous* ads.  PI at 12-14.  The actual facts prove that Plaintiff's assumptions – and its argument about viewpoint discrimination – are wrong.

WMATA never knew about the *Dangerous* ads before they were placed in WMATA's advertising space.  Bowersox Decl., ¶¶ 22-23.  OUTFRONT, which is paid for each ad that it

---

[2] The same is true of *Davison v. Loudoun County Bd. of Supervisors*, No. 16-CV-932, 2016 WL 4801617 (E.D. Va. Sept. 14, 2016), which concerned posts deleted from a nonpublic social media site that did not violate any enumerated rule.

14

accepts, failed to refer the ads to WMATA for review, as it is supposed to do whenever there are any questions about whether an ad meets the Guidelines. *Id.*, ¶¶ 20-21, 24.   WMATA learned of the ads from comments on social media only after they already were in its transit stations. *Id.*, ¶ 23.   WMATA then initiated the review that it would have performed but for OUTFRONT's error and, in that review, concluded that the ads for *Dangerous* violated Guidelines 9 and 14 (because, as described above, the ads were issue-oriented political advocacy). *Id.*, ¶ 25.   The ads were, therefore, removed. *Id.*, ¶ 27.   Rather than engage in viewpoint discrimination, WMATA simply followed its Guidelines.

Acceptance of the *Dangerous* ads by OUTFRONT was a mistake, but nothing in WMATA's actions supports the claim that it discriminated against Plaintiff based on its viewpoint.   Nor is there any evidence that WMATA removed the ads because it found Mr. Yiannopoulos' views offensive.   The ads were removed because they promote *Dangerous*, which is – as Plaintiff freely admits – a piece of advocacy concerning public policy, and because they promote Mr. Yiannopoulos, who is well known for advocating political and social views.   PI at 18.   The particular viewpoint of that advocacy is irrelevant to WMATA's decision; the fact that it is advocacy on political and social issues is what violated the Guidelines.

As such, this case is different from *Matal v. Tam*, 137 S. Ct. 1744 (2017), and *FCC v. Pacifica Foundation*, 438 U.S. 726 (1978).   Those cases involved provisions by which the government restricted speech based on whether it would offend or disparage others.   WMATA did not act because viewers of the *Dangerous* ads were offended; WMATA took action because the ads should have been reviewed by WMATA's review panel and, had that occurred, the ads would never have been accepted under its viewpoint-neutral Guidelines.   Accordingly, Plaintiff cannot establish a likelihood of success on its viewpoint discrimination claim.

C.        **WMATA's Policy Is Not Unconstitutionally Vague.**

Plaintiff also argues that the guidelines give WMATA "unfettered discretion" over ads. PI at 16.  Plaintiff is wrong again.

As discussed above, the standard for regulations of speech in a nonpublic forum is whether the restriction is "reasonable" and whether it is viewpoint neutral.  *Cornelius*, 473 U.S. at 800.  "A regulation of speech must be clear enough to 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited,' [citation], and to avoid "foster[ing] arbitrary and discriminatory application," [citation]."  *Bryant v. Gates*, 532 F.3d 888, 893 (D.C. Cir. 2008) (quotations and citations omitted).[3]  A policy is unconstitutionally vague only when it provides officials with "unbridled discretion over a forum's use."  *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).

WMATA's Guidelines do not run afoul of that standard.  They do not prohibit "issue-oriented ads" without elaboration or leave WMATA officials "unbridled discretion" to accept or reject ads.  The WMATA Board approved closing the forum to "issue-oriented advertising, including but not limited to, political, religious and advocacy advertising. . . ."  Bowersox Decl., Exh. A.  The Guidelines then elaborate on the specific types of ads that are prohibited, including,

---

[3]  Plaintiff cites *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-51 (1969), for the proposition that the Guidelines "must contain 'narrow, objective, and definite standards to guide the licensing authority.'"  PI at 14.  However, *Shuttlesworth* was an appeal of a civil rights activist's conviction for violating a criminal law that prohibited any parade or procession on city streets without prior city approval of a permit.  *Shuttlesworth*, 394 U.S. at 148-49.  The D.C. Circuit has recently held that vagueness concerns about speech restrictions are most stringent when coupled with criminal sanction.  *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 736 (D.C. Cir. 2016).  By contrast, where the restriction is civil like the Guidelines, the test is consistent with *Bryant*: "what 'a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, would have fair warning of what the regulations require.'"  *Id.* (quoting *Freeman United Coal Mining Co. v. Federal Mine Safety & Health Review Commission*, 108 F.3d 358, 362 (D.C. Cir. 1997)).

*e.g.*, ads "intended to influence members of the public regarding an issue on which there are varying opinions" and "that are intended to influence public policy." *Id.,* Exh. B.  The prohibition on issue-oriented ads is therefore not unconstitutionally vague.

In *Bryant*, the D.C. Circuit was confronted with a similar argument to the one Plaintiff makes here.  The *Bryant* plaintiff claimed that restrictions on advertising and content in a military newspaper were unconstitutionally vague.  532 F.3d at 893- 94.  Under Department of Defense ("DoD") guidelines, the publications could not publish "'paid political advertisements for a candidate, party, which advocate a particular position on a political issue, or which advocate lobbying elected officials on a specific issue[, which] includes those advertisements advocating a position on any proposed DoD policy or policy under review.'"  *Id.* at 892 (quoting Department of Defense Instruction 5120.4 § 4.11 (1997)).  The plaintiff argued that because the newspapers were, by nature, governmental and thus "political," the prohibition on "political" advertisements was an "unstated or undefined" standard.  *Id*. at 893.

Rejecting the argument, the *Bryant* court found that, "far from being vague," the prohibition on "political" ads was "'well-defined.'"  *Id*.  "[T]he context in which that term appears . . . makes clear that it relates specifically to elections and policy matters of concern to public officials. . . ."  *Id*.; *see also Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 412 (1950) (in assessing whether a term is vague, the "particular context is all important").

WMATA's Guidelines 9 and 14 similarly must be viewed in context.  The Board added those Guidelines under a Resolution that closed access to "issue-oriented advertising," including ads that are "political, religious, and advocacy" in nature."  Bowersox Decl., Exh. A.  A person of ordinary intelligence would understand that Guideline 9 ("Advertisements intended to influence members of the public regarding an issue on which there are varying opinions") and Guideline

17

14 ("Advertisements that are intended to influence public policy") describe ads that attempt to persuade viewers to take or change positions on matters of public policy and debate. *Id.*, Exh. B. That, of course, is precisely what Plaintiff admits *Dangerous* seeks to do and what Mr. Yiannopoulos claims to be his mission as he "lead[s] the charge" against censorship so he can win the "war . . . for free speech" in which he is "the only one who can win it for the forces of light." Weisel Decl., Exh. J.

Thus, it is not surprising that a sister court in this District recently rejected a nearly identical vagueness challenge to the Guidelines. In *AFDI v. WMATA*, the court cited the foregoing provisions and held that WMATA's Guidelines were not unconstitutionally vague. 2017 WL 1167197, at *5. There is no reason for a different result here. WMATA's Guidelines, moreover, are consistent with policies of other transit agencies that have been upheld against constitutional challenge. *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974) (upholding transit agencies prohibition on "[p]olitical advertising" in certain locations); *SMART*, 698 F.3d at 892-93 (restriction on "political or political campaign advertising" was "not so vague or ambiguous that a person could not readily identify the applicable standard").

Plaintiff nonetheless contends that Guidelines 9 and 14 are unconstitutionally vague, claiming that WMATA has applied them inconsistently. Plaintiff overreaches, asking this Court to ascribe political advocacy to basic commercial speech.

For instance, Plaintiff asserts that WMATA's acceptance of ads for a casino, alcoholic beverages, a gay dating website, a movie in which women watch a male stripper, and defense contractors displaying their planes, is somehow inconsistent with WMATA's refusal to accept the advertisements for Plaintiff's "piece of advocacy." PI at 16, 18 (citing Complaint Exhs. E, F. K. O). Plaintiff theorizes that those other accepted ads could involve "issue[s] on which there are

18

varying opinions," PI 16, ignoring the Resolution's reference to "issue-oriented advertising" and the language in Guidelines 9 and 14 that prohibited ads "intended to influence members of the public regarding an issue on which there are varying opinions" or "intended to influence public policy[.]"  Bowersox Decl., Exhs. A, B.  Ads encouraging viewers to go to a casino, have a beer, visit a dating site, or attend a comedic movie are not advocating any political or policy positions. The same is true of an ad promoting the products of defense contractors.  PI at 16 (citing Complaint Exh. D).  No person of ordinary intelligence would fail to see the difference between what the Guidelines prohibit and the non-political commercial speech of the accepted advertisements.[4]

Similarly, Plaintiff claims WMATA has accepted ads "showing a crowd of demonstrators holding signs with 'Black Lives Matter,' 'Stand for Justice,' and similar slogans." PI at 16.  The ad Plaintiff describes is one of five ads encouraging attendance at the University of District of Columbia Law School.  *Id.*; Bowersox Decl., ¶ 30, Exh. F.  The other ads do not contain anything remotely issue-oriented.  *Id.*  And the ad Plaintiff cites has a background showing protesters, but is in an ad promoting the law school being named "#1 in 'Law Schools That Give Back[,]" having a "Top 10 Ranked Clinical Program"[,]" being "DC's Most Affordable Law School[,]" and offering "Part-Time And Full-Time Positions."  PI at 16.  That is not an ad that intends to influence members of the public about an issue on which there are varying opinions or a matter of public policy.  The only thing it is intended to do is encourage viewers to go to that law school.

---

[4]  Plaintiff likewise points to ads for the restaurant Chipotle displaying a platter of pork and suggests that ad is an issue-oriented ad similar to PETA discouraging the eating of meat.  PI 17, citing Complaint, Exhs. P, T.  Again, the difference is obvious.

In addition, even if some of the advertisements might be considered political advocacy, they do not prove WMATA has inconsistently applied its Guidelines.  That is because OUTFRONT, a third-party contractor, approved nearly all of the aforementioned ads without submitting them to WMATA for review.  Bowersox Decl., ¶ 31.  The only ad that was submitted to WMATA for review was the ad for the gay dating site.  *Id.*  As noted above, although WMATA accepted the ad attached as Exhibit K to the Complaint, it rejected a different ad for the same dating site stating: "Dear Mr. President[,] Let's Make America Gay Again[.]"  *Id.*, ¶ 19, Exh. E.

Also never submitted to WMATA was the ad for the play "The Originalist."  *Id.*, ¶ 31; *see also* Complaint, Exh. N.  Moreover, Plaintiff suggests that the play's advertisement is similar to the *Dangerous* ad because "[m]any viewers of the advertisement are aware that the play is about the late Supreme Court Justice Antonin Scalia, and contains many passages in which the Scalia character advocates his conservative judicial philosophy."  Complaint, ¶ 62.  But as reviews and interviews with the play's author demonstrate, that play involves fictional encounters between Justice Scalia and his liberal law clerk.  Weisel Decl., Exhs. P-S.  One review describes how the fictional "Scalia gets pushed on his legal theory of 'originalism'" and is "also challenged in no uncertain terms on legal opinions that at their worst rankle opponents as racist and homophobic."  *Id.*, Exh. P.  In an interview with SCOTUSblog, the play's author explained that the play is designed to show "two people who are passionate, committed and willing to fight for what they believe" and allows "an audience to hear Justice Scalia's viewpoints, then hear them challenged."  *Id.*, Exh. S.  Thus, the play does not advocate a particular viewpoint; it discloses Justice Scalia's views and then counters them with opposing viewpoints.  That is not comparable to Plaintiff's book, which promotes a singular viewpoint – Mr. Yiannopoulos's.  Accordingly, the

ad promoting Mr. Yiannopoulos and his book is an issue-oriented ad intended to influence public opinion; the ad for the play is not.

As the Sixth Circuit recognized, when applying policies such as WMATA's Guidelines, "there may be some difficult determinations, on which reasonable people may disagree." *SMART*, 698 F.3d at 893.  The First Amendment does not require eliminating all discretion; it prohibits unfettered discretion.  *Id*.  That a decisionmaker applying policies "may at times make incorrect determinations within their limited discretion" does not render the policies unconstitutional.  *Id.*; *see also Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 95 (1st Cir. 2004) (in administering advertising policy, transit authority "is also entitled to some discretion in determining which advertisements are likely to alienate ridership and cost it revenue").

For all these reasons, Plaintiff has failed to establish any basis for claiming the Guidelines are unconstitutionally vague.

## III.   PLAINTIFF HAS NOT SHOWN IT WILL SUFFER ANY IRREPARABLE HARM IF AN INJUNCTION DOES NOT ISSUE.

Because Plaintiff cannot establish a likelihood of success on the merits, whether it would suffer irreparable harm ultimately is irrelevant.  *Navistar*, 2011 WL 3743732, at *3-4 (party seeking injunction must establish a likelihood of success).  In any event, Plaintiff has failed to prove it will suffer any irreparable harm.

The alleged impairment of Plaintiff's rights is its inability to advertise its book in a particular location.  Plaintiff admits that *Dangerous* is "selling briskly" and has been a *New York Times*, *Wall Street Journal*, *Publisher's Weekly*, and Amazon.com bestseller.  Declaration of Alexander Macris, ¶ 13.  Plaintiff offers nothing more than speculation that advertising in WMATA's transit system would increase sales further.

Moreover, it is undeniable that Plaintiff has many other advertising options in the city, *e.g.*, print ads in newspapers and magazines, billboards and outdoor signs, radio and television ads.  Indeed, Plaintiff's Complaint identifies bus stop shelters in Washington, D.C. that are not owned by WMATA and will accept ads that WMATA rejects.  Complaint ¶ 26 & Exh. B (allegation that ACLU's ad rejected by WMATA has been placed on non-WMATA-owned "bus stop shelters in Washington, D.C." and photo of such an ad).  Plaintiff has not even attempted to show these alternatives are inadequate.

"[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits."  *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir 1989); *see also Rushia v. Town of Ashburnham*, 701 F.2d 7, 10 (1st Cir. 1983).  Rather the plaintiffs must show "'a chilling effect on free expression.'"  *Hohe*, 868 F.2d at 73 (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965)); *accord Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006) (quoting *Hohe*).  It is "purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for preliminary injunction purposes."  *Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984) (citing *Ebel v. City of Corona*, 698 F.2d 390 (9th Cir. 1983)).  It is the "direct penalization, as opposed to incidental inhibition, of First Amendment rights [that] constitutes irreparable injury."  *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983).

In *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182 (E.D. Cal. 2015), *aff'd*, 637 F. App'x 401 (9th Cir. 2016), which involved similar facts, a court found irreparable harm from a First Amendment violation insufficient to warrant injunctive relief.  There, the plaintiff gun store owners sought to enjoin restrictions on handgun advertising as a restriction on their First

Amendment rights.  The district court found that the plaintiffs demonstrated likelihood of

success and that the infringement of their First Amendment rights constituted irreparable harm.

*Id.* at 1191-92.  But the court concluded that the harm carried "minimal weight" in the injunctive

relief analysis, because the plaintiffs had other available means to advertise that they sold

handguns and could do so in other media.  *Id.* at 1193.  On appeal, the Ninth Circuit confirmed

that the district court did not abuse its discretion in finding that "the magnitude of this potential

harm [was] minimal due to the commercial nature of the speech and limited scope of the

restriction."  *Tracy*, 637 F. App'x at 402.

 Similarly, even if Plaintiff could show a likelihood of success on the merits of its First

Amendment claim, Plaintiff has not shown it will suffer any irreparable harm without injunctive

relief nor that it does not have adequate alternative sites for its ads.

## IV. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF.

 As discussed above, if Plaintiff can prove any harm from being forced to advertise its

book in other media and locations, such harm would be minimal at best.  By contrast, if forced to

run the ads, WMATA will be forced to bear the administrative burden that it sought to avoid by

closing its advertising space to issue-oriented ads.  Not only will it have to deal with complaints,

but it also is likely that Plaintiff's ads will be vandalized, which multiple articles and Twitter

posts have reported occurring to ads for *Dangerous* in New York and Chicago transit facilities.[5]

Weisel Decl., Exhs. T-W.  Moreover, WMATA employees will be forced to view the

controversial ads throughout the workday, as will riders on WMATA's trains.  These factors

---

[5]  The vandalism of ads for *Dangerous* is not the first time that vandals have damaged
materials related to Mr. Yiannopoulos.  Posters for Mr. Yiannopoulos' tour were vandalized, as
was his tour bus.  Weisel Decl., Exhs. X-Y.

weigh against the minimal intrusion into Plaintiff's First Amendment rights and provide further reason to deny the requested preliminary injunction.

## CONCLUSION

For the foregoing reasons, Defendants respectfully requests that this Court deny Plaintiff's motion for preliminary injunction.

Date:   September 5, 2017

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

By:   _s/ Rex S. Heinke_____
         Rex S. Heinke (pro hac vice pending)
         Jessica M. Weisel (pro hac vice pending)
         1999 Avenue of the Stars, Suite 600
         Los Angeles, California 90067
         Phone: (310) 229-1000
         Fax: (310) 229-1001

         Pratik A. Shah
         James E. Tysse
         1333 New Hampshire Ave., N.W.
         Washington, D.C., 20036
         Telephone: (202) 887-4000
         Facsimile: (202) 887-4288

         Attorneys for Defendants