IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, | § § § | |
| FEMHEALTH USC, INC., d/b/a CARAFEM, | § § § | |
| MILO WORLDWIDE LLC, | § § | |
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC. | § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 1:17-cv-01598-TSC |
| v. | § § | |
| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY and PAUL J. WIEDEFELD, | § § § § | |
| Defendants. | § § | |

**DECLARATION OF LYNN M. BOWERSOX IN SUPPORT
OF OPPOSITION TO PLAINTIFF MILO WORLDWIDE
LLC'S MOTION FOR PRELIMINARY INJUNCTION**

1. I make this Declaration based upon personal knowledge and information available to me, and I am competent to testify to the matters contained herein.

2. I am the Assistant General Manager for Customer Service, Communications, and Marketing at the Washington Metropolitan Area Transit Authority ("WMATA"). Among my duties, I oversee the activities of WMATA's Office of Customer Service, WMATA's Office of Marketing, and WMATA's advertising program related to the Metrorail and Metrobus systems.

3. To help fund its operations, WMATA provides advertising space for commercial ads. Commercial advertisers can purchase advertising space in stations, in trains, and in and on buses operated by WMATA.

4. In the 1970s, WMATA's Board of Directors ("Board") established a policy governing ads in WMATA's advertising space. As part of that policy, WMATA's advertising space was considered a public forum.

5. Beginning in 2010, WMATA began to reconsider its policy. Almost every month, WMATA was faced with complaints from employees, riders, elected officials, and community and business leaders about ads in WMATA's advertising space.

6. The ads that triggered these complaints covered a wide variety of different subjects and reflected different viewpoints. They encompassed such disparate matters as ads from PETA showing animal cruelty that were disturbing to some people; condom advertising geared towards AIDS awareness and prevention; ads related to marijuana legalization; ads regarding sexual orientation; an ad by the Airline Association related to rules and regulations governing international aviation; and ads critical of government health care policies.

7. Attached as **Exhibit A** is an accurate copy of the Motion, which was approved by WMATA's Board of Directors on May 28, 2015, to close WMATA's commercial advertising

space to all issue-oriented advertising, including political, religious, and advocacy advertising until the end of 2015 pending review and public comment.

8. The review directed by the Board was conducted under the auspices of my department.

9. Our review ultimately concluded that the economic benefits of such issue-oriented ads were outweighed by four considerations: community and employee opposition, security risks, vandalism, and administrative burdens.

10. First, issue-oriented ads led to community opposition and complains, adverse publicity for WMATA, and claims from some community leaders that WMATA was perpetuating discrimination by carrying certain messages from certain advertisers. WMATA also received complaints from employees, who had to constantly face the messages of the controversial ads over extended periods.

11. Second, issue-oriented ads sparked concerns about security. Both the Metro Transit Police Department and the U.S. Department of Homeland Security feared that certain ads would, due to external world events, incite individuals to violence on the system and harm WMATA employees and customers. For example, a proposed ad featuring a cartoon depiction of the Prophet Mohammad raised concerns because some Muslims consider drawing the Prophet Mohammed so offensive that they have reacted violently to such depictions in the past. WMATA was aware that two gunmen were killed after they attempted to attack the building where the contest that eventually produced this proposed ad was being held.

12. Third, the ads led to vandalism on trains and buses. Sometimes, the vandals wrote messages contrary to those being advocated in the ads.

13. Fourth, issue ads created an administrative burden. To avoid controversies, WMATA found itself spending substantial time reviewing proposed ads.

14. Before making a final determination, WMATA staff conducted a survey of the public's views on issue-oriented ads. The results included findings that: (1) 98% of the public was familiar with the types of ads found on buses, in trains, and in stations; (2) 58% opposed issue-oriented ads while 41% supported such ads; and (3) 46% were extremely opposed compared to 20% that were extremely supportive of issue-oriented ads.

15. Attached as **Exhibit B** is an accurate copy of WMATA Board of Directors' Resolution No. 2015-55, which was approved by the Board on November 19, 2015. This Resolution, with its attached amended Guidelines Governing Commercial Advertising, closed WMATA's commercial advertising space to all such issue-oriented advertising on a permanent basis. The Resolution also reflects certain of the results of the survey of the riding public referenced therein.

16. To effectuate the Resolution, WMATA revised its Commercial Advertising Guidelines, which, among other things, provides that "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited" (Guideline 9) and that "[a]dvertisements that are intended to influence public policy are prohibited" (Guideline 14). WMATA also created a review panel of three attorneys and the Director of Marketing.

17. Since the passage of the new policy, WMATA has rejected issue-oriented ads that contained advocacy, religious, or political issues. Rejected ads cover subjects that include: (1) anti-poaching and wildlife trafficking (from WildAid and the U.S. Fish and Wildlife Service); (2) pro-Israel and pro-Egypt (from Birthright Israel and the Egyptian Embassy, respectively);

(3) pro-science (from the American Association for the Advancement of Science); (4) refugee support (from Doctors Without Borders); (5) celebrating the failure of the June 2015 Turkish coup attempt (from Musiad USA, a Turkish American association); and (6) anti-prostitution (from End Demand Illinois).  Attached as **Exhibit C** are accurate copies of these advertisements that were rejected by WMATA for violating the Guidelines.

18. WMATA also has rejected pro- and anti-LGBTQ ads.  These included a Human Rights Campaign ad stating "Show Your Pride" and a Parents and Friends of Ex-Gays and Gays stating "Ex-Gays prove change *is* possible" (original emphasis).  Attached as **Exhibit D** are accurate copies of these rejected advertisements.

19. Also, though WMATA has accepted the advertisement from a gay dating site, squirt.org attached as Exhibit K to the Complaint in this action, it rejected a proposed ad for that site, which stated: "Dear Mr. President[,] Let's Make America Gay Again[.]"  Attached as **Exhibit E** is an accurate copy of the rejected squirt.org advertisement.

20. To contain costs and promote efficiency, WMATA contracts with an outside contractor, OUTFRONT Media, Inc. ("OUTFRONT"), which handles day-to-day advertising and is paid for each ad that runs in WMATA advertising space.  Proposed ads are submitted by prospective advertisers directly to OUTFRONT, which contracts directly with the advertisers.

21. OUTFRONT is authorized to run advertisements that it deems are in compliance with the Commercial Advertising Guidelines and to reject advertisements that it deems clearly in violation of the guidelines without submitting the advertisements to WMATA for review.  However, OUTFRONT is supposed to submit potential issue-oriented ads to WMATA.  Such ads are then reviewed by a panel of three attorneys and WMATA's Director of Marketing, which makes a final determination on whether the ads satisfy the Guidelines.

22.     OUTFRONT did not submit the ads for the book *Dangerous* by Milo Yiannopoulos to WMATA for review.

23.     On or about July 5, 2017, the Office of Customer Service, which monitors customer information requests and WMATA's reputation on social media, informed me that advertisements were running in the transit system for the book "Dangerous," written by Milo Yiannopoulous. That was the first time I and other WMATA employees became aware of those advertisements.

24.     I then read an excerpt of the book online, which appeared to be issue-oriented, and learned that OUTFRONT had approved the advertisements without presenting them to WMATA for review; and that the advertisements were scheduled to run from June 26 – July 23, 2017.

25.     I immediately submitted the advertisements to WMATA's review panel, which determined that the advertisements violated WMATA's Commercial Advertising Guidelines 9 and 14.

26.     WMATA then directed OUTFRONT to inform the advertiser of its decision to reject the advertisements.  WMATA also directed OUTFRONT to remove the advertisements and refund the advertiser, Milo Worldwide, LLC, all monies it paid for the advertising

27.     Between July 6 and July 8, 2017, the advertisements were removed from the transit system's advertising space.

28.     When WMATA's customer service representatives respond to such complains, they use a form response.  In response to one of the complaints about *Dangerous*, a customer service representative erroneously used an outdated response that had been drafted and used when WMATA's advertising space was still a designated public forum.  The outdated response

is quoted on the first page of the Memorandum of Points and Authorities in Support of Plaintiff MILO Worldwide LLC's Motion for a Preliminary Injunction.

29. That mistake was corrected. The remaining complaints received the following appropriate and current response, which has been used since WMATA closed its advertising space to issue-oriented advertising:

> Dear Customer Name:
>
> Thank you for your recent correspondence regarding "xxxx" advertisement on the Metro System. WMATA reviewed the advertisement and determined that it is prohibited by the Commercial Advertising Guidelines which may be found on our website at: https://www.wmata.com/about/records/public_docs/upload/Advertising_Guidelines.pdf
>
> Thanks again for your inquiry.

30. Plaintiff attaches several ads to its Complaint that ran in WMATA advertising space that Plaintiff contends are inconsistent with WMATA's rejection of Dangerous. Among those ads is one for the University of District of Columbia Law School. That was one of five ads submitted by the law school to OUTFRONT. Attached as **Exhibit F** are accurate copies of the other four ads.

31. On pages 16-17 of its brief, Plaintiff refers to ads for a casino, defense contractors, alcoholic beverages, a gay dating website, a movie in which women watch a male stripper, and a play about Justice Scalia. Of those ads, OUTFRONT only submitted the ad for the gay dating website to WMATA for review. OUTFRONT accepted the remaining ads without consulting WMATA.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct. Executed on September 5, 2017.

_____
Lynn M. Bowersox