UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION,

FEMHEALTH USA, INC., d/b/a CARAFEM,

MILO WORLDWIDE LLC,

PEOPLE FOR THE ETHICAL TREATMENT          No. 1:17-cv-1598 (TSC)
    OF ANIMALS, INC.,

                    Plaintiffs,

        v.

WASHINGTON METROPOLITAN AREA
    TRANSIT AUTHORITY,

PAUL J. WIEDEFELD,

                    Defendants.

**PLAINTIFF MILO WORLDWIDE LLC'S REPLY
IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

WMATA's opposition ("Opp.") to Milo Worldwide's motion for a preliminary injunction

rests on two self-contradictory positions. WMATA begins by contending that because Milo

Yiannopoulos is a political and social advocate whose book involves advocacy, WMATA

properly looked behind the face of Milo Worldwide's book advertisements to conclude that their

"promotion of *Dangerous* and Mr. Yiannopoulos is political advocacy." Opp. at 12. A few pages

later, WMATA reverses course and argues that Plaintiff "overreaches [in] asking this Court to

ascribe political advocacy to basic commercial speech" by looking behind the face of various

advertisements that WMATA has accepted. Opp. at 18.

WMATA cannot have it both ways. Either the Guidelines must be applied fairly to the

face of proposed advertisements, or they permit (or require) WMATA to undertake an inquiry of

indeterminate breadth and depth into the implicit messages lurking behind any proposed

advertisement. If the former is true, then WMATA failed to follow its own rules with respect to advertisements whose clear message was simply, "buy this book"—thereby violating Plaintiff's constitutional rights. If the latter is true, then the Guidelines are hopelessly subjective and invite WMATA to exercise unfettered discretion, at odds with First Amendment requirements, as it did in rejecting Plaintiff's advertisements—thereby violating Plaintiff's constitutional rights.

It is, of course, true that Mr. Yiannopoulos is a political and social advocate whose book involves political and social advocacy. It does not follow, however, that advertisements sponsored by a publisher which simply identify a book and its author violate the Guidelines, which prohibit "*Advertisements* intended to influence members of the public regarding an issue on which there are varying opinions" (Guideline 9; emphasis added), and "*Advertisements* that are intended to influence public policy" (Guideline 14; emphasis added). The Guidelines do not prohibit all advertisements sponsored *by* people or organizations that are themselves controversial, or advertisements *for* products that are themselves controversial, and even the very limited record now before the Court shows that the Guidelines have not been applied to prohibit such advertisements. The rejection of Milo Worldwide's advertisements thus violated WMATA's own Guidelines, was arbitrary and capricious, and violated the minimum constitutional requirement of reasonableness that applies even in a limited public forum or a nonpublic forum.

Alternatively, if WMATA is correct that the Guidelines permit or demand a behind-the-scenes investigation into the political and social context of each proposed advertisement, then Plaintiff's examples of ads WMATA accepted despite their controversial political subtext reveal that the rejection of Plaintiff's advertisements constituted viewpoint discrimination under Guidelines that confer unfettered discretion on the decision-maker. Moreover, the facts

underlying WMATA's decision to prohibit Milo Worldwide's advertisements show that the actual reasons for the ads' removal was aversion to their perceived message on the part of WMATA's ridership, an aversion either adopted or accommodated by WMATA's leadership— not, as WMATA professes, the routine implementation of a neutral and consistently-applied rule.

Because the violation of Milo Worldwide's First Amendment rights continues to cause irreparable harm, and because WMATA's interests in continuing to apply its Guidelines in an unreasonable and unconstitutional manner are entitled to little weight, a preliminary injunction should issue.

## I.  PLAINTIFF HAS SHOWN A LIKELIHOOD OF SUCCESS ON THE MERITS

### A. WMATA violated its own regulations, and acted arbitrarily and capriciously, when it rejected Plaintiff's advertisements

The parties agree that even in a limited public forum or nonpublic forum, restrictions on speech must be both "reasonable and viewpoint neutral." Opp. at 9 n.1 (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 390 n.6 (1992); *Christian Legal Society v. Martinez*, 561 U.S. 661, 679 n.11 (2010)). WMATA does not dispute that when a governmental body regulates speech, it must "respect the lawful boundaries it has itself set." *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). Nor does it dispute that arbitrary and capricious action to bar speech is an unreasonable, and therefore unconstitutional, restriction. *See United States v. Kokinda*, 497 U.S. 720, 725–26 (1990); PI Memo at 14-15 (citing additional cases).

The facts here show that WMATA has failed to respect the boundaries set by its own regulations, and has acted arbitrarily and capriciously, and therefore unconstitutionally, in rejecting Plaintiff's advertisements.

Defending its Guidelines, WMATA explains that "Guideline 9 ('Advertisements intended to influence members of the public regarding an issue on which there are varying opinions') and

Guideline 14 ('Advertisements that are intended to influence public policy') describe *ads that attempt to persuade viewers* to take or change positions on matters of public policy and debate." Opp. at 17-18 (emphasis added). Plaintiff agrees that this reflects the plain meaning of these Guidelines.

This also reflects the manner in which WMATA has applied the Guidelines in some past instances on which WMATA relies. WMATA catalogues a number of advertisements it has rejected in Exhibits C, D, and E to its Opposition. Consistent with the meaning of the Guidelines offered by WMATA, those ads were rejected based on their content, as WMATA explains. For example, some rejected ads were "pro-Israel and pro-Egypt" or "pro- and anti-LGBTQ." Declaration of Lynn M. Bowersox, ¶¶ 17-18. Others were "anti-prostitution" or urged the President to "Make America Gay Again." *Id*. ¶¶ 17, 19.

WMATA's general practice likewise makes clear that in applying the Guidelines it does not research the contents of the books, plays, and movies that are advertised, or the backgrounds of the people or companies whose products are advertised. For although WMATA's lawyers now say of *The Originalist* that it "does not advocate a particular viewpoint," Opp. at 20, they concede that WMATA had no idea whether that was true before running the ad. *See id*. (noting that the ad was "never submitted' for review). And actually, as the *New York Times* review makes clear, "the character at its center" (Justice Scalia) is "arguably among the most polarizing jurists of his stature in American history," and "gets the best jokes and jabs, and the longest defenses of his perspective." Weisel Decl., Exhibit Q. Yet WMATA does not suggest that, if a few customers had complained, it would have rejected the ad. WMATA admits that it has accepted ads for other books, *see* Answer ¶ 64; if it has investigated the other authors' politics, it does not say so.

WMATA even ran an ad this summer for the Washington Nationals in which the central figure is a politician—D.C. Mayor Muriel Bowser:



[Gallery Place Station, May 30, 2017]

Although Mayor Bowser is wearing a baseball cap, she remains a well-known politician, who has taken actions and expressed views that have angered some Metro riders. But those political actions and statements did not disqualify this advertisement, which was apparently approved based only on the message visible on the face of the ad, not rejected because the ad is dominated by a photograph of a politician who is running for reelection next year.[1]

Further confirming its own explanation of its Guidelines, WMATA affirmatively asserts in Part I-C of its Opposition that it *does not* consider underlying controversies when it accepts advertisements that are "basic commercial speech." Opp. at 18. Thus, WMATA explains, "Ads encouraging viewers to go to a casino, have a beer, [or] visit a [gay] dating site," Opp. at 19, "are not advocating any political or policy positions." *Id.*—thereby excluding from its ken the obvious fact that there are varying opinions about gambling, drinking, and gay sex. Likewise, in

---

[1] *See* Tom Sherwood, *Sherwood's Notebook: Clear Skies for Mayor Bowser?,* Sept. 13, 2017, reporting that "Bowser has said she is running for re-election." http://www.nbcwashington.com/news/local/Sherwoods-Notebook-Clear-Skies-for-Mayor-Bowser-444155743.html.

WMATA's official view, "[n]o person of ordinary intelligence" could think that "an ad promoting the products of defense contractors," displayed at a Metro station used by Pentagon officials, is intended to influence public policy about which military aircraft to procure or whether to build up the U.S. military generally. *Id*. And regarding an ad sponsored by UDC Law School showing a crowd of demonstrators holding signs saying "Black Lives Matter" and the like (Complaint Exhibit C), WMATA perceives that "[t]he only thing it is intended to do is encourage viewers to go to that law school." *Id*. WMATA thus could not be more clear that its Guidelines are aimed only at excluding those "political or policy positions" that are explicit on the face of advertisements.

Yet when it came to Milo Worldwide's ads, which simply urged viewers to buy Mr. Yiannopoulos' new book, WMATA did not conclude that "[t]he only thing it is intended to do is encourage viewers to" buy the book. Rather, WMATA energetically excavated not only the author's prior statements about various topics, but even others' opinions of those statements, *see* Opp. at 11-12; Weisel Decl. Exhibits I, J, K, L, M, N, O, and decided that the publisher's straightforward commercial speech was actually intended to influence members of the public regarding a litany of issues that were not even hinted at in the advertisements themselves.

It is beyond serious dispute that Plaintiff's ads were not rejected based on their visible content. WMATA's agent, Outfront Media, which is tasked with referring to WMATA any proposed "ads that may raise concerns under the Guidelines," Opp. at 7, saw nothing in Plaintiff's ads that even raised a question requiring referral. *Id*. Even after some Metro customers registered complaints and WMATA's Manager of Advertising & Market Development looked at the ads, she concluded, "This is an ad for a book, as such it is a commercial ad and falls within

our guidelines." WMATA 0864.[2]

It was only after a WMATA Media Relations employee found an article in USA Today describing Mr. Yiannopoulos as a "controversial right-wing provocateur" whose book had been "dumped" by Simon & Schuster, WMATA 0883, that the ads were submitted to WMATA's formal review process. WMATA 0293. And although WMATA claims that this was a routine procedure ("WMATA then initiated the review that it would have performed but for OUTFRONT's error," Opp. at 15), it appears to have been anything but routine. Rather than focusing on the advertisements themselves, Assistant General Manager Lynn Bowersox "read an excerpt of the book online," and saw that it "appeared to be issue-oriented," before she submitted the ads for review. Bowersox Decl. ¶¶ 24-25. WMATA offers no reason to believe that this sort of background research is done with other advertisements, and there is every reason to believe that it is not. For example, even the most cursory background research would have revealed to WMATA that the Ringling Bros. circus' use of live elephants and tigers, prominently depicted in their recent advertisement (Exhibit U to the Complaint) is a subject of heated controversy, with many people believing it amounts to animal cruelty. Likewise, a brief Google search (if not common knowledge) would have revealed that the advertisement at the Pentagon Metro Station proclaiming, "WHENEVER, WHATEVER OR WHEREVER THE MISSION, THE F-35 CAN CARRY THE LOAD" (Exhibit D to the Complaint) reflects an effort by Lockheed Martin to influence public policy with respect to a troubled aircraft procurement program for a fighter jet

---

[2] Citations to "WMATA ####" refer to Bates-stamped documents provided by WMATA, which agreed to provide, in preliminary discovery, non-privileged documents "constituting or reflecting communications regarding the advertisements sponsored by MILO Worldwide." *See* Consent Motion for Limited, Expedited Discovery (ECF No. 12). Copies of such documents cited in this memorandum are attached as an appendix, in the order in which they are cited.

that may never be able to carry the load,[3] not to mention an effort to influence public policy about military spending and the deployment of U.S. armed forces more generally.

WMATA points out that a transit agency may sometimes need to look at extrinsic material "[t]o substantiate [its] understanding of the apparent message of [an] advertisement." Opp. at 10 (quoting *American Freedom Defense Initiative v. Suburban Mobility Authority for Regional Transportation*, 698 F.3d 885, 894 (6th Cir. 2012)). Indeed, ascertaining the meaning of an unfamiliar phrase or image can help in understanding what an advertisement *says*. But clarifying an ad's "apparent message" is very different from what WMATA did here. There was nothing mysterious or confusing in Plaintiff's advertisements—their message was simply, "buy this book," as both Outfront and WMATA's Manager of Advertising & Market Development immediately understood by looking at the ads. What WMATA did, as the timeline of its communications demonstrates (*see infra* at 13-15), was to respond to a flurry of customer complaints by researching Mr. Yiannopoulos' politics and the criticism of his politics by others (*see* Weisel Decl., Exhibits I, J, K, L, M, N, O), and deciding to remove his ads from display because his politics offended some customers—or perhaps offended WMATA decision-makers themselves.

Based on the facts now before the Court, it seems clear that the standards applied to Plaintiff's advertisements were entirely different from the standards applied to other commercial advertisements. In Plaintiff's ads, covert advocacy was discerned from silence, while in other advertisements, even overt advocacy was ignored. This discriminatory treatment failed to "respect the lawful boundaries [WMATA] has itself set." *Rosenberger*, 515 U.S. at 829, and was

---

[3] *See, e.g.,* Paul Barrett, "Is the F-35 a Trillion-Dollar Mistake?," Bloomberg Businessweek, April 4, 2017, available at
https://www.bloomberg.com/news/features/2017-04-04/is-the-f-35-a-trillion-dollar-mistake.

an arbitrary and capricious, and therefore an unreasonable, departure from the plain meaning and customary application of WMATA's advertising Guidelines. It therefore violated Plaintiff's rights under the First Amendment.

### B. WMATA Exercised Unfettered Discretion in Rejecting Plaintiff's Ads

In defending its rejection of Plaintiff's ads, WMATA abruptly switches course. Ignoring its own explanation of what the Guidelines mean, and ignoring how they have been applied to a variety of other advertisements, WMATA now argues that it was a proper application of the Guidelines to reject a straightforward commercial advertisement for a book because research prompted by customer complaints disclosed that the book's author has controversial political opinions. *See* Opp. at 10-14 (citing Mr. Yiannopoulos' website, a press release, and news reports about his recent college tour).

If this was a proper application of the Guidelines, then the Guidelines failed to constrain WMATA's discretion in a constitutionally adequate manner.

WMATA agrees that a regulation of speech must be "clear enough to . . . avoid 'foster[ing] arbitrary and discriminatory application.'" Opp. at 16 (quoting *Bryant v. Gates*, 532 F.3d 888, 893 (D.C. Cir. 2008) (bracketed alteration by WMATA). But as a threshold matter, WMATA understates the degree of clarity necessary for Guidelines regulating speech. WMATA argues that where criminal punishment is not involved, the same standard applies in cases involving the First Amendment rights as in cases involving merely economic regulations. *See* Opp. at 16 n.3 (citing *Freeman United Coal Mining Co. v. Federal Mine Safety & Health Review Comm'n*, 108 F.3d 358 (D.C. Cir. 1997), which sustained as adequately specific a regulation requiring mine structures to be "maintained in good repair"). That is not the law. When a regulation "reach[es] expression sheltered by the First Amendment, the doctrine demands a

greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974);

*see also id*. at 573 n.10 ("Compare the less stringent requirements of the modern vagueness cases

dealing with purely economic regulation."). With respect to economic regulation, the D.C.

Circuit has explained that "'it is not unfair to require that one who deliberately goes perilously

close to an area of proscribed conduct shall take the risk that he may cross the line.'" *DiCola v.*

*FDA*, 77 F. 3d 504, 508 (D.C. Cir. 1996) (quoting *Throckmorton v. NTSB*, 963 F.2d 441, 445

(D.C. Cir. 1992)). But in the First Amendment area, even where criminal penalties are not

involved, the opposite rule applies: "When speech is involved, rigorous adherence to those [due

process] requirements is necessary to ensure that ambiguity does not chill protected speech."

*F.C.C. v. Fox Television Stations, Inc.,* 567 U.S. 239, 253–54 (2012).

In another misunderstanding, WMATA defends its Guidelines as if Plaintiff were seeking

a ruling that Guidelines 9 and 14 are unconstitutional on their face. *See* Opp. at 16-21. Not so.

While the Complaint contains such a claim, Plaintiff Milo Worldwide was very careful not to

press that point in its motion for a preliminary injunction. *See* PI Memo at 17 n.8.[4]

Plaintiff's argument is that WMATA exercised unfettered discretion *in this case* when it

relied on a self-contradictory interpretation of Guidelines 9 and 14 to reject Plaintiff's

advertisements. As interpreted and applied by WMATA to Plaintiff's advertisements—and as

---

[4] Footnote 8 states: "In *American Freedom Defense Initiative v. WMATA*, No. 15-cv-1038, 2017 WL 1167197 (D.D.C. 2017), *appeal pending*, No. 17-7059 (D.C. Cir. filed April 7, 2017), this Court held that WMATA's advertising Guidelines are not unconstitutional on their face. As noted earlier, the instant motion presents only an as-applied challenge to Guidelines 9 and 14."

Before pursuing a facial challenge to the Guidelines, Plaintiffs wish to obtain discovery from WMATA in the normal course. Plaintiffs anticipate that such discovery will reveal many more instances of inconsistent application, largely favoring mainstream viewpoints and disfavoring non-mainstream viewpoints, which will support the argument that the Guidelines are inherently susceptible to arbitrary, capricious, and viewpoint-discriminatory application. Plaintiffs also anticipate that discovery will reveal that WMATA's decision-making process, in this case and others, was not seriously fettered by the Guidelines.

defended in this litigation—those Guidelines were neither clear nor definite enough to prevent WMATA's decision-makers from engaging in the arbitrary and discriminatory rejection of Plaintiff's advertisements that the First Amendment forbids. This is other half of the argument presented in Part I-A, above: if the Guidelines are adequately clear and definite, then WMATA violated its own rules. If WMATA did not violate its own rules, then the Guidelines were too indefinite to constrain WMATA's decision-making process in any meaningful way. Either way, WMATA has violated Plaintiff's constitutional rights.

As we have already shown—and as WMATA agrees except as applied in this case—the Guidelines are addressed to the content of advertisements, not to the scripts of plays, the screenplays of movies, the manuscripts of books, or the political views of advertisers. For that reason, Outfront Media, tasked by WMATA with applying the Guidelines in easy cases, had no hesitation in accepting Plaintiff's advertisements. Likewise, WMATA's Manager of Advertising & Market Development agreed that as "an ad for a book, as such it is a commercial ad and falls within our guidelines." But WMATA's decision-makers purportedly understood the Guidelines quite differently, in this case. As applied to Plaintiff's advertisements, according to WMATA, the Guidelines required (or at least permitted) an examination of an advertiser's statements in other contexts, the reactions of some college students to the advertiser's appearances on college campuses, and any other information WMATA wished to consider. *See* Opp. at 11-12 and Weisel Decl. Exhibits I, J, K, L, M, N, O.

Simultaneously, however, WMATA understands that the Guidelines do not require (and perhaps do not permit) such investigations behind the face of advertisements "encouraging viewers to go to a casino, have a beer, visit a dating site, or attend a comedic movie," Opp. at 19, or encouraging viewers "to go to [a] law school" when that law school's advertisement shows a

crowd of demonstrators holding signs saying "Black Lives Matter" and similar political slogans. *Id*. WMATA asserts that "[n]o person of ordinary intelligence could fail to see the difference" between these advertisements and Plaintiff's ads, but Plaintiff begs to differ. Contrary to WMATA's submission, these are incoherently inconsistent interpretations of Guidelines that must provide "precision and guidance . . . so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations,* 567 U.S. at 253.

If the interpretation of the Guidelines that WMATA applied in this case was correct, then the Guidelines necessarily fail the test of precision and predictability, because every decision will depend upon the results of idiosyncratic research of the kind that was performed here, and that WMATA has retrospectively performed regarding *The Originalist*. *See* Weisel Decl. Exhibits P, Q, R, S. The resulting system would be inherently subjective and unpredictable, as well as far more burdensome than the pre-2015 system that WMATA abandoned in part because it was viewed as administratively burdensome. *See* Bowersox Decl. ¶ 13 ("issue ads created an administrative burden. To avoid controversies, WMATA found itself spending substantial time reviewing proposed ads"). How much of a book must WMATA read to determine whether an ad for the book is issue-oriented? Can WMATA accept an ad for a new play that has not yet opened and been reviewed? Is an advertisement for *Saturday Night Live* just an invitation to watch a TV show, or should it be rejected because SNL is intended to influence members of the public on issues on which there are varying opinions? Is an ad for the Venetian Resort Hotel & Casino in Las Vegas just an ad for a hotel, or should it be rejected because the Venetian is owned by Sheldon Adelson, who is well known as a major financial backer of Republican presidential candidates?[5] What if he owned only 49% of the hotel?

---

[5] *See* https://en.wikipedia.org/wiki/Sheldon_Adelson.

Either WMATA's Guidelines did not permit the standardless, ad hoc decision-making process that took place regarding Plaintiff's advertisement, or the Guidelines invited WMATA to exercise unfettered discretion, and thereby encouraged it to engage in viewpoint discrimination prohibited by the First Amendment.

The record of WMATA's communications and actions shows that such viewpoint discrimination is precisely what occurred.

### C.  WMATA rejected Plaintiff's advertisements because of their viewpoint

Contrary to WMATA's characterization of its decision-making process in this case as routine, the record makes clear that WMATA would not have rejected Plaintiff's advertisements but for the vocal complaints of a handful of customers who objected to the values or opinions that they perceived Mr. Yiannopoulos stood for—a classic, viewpoint-based, "heckler's veto." Accordingly, the removal of Plaintiff's advertisements violated the First Amendment.

Plaintiffs' advertisements were posted on June 26. Macris Decl. ¶ 6. On July 5, WMATA apparently received ten tweets from seven people (one person tweeted four times, and all but one of the other tweets were retweets of hers) objecting to the advertisements. To the extent the tweets expressed reasons, they all objected to the mere fact that Mr. Yiannopoulos was being allowed to advertise:

> From E.R.:  Hey @wmata. Care to comment on how you're selling advertising placement to Milo, a white nationalist pedophile?

> From E.R.:  The things he's said and done to Trans Women is reason enough to deny this. But on your morning commute? I will see this every damn day.

> From E.R.:  This is something that NO marginalized group should have to see on their daily commute. This is a predator.

> From E.R.:  Not only does it violate the no-politics policy for #WMATA's ads, but it's milo yiannopoulos. A person who has built his career on hate.

> From T.H.: Are you kidding me? @wmata taking money to advertise for a WHITE NATIONALIST. What message are you sending DC's diverse riders? Unacceptable[.][6]

WMATA's reaction was swift. By 3:39 p.m., WMATA's Manager of Advertising & Market Development had obtained from Outfront and reviewed the advertisements and the contract between Outfront and Milo Worldwide, and had concluded that "This is an ad for a book, as such it is a commercial ad and falls within our guidelines." WMATA 0864. But at 4:32, a WMATA employee sent her an article from USA Today describing Mr. Yiannopoulos as a "controversial right-wing provocateur" whose book had been "dumped" by Simon & Schuster, WMATA 0883, and by 4:50 p.m., the ads were being submitted for formal review. WMATA 0293. Nothing, of course, had changed about the ads themselves, which remained just "ad[s] for a book."

The decision to remove the ads was apparently made on July 6,[7] and by the morning of Friday, July 7, the ads were being taken down in a hurry, so that WMATA could respond to the

---

[6] WMATA 0028, 0029, 0031, 0032, 0033, 0047. There was apparently an eleventh tweet, quoted in Plaintiff's PI Memo at 12; that tweet may not have been produced in discovery because the tweeter spelled Yiannopoulos as "yionwlopsooe."

After taking down Plaintiff's advertisements, WMATA received message from two riders objecting to the removals:

From C.F.: Your removal of the Milo Yiannopoulos book advertisements is a terrible decision and a sad commentary on the state of free speech in our nations capital. While I'm not a fan of Mr. Yiannopoulos, I am a fan of free speech, open communication and fair application of rules and standards for everyone. I have seen the ad and the WMATA policies that it is supposed to be violating. I see nothing in the ad promoting any side of an issue or seeking to specifically influence the public on any issue. Are you going to continue to apply this undefined standard to all future advertisements[?] [W]ould you have allowed Senator Al Franken to advertise his book "Rush Limbaugh is a big fat idiot"? WMATA 1016.

From L.R.: Please re post pre order book dangerous advertising. This is going to cost you millions. You are infringing on first amendment rights. I am tired of your relying on tax payers to bail you out. WMATA 1041.

[7] All documents reflecting WMATA's decision-making process were withheld under claims of attorney-client and/or attorney work-product privilege.

people who had tweeted, and to the news media which had inquired, that the ads had been removed. *See* WMATA 0530. When one employee spotted an ad still displayed at the Cleveland Park Metro Station Friday evening., the Manager of Advertising & Market Development emailed Outfront that "We need someone to remove this ad tomorrow." WMATA 0304. At 7:40 Saturday morning, she again emailed Outfront, "I need that ad down asap. This cannot wait until Monday." *Id*. At 11:09 a.m., she inquired. "Do we have any update yet? I need to confirm with Lynn [Bowersox] that these ads are all down." WMATA 0307. This does not seem like standard operating procedure at WMATA.

When one media outlet tried repeatedly to ascertain the reason for WMATA's decision, WMATA played dumb. On July 7 at 2:19 p.m., DCist inquired, "Can you explain which guideline it violates and how?" WMATA 0761. At 2:32 WMATA replied, "Yes. Guidelines 9 and 14 of WMATA's Commercial Advertising Guidelines," without answering the second part of the question. *Id*. At 2:33 DCist reiterated the question, "How was this determination made?" At 2:36 WMATA replied, "Not sure what you're asking here." At 6:47 DCist elaborated: "So my question is what, specifically, in the content of the ad is at issue here? Is it the contents of the book? Is it the fact that it's Milo? What, exactly, about the advertisement intends to influence public opinion or members of the public on an issue with varying perspectives?" *Id*. The documents show no response to those questions.

WMATA continues to have no answer to that question—"What, exactly, about the advertisement intends to influence public opinion or members of the public on an issue with varying perspectives?"—except to argue that the advertisement somehow incorporates the contents of the book and, indeed, any information about its author that WMATA chooses to consider. *See* Opp. at 10-12. But, as already discussed, WMATA has treated other

advertisements quite differently. The advertisements for *The Originalist* were not viewed as incorporating the controversial judicial and extra-judicial opinions of Justice Scalia; the advertisements for Ringling Bros. circus were not treated as incorporating the well-known controversy about the use of captive animals in circuses; the advertisements about the F-35 jet fighter (which did not even offer a product for sale) were not treated as incorporating the sponsor's obvious goal of influencing military procurement policy; the advertisement featuring Mayor Bowser was not treated as incorporating her political positions; the advertisements for PORKADISE FOUND and McDonald's hamburgers were not treated as incorporating the controversy about eating meat. Even this advertisement for The President Show:



[Eastern Market Station, April 23, 2017]

was not treated as incorporating the obviously political content of the show itself (despite the clue provided by the Russian nesting dolls on the credenza that the show would mock the President rather than praise him), or the highly controversial nature of its subject, President

Trump—a figure probably even more feared and despised by many Metro riders than Milo Yiannopoulos.[8]

There are only two plausible explanations for this discriminatory treatment: either it reflects the fact that some riders told WMATA that Mr. Yiannopoulos' political and social views were unacceptable, or it reflects the fact that WMATA's decision-makers independently concluded that his political and social views were unacceptable. The fact that Mr. Yiannopoulos' political and social views are controversial cannot explain WMATA's action. His views are controversial, but those views are not expressed in the rejected advertisements,[9] and as we have shown above and in the motion for a preliminary injunction, WMATA has accepted numerous advertisements meeting the same description.[10]

By rejecting Plaintiff's advertisements based on the political and social viewpoint that WMATA *imputed* to the ads at the instigation of a handful of offended viewers—a treatment not accorded other advertisements, WMATA engaged in viewpoint-based discrimination against Plaintiff.

---

[8] It is not hard to imagine a Metro rider tweeting that an image of President Trump "is something that NO marginalized group should have to see on their daily commute," and that he is "a person who has built his career on hate," or complaining that "I will see this every damn day." It is likewise easy to imagine that a supporter of President Trump would be offended by seeing on his daily commute the image of a smirking presidential impersonator, complete with props insinuating that the President is in cahoots with Russia.

Of course in the United States, and particularly here in the Nation's Capital, people expect to be exposed to such communications in public places as they go about their daily business, regardless whether they agree or disagree with the communications' viewpoints.

[9] The short phrases from book reviews at the top of the ads: "The Kanye West of Journalism"– The Nation; "The Ultimate Troll"–Fusion; "Internet Supervillian"–Out Magazine; "The Most Hated Man on the Internet"–The Nation (*see* Complaint Exhibit L), are of course not expressions of Mr. Yiannopoulos' views.

[10] The examples Plaintiffs have provided reflect only advertisements displayed in the Metrorail system in the past few months. Discovery in this lawsuit will undoubtedly disclose many more examples from the 21 months in which WMATA's current policy has been in effect.

It may be that WMATA did not receive complaints about other advertisements. That makes no difference. When a governmental body adopts or accommodates the viewpoint-based objections of members of the public, its actions are unconstitutional: "We have said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017) (citations omitted) (plurality opinion); *see also American Freedom Defense Initiative v. WMATA*, 898 F. Supp. 2d 73, 83 (D.D.C. 2012) ("The fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." (alteration omitted) (internal quotation marks and citation omitted)).

WMATA claims that its actions here were just business as usual. *See* Opp. at 15. But that claim is insupportable, for the reasons already discussed. Both procedurally and substantively, Plaintiffs' ads were subjected to discriminatory treatment that has not been applied to other advertisements. The discrimination was not because of their size, their shape, their color scheme, or their typeface; it was not because they proposed the sale of an unlawful substance or stated a price for the book that was not its true price. It was because they were viewed as conveying a message that was, as one rider tweeted, "Unacceptable." WMATA 0033.

WMATA also seeks to deflect responsibility to its advertising agency, Outfront Media. *See* Opp. at 15 ("Acceptance of the *Dangerous* ads by OUTFRONT was a mistake"). To be sure, Outfront accepted Plaintiff's advertisements without seeking WMATA's review. But that *was* business as usual. Outfront is expected to accept ads that plainly comply with the Guidelines, which Plaintiff's ads did. As WMATA's Manager of Advertising & Market Development agreed, it was "an ad for a book, as such it is a commercial ad and falls within our guidelines."

WMATA 0864. Except for the political and social views of the book's author, about which

WMATA became aware only because some riders condemned them, Outfront's routine decision

to sign the contract and post the ads would have been the end of the matter.

Because WMATA's action was based, directly or indirectly, on the political viewpoint it

imputed to Plaintiff's advertisements, Plaintiff has shown a strong likelihood of success on the

merits.

## II.  PLAINTIFF IS SUFFERING IRREPARABLE HARM

WMATA's highly-publicized removal of Plaintiff's ads in response to the highly-

publicized complaints calling Milo Yiannopoulos a Nazi and the like sent the public a message

that Mr. Yiannopoulos is beyond the pale—that while other people could advertise their books,

plays, movies, and other products, advertisements for his book couldn't be tolerated. That

message continues to harm Mr. Yiannopoulos and Milo Worldwide. Restoring Plaintiff's

advertisements to Metro stations and rail cars for the remainder of the four weeks Milo

Worldwide had purchased would help to mitigate the harm WMATA caused by removing the

ads in the middle of their run. Absent relief, that harm will continue unabated

Beyond that, WMATA does not deny the general rule that the loss of First Amendment

rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v.

District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S.

347, 373–74 (1976)). *See* PI Memo at 17-18. It asserts, however, that a finding of irreparable

injury is not "automatic," because a few cases have found that in particular circumstances there

was not irreparable injury. Opp. at 22-23. Those cases are inapposite here.

WMATA's main case is *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182 (E.D.

Cal. 2015), *aff'd*, 637 F. App'x 401 (9th Cir. 2016). The district court there found no irreparable

injury where (i) the challenged advertising restriction only prevented gun stores from placing signs in their windows saying "handguns for sale" or displaying handguns there; the stores remained free to use signs saying "guns for sale" and to display other guns in their windows; (ii) the gun stores made no argument that they would lose any business as a result of the regulation, and there was no evidence that they would; (iii) the public safety concern of preventing "impulse buys" of handguns and the resulting handgun crimes and suicides weighed heavily against a preliminary injunction. Here, by contrast, (i) WMATA has not suggested that some small modification of Plaintiff's advertisement would be acceptable; to the contrary, it has made clear that any advertisement for Mr. Yiannopoulos' book would be rejected; (ii) Milo Worldwide has argued that it is losing book sales as a result of WMATA's action, and common sense supports that proposition; (iii) there is no concern that entry of an injunction will result in serious crime or death.

WMATA's other cases are no more relevant. In *Hohe v. Casey*, 868 F.2d 69 (3d Cir. 1989), the "fair share" union dues that plaintiffs wished to be relieved from paying were placed in interest-bearing escrow accounts, so their injury could be repaired if they prevailed. In *Rushia v. Town of Ashburnham*, 701 F.2d 7 (1st Cir. 1983), the plaintiff wanted "an injunction against a state criminal prosecution," and he "*did not claim* in the district court that his 'irreparable injury' consisted of the threat to his First Amendment right[s]. *Id*. at 10 (emphasis added). In *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006), the court recognized that to suffer irreparable injury "moving parties must . . . establish they are or will be engaging in constitutionally protected behavior," *id*. at 301; it found that the plaintiffs there *were* suffering irreparable injury and vacated the district court's denial of a preliminary injunction. *Id*. at 305. It

is undisputed here that Plaintiff was engaged in the constitutionally protected behavior of advertising, until WMATA took down his ads.

WMATA's citations to *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983), and *Goldie's Bookstore, Inc. v. Superior Court of California*, 739 F.2d 466 (9th Cir. 1984), are particularly curious, as the Eleventh Circuit in *Cate* ordered the *granting* of a preliminary injunction in light of the "strong public interest in protecting First Amendment values," *id.* at 1190, and the Ninth Circuit in *Goldie's Bookstore* indicated that "[t]his case, however, does not implicate the first amendment." *Id.* at 472.

WMATA also argues that Plaintiff has "other advertising options" and has not shown that "these alternatives are inadequate." Opp. at 22. It is unsurprising that this argument is accompanied by no citation, as it is not Plaintiff's burden to make any such showing. "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 880 (1997) (quoting *Schneider v. State*, 308 U.S. 147, 163 (1939)).

Finally, WMATA argues that because Plaintiff's book has been selling well, it is only speculation that Metro advertising would result in additional sales. Opp at 21. However, Plaintiff's CEO has stated under penalty of perjury that "Milo Worldwide has lost and continues to lose sales of *Dangerous* by having its advertisements censored by WMATA. Re-posting of our advertisements for the remaining 18 days of the advertising run we already paid for will contribute to the book's continued sales." Macris Decl. ¶ 14. In any event, this is a curious argument for WMATA to advance; presumably it tells prospective advertisers that Metro advertising is worth the money WMATA charges—in this case, more than $27,000. It is doubtful

that WMATA really wants this Court to rest its decision on the proposition that Metro advertising isn't worth the price.

### III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR PLAINTIFF

WMATA argues that Plaintiff should have to meet an especially high standard here because it seeks a mandatory injunction. Opp. at 8. "But this court has rejected any distinction between a mandatory and prohibitory injunction, observing that 'the "mandatory" injunction has not yet been devised that could not be stated in "prohibitory" terms.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (quoting *United States v. Western Electric Co.*, 46 F.3d 1198, 1206 (D.C. Cir. 1995)).

Against the constitutional and financial harm being suffered by Plaintiff, WMATA states that if it is ordered to re-post Plaintiff's ads, it "will be forced to bear the administrative burden that it sought to avoid by closing its advertising space to issue-oriented ads." Opp. at 23. That is incorrect; a preliminary injunction will require WMATA only to re-post Plaintiff's ads for the number of days that were lost. There will be no administrative burden beyond an e-mail to Outfront directing it to re-post the ads.

WMATA complains that it will "have to deal with complaints," *id*. Plaintiff believes the Court can take judicial notice that WMATA has to deal with complaints every day.

WMATA notes that employees and riders will be "forced" to view Plaintiff's advertisements, *id*., but they are equally "forced" to view other advertisements which some may find disagreeable or even dangerous: PETA members are "forced" to view circus ads showing animals being (as they believe) abused; people who are trying to become vegetarians are "forced" to view ads for McDonald's hamburgers; recovering alcoholics are "forced" to view ads for alcoholic beverages;, compulsive gamblers are "forced" to view ads for gambling casinos;

people who think gay sex is sinful are "forced" to view ads for a gay hookup service; people with little money are "forced" to view ads for expensive consumer goods they cannot afford; pacifists are "forced" to view ads for fighter jets that they believe it is morally wrong to construct and deploy. WMATA plainly does not actually believe that whatever harm its riders and employees suffer by the presence of unwelcome advertisements outweighs the income it receives from such advertisements.

Finally, WMATA predicts that Plaintiff's ads may be vandalized. *Id*. Perhaps so, but if courts rule that the possibility of minor vandalism outweighs First Amendment rights, few unpopular speakers will be able to exercise those rights. Some courts have held that a transit system may reject advertisements when there are real threats of serious violence. *See Seattle Mideast Awareness Campaign v. King County*, 781 F.3d 489, 494-95, 501 (9th Cir. 2015). Even if that is correct, there were no such threats here. Not a single one of the handful of complaints received by WMATA even hinted at vandalism, much less violence. *See* Exhibit __. And while WMATA's Opposition indicates that a few of Plaintiffs' advertisements in the New York and Chicago subway systems were torn or defaced, *see* Weisel Decl. Exhibits T-W, there is no evidence suggesting that WMATA was aware of those incidents when it decided to reject Plaintiffs' ads, or even that those incidents had occurred prior to WMATA's rejection. Plaintiffs' large posters were displayed at 45 locations in WMATA stations, and smaller "car cards" were displayed in as many as 200 rail cars, for 10 days before being taken down, *see* Marcis decl. ¶¶ 6, 9, and WMATA has not pointed to a single threat or instance of vandalism that might have influenced its decision.

The Supreme Court "ha[s] not permitted the government to assume that every expression of a provocative idea will incite a riot." *Texas v. Johnson*, 491 U.S. 397, 409 (1989). Nor should

this Court presume, without evidence, that displaying Plaintiff's advertisements for another 18

days will disrupt WMATA's operations sufficiently to outweigh Plaintiff's constitutional rights.

## CONCLUSION

For the reasons given above, Plaintiff Milo Worldwide's motion for a preliminary

injunction should be granted.

September 19, 2017                    Respectfully submitted,

                                     *Arthur B. Spitzer*
                                     Arthur B. Spitzer (D.C. Bar No. 235960)
                                     Scott Michelman (D.C. Bar No. 1006945)
                                     American Civil Liberties Union Foundation
                                       of the District of Columbia
                                     4301 Connecticut Avenue, N.W. Suite 434
                                     Washington, DC 20008
                                     (202) 457-0800
                                     aspitzer@acludc.org

                                     Lee Rowland
                                     Brian Hauss
                                     American Civil Liberties Union Foundation
                                     125 Broad Street, 18th floor
                                     New York, NY 10004
                                     (212) 549-2500
                                     lrowland@aclu.org

                                     Leslie Mehta
                                     American Civil Liberties Union Foundation
                                       of Virginia
                                     701 East Franklin Street, Suite 1412
                                     Richmond, VA 23219
                                     (804) 644-8022
                                     lmehta@acluva.org

                                     *Attorneys for Plaintiff MILO Worldwide LLC*

Jeffrey P. Weingart
Stephen B. Meister
Meister Seelig & Fein LLP
125 Park Avenue – 7th Floor
New York, New York 10017
(212) 655-3500

*Of Counsel to Plaintiff MILO Worldwide LLC*