# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION,<br><br>FEMHEALTH USA, INC., d/b/a CARAFEM,<br><br>MILO WORLDWIDE LLC,<br><br>PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>WASHINGTON METROPOLITIAN AREA TRANSIT AUTHORITY,<br><br>PAUL J. WIEDEFELD,<br><br>Defendants. | Civil Action No. 17-cv-01598 (TSC) |

## MEMORANDUM OPINION

Defendant Washington Metropolitan Area Transit Authority ("WMATA") prohibits certain kinds of advertisements in the metro system. Plaintiffs American Civil Liberties Union ("ACLU"), Femhealth USA, Inc., d/b/a Carafem ("Carafem"), MILO Worldwide LLC ("Milo Worldwide"), and People for the Ethical Treatment of Animals, Inc. ("PETA"), filed a joint complaint alleging that WMATA's refusal to post their advertisements violated their First and Fifth Amendment rights. Plaintiff Milo Worldwide also filed the instant motion for a preliminary injunction. For the reasons below, the court finds that Milo Worldwide's request for a preliminary injunction is insufficiently supported by a showing of both likelihood of success on the merits and irreparable harm, and therefore the motion is DENIED.

# I.    BACKGROUND

Until May 2015, WMATA permitted a wide variety of commercial and non-commercial advertisements to be displayed throughout the metro system. On May 28, 2015, WMATA changed that approach and "closed its advertising space to 'all issue-oriented advertising . . . until the end of the calendar year,'" Am. Ans. 4, ECF No. 20, defining "issue-oriented advertising" as "including but not limited to, political, religious and advocacy advertising." Chair of Board of Directors Mot. 1, May 28, 2015, ECF No. 21-2.

WMATA claims that it decided to close the advertising space after a policy review process that began in 2010, and that the impetus for closure stemmed from controversies associated with issue-oriented advertisements. Opp. to Mot. for Prelim. Inj. at 3–4, ECF No. 21; Decl. of Lynn M. Bowersox, Assistant General Manager for Customer Service, Communications, and Marketing, at ¶¶5, 7–8, ECF No. 21-1. In particular, WMATA maintains that the costs of such advertisements—in terms of (1) community and employee opposition, (2) security risks resulting from potential incitement to violence, (3) encouragement of vandalism and defacement of trains and buses, and (4) administrative burdens of reviewing potentially controversial advertisements and addressing community reaction—outweighed the economic benefits associated with displaying them. *Id.* at 4; Bowersox Decl. ¶¶ 9–14. In November 2015, WMATA formally adopted an amended set of fourteen Guidelines Governing Commercial Advertising ("Guidelines") as part of its ban on issue-oriented advertising. Compl. ¶15; Am. Answer 3–4; Bowersox Decl. ¶16; WMATA Guidelines, ECF No. 21-3. Of particular importance here, Guideline 9 provides that "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited," while Guideline 14 provides that "[a]dvertisements that are intended to influence public policy are

prohibited." (WMATA Guidelines 9, 14). When it revised its Guidelines, WMATA also created a review panel—consisting of three attorneys and the director of marketing—to evaluate proposed advertisements. Bowersox Decl. ¶¶16, 21. Although WMATA contracts with an outside entity, OUTFRONT Media ("OUTFRONT"), to coordinate the logistical and financial aspects of submission and placement of proposed advertisements, OUTFRONT is required to submit any potentially issue-oriented advertisements to WMATA for panel review. Bowersox Decl. ¶¶ 20, 21. Thus, although OUTFRONT is empowered to accept or reject advertisements that it deems compliant or noncompliant with the Guidelines, *id.*, WMATA has the final say over whether a proposed advertisement is appropriate under the Guidelines. *Id.* ¶21.

Plaintiff Milo Worldwide is a corporation through which Milo Yiannopoulos—"a public figure who is known for his iconoclastic opinions about contemporary issues"—conducts business relating to his roles as an author, public speaker, and journalist. Mot. Prelim. Inj. 2, ECF No. 2; Decl. of Alexander Macris, Chief Executive Officer of Milo Worldwide, LLC ¶2, ECF No. 2-2. Milo Worldwide published Yiannopoulos's latest book, *Dangerous*. Macris Decl. ¶2. As part of a planned 28-day advertising campaign, Milo Worldwide contracted with OUTFRONT and submitted four advertisements in June 2017. Mot. 4. The advertisements consisted of Yiannopoulos's face, the book's title, and one of four quotations from different book reviews, which appeared on metro facilities in the following form:



Mot. 4; Compl. Ex. L, ECF No. 1-4; Macris Decl. ¶3.  OUTFRONT initially accepted the

advertisements, placing them in the metro system on June 26, 2017.  Mot. 4.  WMATA then

received a number of complaints about the advertisements (ECF No. 24-1), prompting customer

relations staff to issue responses, at least one of which read in part:

> "The display of this ad is consistent with Metro's policy of remaining content-
> neutral when accepting advertising. Although Metro understands that feelings and
> perceptions will vary among individuals within the community, we cannot reject
> advertising because some find it inappropriate or offensive."

Compl. ¶56; Am. Answer 8. WMATA maintains that an employee sent the above communication in error, using an outdated form response that had been drafted when WMATA maintained its advertising space as a designated public forum. Opp. to Mot. Prelim. Inj. 7; Bowersox Decl. ¶¶28–29.[1] WMATA further asserts that employees sent only one erroneous response, Opp. to Mot. Prelim. Inj. 7–8, that the error was corrected, and that it responded to all other complaints with the following message:

> Dear Customer Name:
>
> Thank you for your recent correspondence regarding "xxxx" advertisement on the Metro System. WMATA reviewed the advertisement and determined that it is prohibited by the Commercial Advertising Guidelines which may be found on our website at: https://www.wmata.com/about/records/public_docs/upload/Advertising_Guidelines.pdf
>
> Thanks again for your inquiry.

Bowersox Decl. ¶29.

WMATA eventually removed the advertisements between July 6 and July 8, 2017, and sought to refund the sum Milo Worldwide paid to post them. Opp. to Mot. Prelim. Inj. 7.[2] The reasons for removal are in dispute. Milo Worldwide suggests that WMATA removed the advertisements due to intense customer disapproval, expressed formally and informally. Mot. 4–5, 12–13. WMATA responds that it removed the advertisements pursuant to established regulations and in accordance with administrative review procedures—not because of their

---

[1] The full text of the allegedly erroneous response—submitted by Milo Worldwide—makes clear that the response was in fact premised on the notion that WMATA's advertising space was a designated public forum. Prior to the section quoted above, the response stated: "We appreciate the concerns you raised about the advertisement. Metro is a public agency, and the courts have ruled that our advertising space is a designated public forum. Therefore, Metro must be guided by First Amendment law with respect to the acceptance of advertising." Addendum to Reply to Opposition to Motion for Preliminary Injunction at 19, ECF No. 24-1.

[2] Milo Worldwide appears to have refused to accept a refund. *See* Macris Decl. ¶11.

unpopularity.  *See* Opp. to Mot. Prelim. Inj. 14–15.  According to WMATA, OUTFRONT

neglected to submit the proposed advertisements for initial WMATA approval before

publication, and when WMATA discovered the advertisements—as a result of customer

complaints—it submitted them for panel review.  Opp. to Mot. Prelim. Inj. 7; Bowersox Decl.

¶¶23–26.  The panel found that the advertisements violated Guidelines 9 and 14, and WMATA

ordered them removed.  Opp. to Mot. Prelim. Inj. 7.

## II.  STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy" that requires a "'clear showing'

that four factors, taken together, warrant relief:  likely success on the merits, likely irreparable

harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with

the public interest."  *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 505

(D.C. Cir. 2016); *accord League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016).

While the precise issue of how much weight should be accorded to each of the factors—i.e.,

whether the "sliding scale approach," pursuant to which an unusually strong showing on one

factor can justify applying a lower standard to another, remains valid—has not been definitively

resolved in this Circuit, *see Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014); *Sherley v.

Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011), the D.C. Circuit has observed that likelihood of

success on the merits "will often be the determinative factor in the preliminary injunction

analysis."  *Pursuing America's Greatness*, 831 F.3d at 511; *see also Arkansas Dairy Co-op

Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009) (treating failure to

adequately demonstrate likelihood of success on the merits as dispositive, and declining to

address the remaining preliminary injunction factors).  Moreover, "the standard for obtaining an

injunction is significantly heightened when a plaintiff requests affirmative injunctive relief." *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 247 (D.D.C. 2014).

## III. DISCUSSION

### A. Likelihood of Success on the Merits

In analyzing a challenge to a regulation involving speech on government property, the starting point is typically a forum analysis—identifying the type of forum at issue and the rules and standards applicable in that forum. *See, e.g.*, *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 800–04 (1985); *Am. Freedom Def. Initiative v. WMATA*, 245 F. Supp. 3d 205, 210 (D.D.C. 2017). The parties here agree that WMATA's advertising space is a limited or nonpublic forum, some terminological discrepancy notwithstanding.[3] Mot. 8; Opp. to Mot. Prelim. Inj. 9 n.1; *Am. Freedom Def. Initiative*, 245 F. Supp. 3d at 211. The terms "limited" or "nonpublic" forum refer to government property that is "not by tradition or designation a forum for public communication." *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, 1070 (D.C. Cir. 2012) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)). In contrast to subject-matter restrictions imposed in traditional or designated public fora, to which courts apply a strict scrutiny standard, *see Pleasant Grove v. Summum*, 555 U.S. 460, 469–70 (2009), subject-matter restrictions in a nonpublic forum need only be viewpoint neutral and reasonable in light of the forum's purposes. *Id.* at 470; *Initiative & Referendum Inst.*, 685 F.3d at 1070; *Perry Educ. Ass'n,* 460 U.S. at 49. Accordingly, it is undisputed that WMATA may impose content restrictions on speech to

---

[3] Milo Worldwide refers to WMATA's advertising space as a "limited public forum," while WMATA uses the term "nonpublic forum." The parties recognize that no substantive legal distinction attaches to the terminological difference. (Mot. 8; Opp. to Mot. Prelim. Inj. 9 n.1).

preserve the purposes of the forum it provides. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829–30 (1995).

Milo Worldwide relies heavily on *Rosenberger*, which held in part that the government may impose content rules in limited fora if those rules are designed to preserve the forum for particular purposes, and that the government may engage in content discrimination to preserve a forum for a given purpose, provided that it (1) "respect[s] the lawful boundaries it has itself set" by not excluding speech "where its distinction is not 'reasonable in light of the purpose served by the forum'," and (2) refrains from engaging in viewpoint discrimination. *Id.* at 829 (quoting *Cornelius,* 473 U.S. 788 at 806). Milo Worldwide argues that: (a) WMATA's decision to exclude Milo Worldwide's advertisements was unreasonable because the advertisements complied with WMATA's Guidelines—that is, the "boundaries [WMATA] . . . itself set"; (b) WMATA's decision amounts to viewpoint discrimination; and (c) Guidelines 9 and 14 are unconstitutionally vague as applied, insofar as both fail to provide a definite standard to constrain WMATA's discretion in determining which advertisements are permitted. Mot. 8–15. The court will address each argument in turn.

1.  Reasonableness of WMATA's Decision

Milo Worldwide contends that because its advertisements were "innocuous on their face"—meaning they did not violate WMATA's Guidelines—WMATA's decision to exclude them contravened its own Guidelines and was therefore unreasonable. Mot. 9–11. Milo Worldwide relies primarily on two cases, *Women's Health Link, Inc. v. Fort Wayne Public Transportation Corp.*, 826 F.3d 947 (7th Cir. 2016), and *Vaguely Qualified Productions, LLC v. Metropolitan Transp. Auth.*, No. 15 Civ. 04952 (CM), 2015 WL 5916699 (S.D.N.Y. Oct. 7, 2015).

In *Women's Health Link*, Citilink, an Indiana municipal corporation providing bus service, rejected a proposed advertisement from Women's Health Link, a nonprofit corporation providing health services to women. 826 F.3d at 949–50. The advertisement consisted of a woman's face, the name and contact information of the advertiser, and text reading "you are not alone" and "free resource for women seeking health care." *Id.* at 949. Citilink forbade any advertisements that "express[ed] or advocate[d] opinions or positions upon political, religious, or moral issues," *id.*, and concluded that the Women's Health Link advertisement violated this prohibition because Women's Health Link opposed abortion and provided alternatives to abortion—such as adoption counseling—along with other healthcare services. *Id.* at 950. Citilink viewed Women's Health Link's provision of alternatives to abortion as a moral issue. *Id.* The Seventh Circuit held that Citilink's policy was "limited to ad content," that the content of the advertisement was "innocuous" insofar as it "lack[ed] the faintest suggestion of a political, religious, or moral aim or agenda" and that Citilink's refusal to allow the advertisements was "an unjustifiable, because arbitrary and discriminatory, restriction of free speech." *Id.* at 952.

*Vaguely Qualified Productions* involved the New York Metropolitan Transportation Authority's ("MTA") rejection of a number of advertisements for an upcoming film entitled *The Muslims are Coming!*, a documentary following the lives of a group of American Muslim comedians. 2015 WL 5916699 at *3. The advertisements used "satire, irony, and other comedic techniques, to demonstrate, through humor, that 'American Muslims are ordinary people.'" *Id.* The advertisements consisted of humorous statements styled as "facts" about Muslims, and included a link to Vaguely Qualified Productions' website promoting the film and the comedians. The MTA rejected the advertisements on the grounds that they violated an MTA

policy prohibiting advertisements "directed or addressed to the action, inaction, prospective action or policies of a governmental entity" and those that "[p]rominently or predominately advocate or express a political message, including but not limited to an opinion, position, or viewpoint regarding disputed economic, political, moral, religious or social issues or related matters, or support for or opposition to disputed issues or causes." *Id.* The district court found that the fact that "the advertisements at issue gently mock prejudice and employ Islamophobia as a comedic device does not make their message 'prominently or predominately' political." *Id.* at *9. It held that "to 'prominently or predominately' advocate or express a political viewpoint, an advertisement must do far more than refer to a subject about which there is a lack of national consensus," that Vaguely Qualified Productions was not "an advocacy group" with "a specific political agenda or policy demands," and that the text of the advertisements—that is, the advertisements themselves, as distinguished from any purported motives in posting them—had no political dimension. *See id.* at *10.

Milo Worldwide argues that these two cases are similar to this one insofar as both involve public transportation agencies that rejected advertisements pursuant to rules governing expression in their advertising space, and both featured advertisements that involved no political or other topic proscribed by those rules.

WMATA responds first that "an ad promoting a manifestly political book is itself political advocacy," and that it would be illogical to require the court to ignore the content of a book when evaluating the message of an advertisement promoting that book. Opp. to Mot. Prelim. Inj. 10–11. WMATA further argues that the advertisements feature Milo Yiannopoulos's visage and contain quotations and other references that link the advertisement to the ongoing controversy surrounding his political advocacy, a fact which highlights the

synonymy of his person with his infamous political views, and incorporates the latter into the advertisement. Opp. to Mot. Prelim. Inj. 10–11. WMATA distinguishes *Women's Health Link* and *Vaguely Qualified Productions* on the grounds that: (1) the advertisers in those cases were not so closely connected to their political views and advocacy that any mention or feature of the advertiser inserted a political dimension into the advertisement; and (2) the Guidelines involved in this case are different from those involved in previous cases, and in any event, the two cases are not controlling in this district. Opp. to Mot. Prelim. Inj. 12–14.

In the court's view, WMATA reasonably concluded that Milo Worldwide's advertisements violated WMATA's prohibition on advertisements intended to influence public policy. WMATA therefore acted reasonably in excluding those advertisements, in view of its stated objective to reduce community and employee opposition, to diminish security risks, and to avoid vandalism and the burdens of administrative review. Bowersox Decl. ¶¶ 9–14. This conclusion is supported by the purpose for which the advertisements were apparently intended and the message that the advertisements—in their full context—communicate. Guideline 14 bars advertisements whose content evinces an intent—or consists of an attempt—to influence public policy. While Milo Worldwide suggests that the advertisements are purely commercial, and do not involve any issue of public policy, Reply to Opp. Mot. Prelim. Inj. 2, ECF No. 24, the content of the advertisements suggest otherwise. They reference, feature, and thereby incorporate Yiannopoulos' book *Dangerous*, which itself is a work of political advocacy—and therefore an attempt to influence public policy. *See Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. (SMART)*, 698 F.3d 885, 894 (6th Cir. 2012) (noting that in assessing the message of the advertisement, a court "may look beyond the four corners to websites that the advertisement incorporates by reference."). Advertisements are intended to

expand the audience for the product they advertise, and insofar as the purpose of an advertisement is necessarily connected to the characteristics of the product or service being advertised, it follows that in the case of a book focused on political advocacy, the advertisement is intended to expand the audience for the advocacy encompassed by the book. *See id.*

Second, the advertisement not only promotes and incorporates the advocacy in Yiannopoulos's book by reference, but also appears to deliberately incorporate other aspects of Yiannopoulos's political advocacy. The advertisement's inclusion of a number of quotations, such as "The Most Hated Man on the Internet," "The Ultimate Troll," "Internet Supervillain," and "Bullying Bleach-Blonde Tantrum Starter"—all of which refer to controversy over Yiannopoulos's political and public policy positions—serve to link the book and Yiannopoulos's policy views by recalling his advocacy to the viewer, thus capitalizing on the notoriety of his personality and views to encourage book sales. *See* Compl. Ex. L, M, ECF No. 1-4.

Third, Milo Worldwide's own pleadings support the court's conclusion. In support of its argument on irreparable harm, Milo Worldwide declared that the book "is a piece of advocacy on contemporary political and social issues [that] lies near the core of the First Amendment," that "publication and sale of *Dangerous* is an effort to reach people with a message and to persuade them," and that "[e]very lost sale therefore represents a lost opportunity to communicate, and perhaps to persuade." Mot. 18. This argument essentially concedes that the advertisements were intended to advance a campaign of persuasion on "contemporary political and social issues." *Id.*

The foregoing analysis also distinguishes this case from *Women's Health Link* and *Vaguely Qualified Productions*. The Seventh Circuit's decision in *Women's Health Link* turned on the fact that the advertisement in question was "a public service announcement that does not so much as hint at advocating or endorsing any political, moral, or religious position" and "lacks

the faintest suggestion of a political, religious, or moral aim or agenda." *See Women's Health Link* at 950, 952. The advertisement did no more than neutrally describe the availability of women's health care services, and neither promoted nor contained any references to advocacy of any kind. *Id.* The advertisement here is fundamentally different insofar as (1) the promotion of and reference to the author's position on public policy issues is the reason for its existence, and (2) the text of the advertisement incorporates prior advocacy along with Yiannopoulos's public persona.

*Vaguely Qualified Productions* is distinguishable on similar grounds. Although the advertisement in that case involved something that could arguably implicate a political issue—a documentary about the lives of American Muslim comedians—the court explicitly relied on the fact that the advertisement did not engage in or involve any kind of advocacy, and that the advertiser was "not an advocacy group . . . [and] has no specific political agenda or policy demands." *Vaguely Qualified Productions,* 2015 WL 5916699 at *10. That assessment contrasts sharply with the situation in this case, where the advertisement appears intended to incorporate Yiannopoulos's past political advocacy to sell his book and thus further advance his political positions. Accordingly, neither of these cases supports Milo Worldwide's argument that WMATA violated its own rules by rejecting the advertisements.

2. Viewpoint Discrimination

Milo Worldwide contends that WMATA's removal of its advertisements amounted to viewpoint discrimination. It claims that WMATA "caved" under pressure from customers who disapproved of Yiannopoulos's viewpoints, and, because WMATA shared that disapproval, it rejected the advertisements. Mot. 12–14. Milo Worldwide elaborates on this claim in its reply, arguing that WMATA's decision to perform "a behind-the-scenes investigation into the political

and social context of [Milo Worldwide's] proposed advertisement[s]," when it had not done so for other political advertisements—"despite their controversial political subtext"—is evidence of viewpoint discrimination. Reply 2.

The parties agree that there is significant public opposition to Yiannopoulos himself and to Milo Worldwide's advertisements.[4] However the court finds Milo Worldwide's evidence of WMATA's viewpoint discrimination insufficient to support a showing of substantial likelihood of success on the merits. Milo Worldwide's claim that WMATA gave in to public disapproval is premised on no more than a temporal nexus between the customer complaints and the removal, a nexus for which WMATA provides a neutral explanation.[5] Milo Worldwide has proffered no additional facts to rebut that neutral explanation, and therefore cannot establish a substantial likelihood that it would prevail on its viewpoint discrimination claim.

Milo Worldwide also points to the fact that WMATA has accepted multiple advertisements with political subtexts as further evidence of viewpoint discrimination. The advertisements identified include:

- An advertisement for the University of the District of Columbia's School of Law, stating "now is the time!," "practice law," "promote justice," and "change lives," above a list of the law school's credentials and achievements, and a photograph of people—presumably students—standing in front of the U.S. Capitol with a banner bearing the school's name and a number of signs, most of which read "Stand for Justice" and one of which reads "Black Lives Matter";

- A series of advertisements sponsored by Boeing and Lockheed Martin, featuring military and civilian aircraft, and including phrases such as "ready to deliver on day one," "the next 100 years," and "the F-35 can carry the load";

---

[4] *See e.g.*, Opp. to Mot. Prelim. Inj., Ex. L, M, N, O (describing violence and mass protests of "thousands" at Yiannopoulos's speaking engagements); *see also id.*, Ex. T, U, V, W, X (exemplifying and documenting opposition to Milo Worldwide's advertisements, including vandalism)).

[5] *See supra* note 1 & accompanying text (describing the temporal nexus and WMATA's neutral explanation for that nexus).

- An advertisement for Maryland casinos, including an image of a casino prize wheel with the words "monumental gaming moments every moment";

- Two advertisements for different brands of beer, reading "taste that's pure gold" and "your dream deserves a Bud," respectively;

- An advertisement for squirt.org, a same-sex dating website, featuring a couple and the words "your place or mine?";

- An advertisement for "The Originalist," a play about the life of the late Supreme Court Justice Antonin Scalia, featuring images of him alongside text reading "a timely, almost revolutionary work";

- An advertisement for the film "Girls' Trip" showing four women observing a scantily clad man;

- Three advertisements for the fast food chain Chipotle, with the words "Porkadise Found"; and

- An advertisement for a circus performance featuring live animals.[6]

These advertisements appeared in metro facilities in the following form:



---

[6] *See* Compl., Ex. C, D, E, F, K, N, O, T, U.





















Milo Worldwide contends that each of these advertisements violates either WMATA's prohibition on advertisements intended to influence public policy (Guideline 14) or its prohibition on advertisements intended to influence members of the public regarding issues on which there are varying opinions (Guideline 9).

The court disagrees that the advertisements and products listed above are analogous to Milo Worldwide's product and advertisements. As noted above, the intended purpose of Milo Worldwide's advertisements is political advocacy; they are part of a campaign to disseminate and encourage adoption of Yiannopoulos's political positions. None of the comparator advertisements can be so characterized. Indeed, none of them appear to be intended to influence public opinion or policy about any issues at all. While Milo Worldwide is certainly correct that there may be varying opinions about the propriety or quality of the goods or services advertised, neither the content of the advertisements themselves nor the products or services that content references focus on convincing the reader to take sides in any moral or political debate. This is true even of the advertisement for the F-35 aircraft, which Milo Worldwide discusses extensively. The content of that advertisement refers to the virtues of a product—an airplane— that involves no obvious political advocacy. That there may be debate surrounding government

investment in the product is beside the point if the advertisement's content, including its references, does not allude to—much less take a position in—that debate.

The same analysis applies with respect to the advertisements for the law school and the play about the life of Justice Scalia, both of which Milo Worldwide argues have a political dimension. Mot. 16; Reply 4. The fact that the content of an advertisement touches on matters of public prominence does not establish that the advertisement is intended to persuade or influence members of the public regarding those matters. Thus, although the advertisement for the University of the District of Columbia School of Law features a photograph of students carrying a "Black Lives Matter" sign, it does not follow that the advertisement is intended as an endorsement of the Black Lives Matter movement. Rather, the advertisement appears designed to promote the availability of what it advertises—the kinds of legal opportunities that accompany enrollment in the law school. Similarly, although a play chronicling the life of Justice Scalia and discussing his legal philosophy may touch on matters of public importance insofar as it involves discussion of political or legal views, the fact that the story of a prominent jurist's life involves legal or political ideas does not transform the telling of it into advocacy of those ideas, nor does it evidence an intent to persuade the public on a given issue. In sum, the court concludes that Milo Worldwide has not demonstrated a likelihood of success on its viewpoint discrimination claim.

3. Vagueness

Milo Worldwide contends that WMATA's Guidelines—in particular the two at issue here—are so vague and lacking in objective or definite criteria that they permit WMATA virtually unfettered discretion to decide which speech to accept or reject. According to Milo Worldwide, this renders the application of those Guidelines in this case "arbitrary, capricious, or

invidious" and thus "unreasonable." *United States v. Kokinda*, 497 U.S. 720, 726 (1990)

(quoting *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974)).

A speech regulation is unconstitutionally vague when it is not "clear enough to 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited.'" *Bryant v. Gates*, 532 F.3d 888, 893 (D.C. Cir. 2008) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Milo Worldwide does not specifically identify what portion of the Guideline language is vague, or describe why it is vague. Mot. 15–17. Nor does its reply brief provide additional details in this respect, instead arguing that if the advertisements are found to fall within the Guidelines, then "the Guidelines necessarily fail the test of precision and predictability, because every decision will depend upon the results of idiosyncratic research," thus creating a "system [that] would be inherently subjective and unpredictable." Reply 12. Milo Worldwide's argument on this issue mostly re-alleges its other two claims—that there is no reasonable basis for the distinctions between the rejected advertisements and other accepted advertisements, and that WMATA's initial acceptance and subsequent rejection of Milo Worldwide's advertisements highlights the Guidelines' arbitrariness. Mot. 15–16. The court finds these arguments unpersuasive here for the same reasons they are unpersuasive with regard to Milo Worldwide's other claims. The distinctions drawn between the rejected advertisements and the accepted advertisements appear to reflect reasonable and appropriate differentiation between different kinds of advertisements. Moreover, WMATA has offered a plausible, neutral explanation for its initial acceptance and subsequent rejection of the advertisements, and Milo Worldwide has failed to proffer evidence at this stage that would rebut WMATA's explanation. *See Bryant,* 532 F.3d at 894 (rejecting vagueness challenge founded on alleged inconsistencies between accepted and rejected expressive materials on the grounds that the materials were

differently situated and so were appropriately treated differently in light of the forum's purposes). Accordingly, Milo Worldwide has not established a likelihood of success on the merits of its vagueness claim.

## B. Irreparable Harm

Milo Worldwide concedes that any monetary loss caused by WMATA's actions is likely recoverable in damages, Mot. 17–19, and bases its irreparable harm claim on the abridgement of its First Amendment rights, arguing that the deprivation of constitutional freedoms itself suffices to establish irreparable harm. *See, e.g.*, *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (finding loss of constitutional freedoms sufficient to establish irreparable injury); *Am. Freedom Defense Initiative v. WMATA*, 898 F. Supp. 2d 73, 84 (D.D.C. 2012) (finding that threat to or impairment of First Amendment interests suffices to establish irreparable harm). Since Milo Worldwide has linked its claim of irreparable harm to its showing of a likelihood of success on the merits, its failure to establish the latter is fatal to the former, and its insufficient showing on both factors requires this court to deny its request for preliminary injunction.

## IV. CONCLUSION

Milo Worldwide has failed to demonstrate a likelihood of success on the merits of any of its claims. It also fails to establish any irreparable injury separate and apart from its allegations of a constitutional violation. Since demonstration of likelihood of success and irreparable injury are required to support a preliminary injunction, further discussion of the remaining factors in the preliminary injunction analysis is unnecessary, and Milo Worldwide's motion for a preliminary injunction is denied.

Date:  March 31, 2018

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge