UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION, *et al.,* Plaintiffs, v. WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, *et al.,* Defendants. | No. 1:17-cv-1598 (TSC) |

**MEMORANDUM IN SUPPORT OF
PLAINTIFF AMERICAN CIVIL LIBERTIES UNION'S
APPLICATION FOR A TEMPORARY RESTRAINING ORDER
AND MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff American Civil Liberties Union (ACLU) has filed an application for a temporary restraining order and a motion for a preliminary injunction ordering the Defendants to accept and display an advertisement that was submitted on behalf of the ACLU on May 21, 2018, in accordance with the terms of the fully-executed standard contract that was previously submitted by the ACLU. Plaintiff ACLU files this memorandum in support of that application and that motion.

**STATEMENT OF FACTS**

On March 31, 2018, this Court denied a motion for a preliminary injunction that had been filed by Plaintiff MILO Worldwide LLC. *ACLU v. WMATA*, ECF No. 27.[1] That opinion set out the background facts that are equally applicable to the instant motion. This memorandum assumes familiarity with those background facts and will not repeat them.

---

[1] The Court's opinion is available at 2018 WL 1583048 (D.D.C. 2018).

Plaintiff ACLU will be holding a nationwide membership conference at the Walter E.

Washington Conference Center in Washington, D.C. on June 10–12, 2018.  The conference will

be a place for people to learn, discuss, and share ideas about civil liberties and civil rights.  All

ACLU members and prospective members are welcome to attend.  The ACLU is using a variety

of methods to highlight the event, including extensive publicity on social media, radio "spots,"

and digital ads on various websites. The ACLU also wants to advertise the conference on the

WMATA transit system, which is a very effective way to reach people who live or work in the

Washington area. Declaration of Jaweer I. Brown, ¶¶ 2-3.

On May 10, the ACLU's media buyer submitted the advertisement depicted below

("Advertisement A") to Outfront Media, WMATA's advertising representative, together with a

fully-executed contract for 45 "2-sheets" (which are 46" x 60" advertisements that appear on

Metro station platforms) and 75 "bus kings" (which are 30" x 144" advertisements that appear on

the exterior sides of buses), to run from May 28 to June 12, 2018, at a cost of $90,000. *Id*. ¶ 4.


Advertisement A

On May 17, Outfront informed the ACLU's media buyer that the advertisement had been

rejected by WMATA on the grounds that it violated guidelines 9 and 14 of WMATA's

Guidelines Governing Commercial Advertising. Guideline 9 provides that "Advertisements

intended to influence members of the public regarding an issue on which there are varying

opinions are prohibited." Guideline 14 provides that "Advertisements that are intended to

influence public policy are prohibited." *Id*. ¶ 5.  The ACLU, through its media buyer, asked for a

more detailed explanation of why its advertisement was rejected. No additional exclamation was

forthcoming.  *Id*. ¶ 7.

In an effort to ensure that its advertisement would comply with the Guidelines, the

ACLU, through its media buyer, submitted alternative advertisements "B" and "C," depicted

below, to Outfront Media on Monday, May 21, 2018. *Id*. ¶ 8.



Advertisement B



Advertisement C

Advertisement B removed the words that were visible on signs in the background photograph in Advertisement A.  Advertisement C removed the background photograph altogether. *Id*. Advertisements B and C are not intended or designed to influence public policy or to influence members of the public regarding an issue on which there are varying opinions. They are intended to encourage ACLU members and prospective members to attend the ACLU's conference. *Id*.

The ACLU's media buyer expected to receive WMATA's approval via Outfront the next day, but did not. Nor was any response received on Wednesday, May 23, or Thursday, May 24, although the ACLU's media buyer repeatedly pressed for a response, emphasizing the shortness of time before the upcoming membership conference. As of noon on Friday, May 25, the ACLU's media buyer still had not heard whether Advertisements B or C were accepted, and could not obtain any assurance of when it would receive a decision.  There is no good reason why WMATA's response has taken so long, and further delay will make it impossible for the ACLU's advertisement to be displayed in Metro stations and on buses a reasonable time before the Membership Conference begins. *Id*. ¶ 9.

The ACLU needs to know at the latest by Wednesday, May 30, whether or not it will be able to place its advertisement in WMATA Metro stations and on WMATA buses, because that is the latest date on which arrangements can be made to print and post the advertisements in Metro stations and on buses a few days before the Membership Conference begins, even with expedited printing and posting. *Id*. ¶ 10.

Plaintiff ACLU seeks injunctive relief ordering Defendants to accept and display Advertisement B in accordance with the terms of WMATA's standard contract.  Should the Court decline to order such relief, then Plaintiff ACLU seeks injunctive relief ordering Defendants to accept and display Advertisement C in accordance with the terms of WMATA's

standard contract.  In either event, the ACLU requests that WMATA be ordered to produce and

display the ACLU's advertisements with the greatest possible expedition.

## APPLICABLE LEGAL STANDARD

A temporary restraining order or preliminary injunction is warranted where the party

seeking relief makes a "clear showing that four factors, taken together, warrant relief: likely

success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of

equities in its favor, and accord with the public interest." *League of Women Voters of U.S. v.*

*Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). "In First Amendment cases, the likelihood of success will

often be the determinative factor in the preliminary injunction analysis." *Pursuing America's*

*Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks omitted). For

that reason, where there is likely success on the merits, the court will "view more favorably

[Plaintiff]'s arguments regarding irreparable injury, the balance of the equities, and the public

interest." *Id.*

In this Circuit, courts have traditionally applied these factors on a "sliding scale," where a

stronger showing on some factors can compensate for a weaker showing on others.  *See, e.g.*,

*Davenport v. Int'l Brotherhood of Teamsters*, 166 F.3d 356, 360-61 (D.C. Cir. 1999).  It has been

suggested, but not decided, that a likelihood of success on the merits may be required.  *See*

*Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (citing *Winter v. Natural Resources*

*Defense Council*, 555 U.S. 7, 20-22 (2008)).  Under either approach, however, Plaintiff makes

the necessary showing here.

Emergency consideration is appropriate because here, as in *League of Women Voters v.*

*Newby,* there is "a hard deadline for meaningful injunctive relief. A fundamental constitutional

issue is at stake and time is of the essence." 838 F.3d at 7.  And as the court in *League of Women*

*Voters* noted, this Circuit "has rejected any distinction between a mandatory and prohibitory injunction, observing that 'the "mandatory" injunction has not yet been devised that could not be stated in "prohibitory" terms.'" *Id*. (quoting *United States v. Western Electric Co.*, 46 F.3d 1198, 1206 (D.C. Cir. 1995)).[2]

## ARGUMENT

As this Court has noted, "WMATA's advertising space is a limited or nonpublic forum" in which "subject-matter restrictions" must be "viewpoint neutral and reasonable in light of the forum's purposes." *ACLU v. WMATA*, Mem. Op. at 7.  In such a forum, the government must "respect[] the lawful boundaries it has itself set," and must not exclude speech "where its distinction is not reasonable in light of the purpose served by the forum."  It must also "refrain[] from engaging in viewpoint discrimination." *Id*. at 8 (quoting *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 829 (1995)) (internal quotation marks omitted).

### I.   Plaintiff ACLU Has a Clear Likelihood of Success on the Merits

#### A.   The ACLU's advertisements were improperly rejected because they are not intended to influence public opinion or public policy.

The advertisements submitted by the ACLU are not "issue ads." They are simply invitations to attend a conference.  The First Amendment does not permit WMATA to exclude certain speakers because of *who they are*.  If Ringling Bros. can advertise for people to come to their circus, the ACLU should be able to advertise for people to come to its conference.

---

[2] In its earlier opinion in this case, the Court stated that "the standard for obtaining an injunction is significantly heightened when a plaintiff requests affirmative injunctive relief." Mem. Op. at 6-7 (quoting *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 247 (D.D.C. 2014)).  But the court of appeals' more recent opinion in *League of Women Voters* rejects that distinction, noting that that "the 'mandatory' injunction has not yet been devised that could not be stated in 'prohibitory' terms." 838 F.3d at 7 (internal quotation marks and citation omitted).

When this Court denied MILO Worldwide's motion for a preliminary injunction, it

perceived that the advertisements in question were "part of a campaign to disseminate and

encourage adoption of Yiannopoulos's political positions," Mem. Op. at 19, as evidenced, in

part, by the fact that the advertisements themselves "deliberately incorporate[d] other aspects of

Yiannopoulos's political advocacy," by including quotations such as "The Most Hated Man on

the Internet," "The Ultimate Troll," "Internet Supervillain," and "Bullying Bleach–Blonde

Tantrum Starter."  In the Court's view, these quotations "serve[d] to link the book and

Yiannopoulos's policy views by recalling his advocacy to the viewer." *Id*. at 12.  The Court

therefore concluded that the advertisements were "intended to influence public policy." *Id*. at 11.

The Court contrasted the Yiannopoulos advertisements with other advertisements that

WMATA had accepted, which the Court found did not "appear to be intended to influence public

opinion or policy about any issues at all." *Id*. at 19.  Thus, for example, the Court found that

an "advertisement for Maryland casinos, including an image of a casino prize wheel with the

words 'monumental gaming moments every moment,'" did not seek to influence public opinion

or policy about gambling but simply sought to encourage patronage of the casino. *Id*. at 15, 19.

Likewise, an "advertisement for a circus performance featuring live animals" did not seek to

influence public opinion or policy about the propriety of using live animals in circuses but

simply sought to encourage attendance at the circus. *Id*.  Similarly, an "advertisement for

squirt.org, a same-sex dating website, featuring a couple and the words 'your place or mine?'"

did not seek to influence public opinion or policy about gay sex or casual hook-ups, but simply

sought to encourage use of the website. *Id*.

Perhaps the most closely analogous example cited in this Court's prior opinion is an

"advertisement for the University of the District of Columbia's School of Law, stating 'now is

the time!'" and featuring a photograph of people standing in front of the U.S. Capitol holding

signs such as "BLACK LIVES MATTER" and "HANDS OUT! FISTS UP! READY TO

FIGHT!"  The Court concluded that this advertisement did not seek to influence public opinion

or policy about racial justice but simply sought to encourage applications to the UDC Law

School. *Id*. at 14. As the Court explained, "although the advertisement for the University of the

District of Columbia School of Law features a photograph of students carrying a "Black Lives

Matter" sign, it does not follow that the advertisement is intended as an endorsement of the

Black Lives Matter movement. Rather, the advertisement appears designed to promote the

availability of what it advertises—the kinds of legal opportunities that accompany enrollment in

the law school." *Id*. at 20.

ACLU Advertisements B and C, which are now before the Court, fit squarely within this

latter category. They do not identify "any issues at all."  Mem. Op. at 19.  They do not seek to

influence public opinion or public policy.  They are simply "designed to promote the availability

of what [they] advertise," Mem. Op. at 20—the opportunity to attend the ACLU's membership

conference.  Therefore, Advertisements B and C do not fall within Guidelines 9 or 14, and

WMATA's rejection of these advertisements violates its own policy.[3]

---

[3] In the ACLU's view, Advertisement A also does not violate WMATA's Guidelines. Its background photograph of demonstrators holding signs is far less prominent and far less distinct, and is no more related to issues of public policy, or issues on which people have varying opinions, than the photograph of demonstrators holding signs in the UDC School of Law advertisement that WMATA accepted and that the Court found proper.  Nevertheless, in an excess of caution, the ACLU submitted Advertisement B (with the words on the signs removed) and Advertisement C (with the background photograph eliminated), to ensure that no reasonable viewer—or WMATA official—could believe that those advertisements were intended to influence public opinion or public policy on any issue.

**B.   WMATA's application of its Guidelines to reject the ACLU advertisements was arbitrary and capricious, and therefore unreasonable.**

When this Court denied MILO Worldwide's motion for a preliminary injunction, it rejected Plaintiffs' argument that the WMATA Guidelines at issue are applied in a manner that is "arbitrary, capricious, or invidious" and thus constitutionally "unreasonable." *Id.* at 20-21. The Court perceived that "[t]he distinctions drawn between the rejected advertisements and the accepted advertisements appear to reflect reasonable and appropriate differentiation between different kinds of advertisements." *Id.*  WMATA's recent rejection of the ACLU's advertisements, however, undercuts its claim to have maintained the distinction that the Court identified.

Comparing WMATA's rejection of the ACLU's advertisements with its acceptance of the other advertisements that are in the record demonstrates the arbitrary and capricious manner in which the Guidelines have been applied.  On its face, Guideline 9 provides that "*Advertisements* intended to influence members of the public regarding an issue on which there are varying opinions are prohibited."  (emphasis added).  Guideline 14 provides that "*Advertisements* that are intended to influence public policy are prohibited."  (emphasis added). If the guidelines were applied according to their plain language, prohibiting only advertisements that *themselves* seek to influence members of the public on certain issues or to influence public policy, then the advertisements for squirt.org, and the UDC School of Law, and the other advertisements canvassed in the Court's earlier opinion, would not violate the Guidelines—*and neither would the ACLU's advertisements*.  As the Court noted, viewing the squirt.com and UDC Law advertisements on their face, they do not "appear to be intended to influence public opinion or policy about any issues at all."  Mem. Op. at 19.  Nor do the ACLU's advertisements.

As the Guidelines are actually applied by WMATA, however, certain advertisements are examined only on their face (*e.g.,* squirt.org and the UDC School of Law), while others, such as the ACLU's, are probed beneath the surface to uncover unexpressed "intentions" that WMATA attributes to their sponsors. Looking behind advertisements that WMATA has accepted illustrates the difference.  For example, visiting the website of squirt.org, as that advertisement encourages, quickly reveals that the sponsor advocates a strong position "regarding an issue on which there are varying opinions."  The website states that squirt.org is "committed to encouraging men in their local communities to resist sexual repression and homophobia and to explore and enjoy a full expression of their sexual selves. ... And of course, Squirt.org also strives to get you laid! A lot!"  https://www.squirt.org/about.  Likewise, the website of the UDC School of Law asks, "What makes UDC David A. Clarke School of Law unique among law schools?" It answers its own question: "UDC Law is committed to the **public interest, using the law to help those in need and reshape our community.**" https://www.law.udc.edu/page/Facts? (emphasis in original).  Although the public policy goal of "using the law to help those in need and reshape our community" may be viewed as a worthy aspiration by most people in the District of Columbia, the UDC School of Law website makes clear that the school is "intend[ing] to influence public policy," and if the law school's intent is attributed to its advertisement, then the advertisement violates the Guidelines.

Determining that the squirt.com and UDC ads (to take those two examples) are acceptable based on their stated messages of urging the viewer to visit a website or apply to a school, but rejecting the ACLU's advertisements despite their similar stated message of urging the viewer to attend a conference, is arbitrary and capricious, unreasonable, and therefore

unconstitutional in a limited public forum.[4]   WMATA's approach to deciding which

advertisements violate Guidelines 9 and 14 is arbitrarily variable: sometimes (as with the

ACLU's advertisements), WMATA looks behind the face of the advertisements for the purposes

of their sponsor, and in other instances (such as the squirt.com and UDC advertisements)

WMATA does not.  The discretion WMATA exercises to apply opposing methodologies to

different advertisements opens the door to impermissible favoritism of certain messages over

others.  *See, e.g., A.N.S.W.E.R. Coalition v. Jewell*, 153 F. Supp. 3d 395, 408 (D.D.C. 2016),

*aff'd*, 845 F.3d 1199 (D.C. Cir. 2017) (explaining the risks inherent in permitting a licensing

authority to exercise "unduly broad discretion").  Moreover, WMATA's choice to apply its

criteria differently to the ACLU's advertisements also strongly suggests improper discrimination

"based on the identity of the speaker," which is itself a "constitutional wrong," because the

government "may not by these means deprive the public of the right and privilege to determine

for itself what speech and speakers are worthy of consideration. The First Amendment protects

speech and speaker, and the ideas that flow from each." *Citizens United v. FEC*, 558 U.S. 310,

340–41 (2010); *accord Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563 (2011) (striking down law

that prohibited pharmaceutical manufacturers, but not others, from using pharmacy information

for marketing; "The law on its face burdens disfavored speech by disfavored speakers."); *Dep't

of Texas, Veterans of Foreign Wars v. Texas Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014)

(en banc) (striking down statute constraining speech by bingo operators but not racetrack

---

[4] Even if the Guidelines were applied only to the content of the advertisements themselves, they
would still suffer from unconstitutional vagueness, because, for example, there is no non-vague
answer to the question, "what is 'an issue on which there are varying opinions'?"  However, it is
not necessary to address that issue at this time, because the application of the Guidelines to the
ACLU's advertisements is demonstrably arbitrary, capricious, and unreasonable.

operators); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 603 (7th Cir. 2012) (noting that the prohibition on speaker-based discrimination is "well-established").

For these reasons, the ACLU has demonstrated a clear likelihood of success on the merits.

## II. The ACLU will Suffer Irreparable Harm in the Absence of Relief

If the Court finds that Plaintiff ACLU has shown a likelihood that its constitutional rights are being violated, it follows that the ACLU will suffer irreparable harm unless an injunction is entered. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976)); *accord, e.g., American Freedom Defense Initiative v. WMATA,* 898 F. Supp. 2d 73, 84 (D.D.C. 2012) ("Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed.")

Although intangible harm therefore suffices in these circumstances, the harm here is tangible. The ACLU's membership conference will begin on June 10, less than three weeks from now. If the ACLU's advertisements are not accepted and displayed very promptly, their value will be lost forever, and the success of the ACLU's conference will be irreparably diminished by the lost attendance of those who would have seen the advertisements and decided to attend.

## III. The Balance of Equities and the Public Interest Favor Entering Relief

If the Court finds that Plaintiff ACLU has shown a likelihood that its constitutional rights are being violated, it likewise follows that the balance of equities and the public interest weigh in Plaintiff's favor.

As this Court has noted, "[i]t is always in the public interest to prevent the violation of a

party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C.

2012) (quoting *Abdah v. Bush*, No. 04-cv-1254, 2005 WL 711814 at *6 (D.D.C. Mar. 29, 2005));

*accord Lamprecht v. F.C.C.*, 958 F.2d 382, 390 (D.C. Cir. 1992) ("a [government] policy that is

unconstitutional would inherently conflict with the public interest").  At a minimum, "[t]he

public interest in this case will be served by ensuring that plaintiffs' First Amendment rights are

not infringed before the constitutionality of the [Guidelines] has been definitively determined."

*Stewart v. D.C. Armory Board*, 789 F. Supp. 402, 406 (D.D.C. 1992).  Nor will WMATA suffer

financial harm or opportunity costs, as the ACLU has contracted to pay WMATA its usual

commercial advertising rates.

**IV. The Court Should Order WMATA to Accept Advertisement B**

If the Court concludes (as it should) that WMATA's rejection of both Advertisements B

and C was improper, it should order WMATA to accept and display Advertisement B, which is

the ACLU's preferred version as between the two.  As the Supreme Court has explained, "[t]he

First Amendment mandates that we presume that speakers, not the government, know best both

what they want to say and how to say it." *Riley v. National Federation of the Blind of North

Carolina, Inc.,* 487 U.S. 781, 790–91 (1988).  Advertisement B, with its more dynamic

background, will better attract the attention of busy commuters and thereby enable the

advertisement to achieve its goal of encouraging people to attend the ACLU's conference.  So

long as Advertisement B does not violate a restriction that is both valid on its face and as

applied, it is the ACLU's option, not WMATA's, to choose which advertisement to pay for, as

"[t]he First Amendment protects [a speaker's] right not only to advocate their cause but also to

select what they believe to be the most effective means for so doing." *Meyer v. Grant*, 486 U.S. 414, 424 (1988).

## CONCLUSION

For the reasons given above, Plaintiff ACLU's application for a temporary restraining order or its motion for a preliminary injunction, ordering WMATA to display Advertisement B (or, in the alternative, Advertisement C) pursuant to the terms of WMATA's standard advertising contract, should be granted.[5]

Proposed orders are filed herewith.

May 25, 2018

Respectfully submitted,

*Arthur B. Spitzer*
Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
  of the District of Columbia
915 15th Street, N.W. – 2nd floor
Washington, DC 20005
(202) 457-0800
aspitzer@acludc.org


Brian Hauss
American Civil Liberties Union Foundation
125 Broad Street, 18th floor
New York, NY 10004
(212) 549-2500
bhauss@aclu.org

Vishal Agraharkar
American Civil Liberties Union Foundation
  of Virginia

---

[5] Because the entry of an injunction will not harm WMATA financially, the security required by Fed. R. Civ. P. 65(c) should be set at zero or at a nominal amount, such as $10. *See, e.g., Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) ("The district court retains discretion as to the amount of security required, *if any*." (internal quotation marks omitted) (emphasis in original)); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) ("the district court did not abuse its discretion in dispensing with the bond").

701 East Franklin Street, Suite 1412
Richmond, VA 23219
(804) 644-8022
vagraharkar@acluva.org

*Attorneys for Plaintiffs*