UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


AMERICAN CIVIL LIBERTIES            .
UNION FOUNDATION, et al.,           .
                                    .  CA No. 17-01598
          Plaintiffs,               .
                                    .
     v.                             .
                                    .  Washington, D.C.
WASHINGTON METROPOLITAN             .  Tuesday, May 29, 2018
AREA TRANSIT AUTHORITY,             .  4:16 p.m.
et al.,                             .
                                    .
          Defendants.
. . . . . . . . . . . . . . .


HEARING ON TEMPORARY RESTRAINING ORDER
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:            ARTHUR SPITZER, ESQ.
                              SCOTT MICHELMAN, ESQ.
                              American Civil Liberties Union of
                              the District of Columbia
                              915 15th Street, NW
                              Second Floor
                              Washington, DC 20005
                              (202) 457-0800


For the Defendants:           ANTHONY PIERCE, ESQ.
                              STANLEY WOODWARD, JR., ESQ.
                              Akin Gump Strauss Hauer & Feld LLP
                              1333 New Hampshire Avenue, NW
                              Washington, DC 20036
                              (202) 887-4411


Court Reporter:               BRYAN A. WAYNE, RPR, CRR
                              U.S. Courthouse, Room 4704-A
                              333 Constitution Avenue, NW
                              Washington, DC 20001
                              (202) 354-3186


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

1

THE DEPUTY CLERK:  Your Honor, we have Civil Action 17-1598, American Civil Liberties Union Foundation, et al., versus WMATA, et al.

I will ask that counsel approach the lectern and identify yourselves and those at your respective tables, starting with the plaintiffs' side.

MR. SPITZER:  Good afternoon, Your Honor.  Arthur Spitzer for the plaintiffs and Scott Michelman with me at the table.

THE COURT:  Good afternoon.

MR. PIERCE:  Good afternoon, Your Honor.  Anthony Pierce on behalf of WMATA.  And with me is Stanley Woodward and Patty Lee, who is the general counsel of WMATA.

THE COURT:  Good afternoon.  I should say before we begin, in the interest of full disclosure, that I know Mr. Pierce socially.  I would describe him as a friend.  We're not close friends.  We don't see each other very often.  But I do know him and his wife socially.  Our children once attended the same nursery school many, many years ago.  So I don't see any reason for me to recuse myself, but I did want to disclose that.

So before I hear your argument -- Mr. Spitzer, are you going to be arguing today?

MR. SPITZER:  Yes.

1          THE COURT:  All right.  There is a matter, I know

2     WMATA has argued that the ACLUF has no standing, and you've

3     filed a motion to add or substitute a party; is that correct?

4          MR. SPITZER:  Yes, your Honor.  We filed a motion for

5     leave to amend the complaint adding the additional party and the

6     allegations about the facts relating to the additional party,

7     and we would ask Your Honor to grant that.

8          The defendants, in their opposition filed Sunday, point to

9     Rule 21, and Rule 21 says the Court may, on its own motion or by

10    motion of a party, add or delete a party at any time.  And if

11    Your Honor would prefer to act under Rule 21 without ruling on

12    the motion to amend, that would be equally fine.

13         THE COURT:  I will grant the motion.  WMATA's point is

14    well taken, but I think at this point it is just something

15    that's going to -- inevitably would be granted anyway were it

16    filed in the normal course of the proceedings, and given the

17    exigency here, I'm going to grant the motion and allow the ACLUF

18    to be added and to proceed.

19         MR. PIERCE:  Your Honor, just for the record, we had

20    not had an opportunity to consider that.  They didn't consult us

21    on the adding of a party.  They consulted us on the TRO.

22         THE COURT:  Yeah, I'm not happy about all of this.

23    There is a local rule about meeting and conferring.  WMATA filed

24    its motion for an extension without stating in the motion

25    whether it was opposed or unopposed without consulting.  The

1    ACLUF filed its motion without meeting and conferring with WMATA

2    with regard to -- and had they done that, it might have not been

3    necessary.

4         So, you know, I'd like to use the time that we have for the

5    substantive argument.  But I'm going to caution both sides.  I

6    have had this case for a while.  I have many cases with you all.

7    It makes my life and my clerk's life a lot harder when you all

8    don't meet and confer, and it probably would cut down on the

9    filings if you did.  So I'm going to be pretty strict about

10   striking things or denying things summarily if you all don't

11   meet and confer.

12        MR. PIERCE:  Just for the record, my only opposition

13   is that it not be granted under Rule 15 because they are not --

14        THE COURT:  Okay.  I will exercise my discretion under

15   Rule 21 and allow the ACLUF to be added, thus rendering the

16   motion moot, and it should be so entered.

17        Okay.  I've read the parties' pleadings.  I have to say

18   that this is a close case.  It's a very difficult case.  I mean,

19   WMATA's rules are its rules, and if I follow the litigation

20   before Judge Berman Jackson with regard to the Catholic Church,

21   I've previously ruled with regard to the Milo Yiannopoulos book,

22   and I think this is close.

23        I do have some questions, but I'm going to let you proceed,

24   and I will interrupt you when you come to the part which I have

25   questions, Mr. Spitzer.

1    MR. SPITZER:  Thank you, Your Honor.  What I would

2    like to do is try to deal with a couple of smaller issues as

3    quickly as I can first and then get to the merits.

4    One point WMATA makes is that granting emergency relief

5    here would be tantamount to full relief, and that's true, but

6    it's equally true in the other direction, that denying emergency

7    relief here would be tantamount to a permanent denial.  The

8    conference is less than two weeks away.  Either this ad will

9    appear next week, or it never will appear.  So the Court is in

10    the unenviable position of having to make what amounts to a

11    final decision on this particular ad in emergency circumstances.

12    WMATA also argues that the balance of equities is against

13    us because we manufactured this emergency.  Respectfully, that's

14    not accurate.

15    THE COURT:  Let me ask you, Mr. Spitzer, with regard

16    to the irreparable harm.  I grant you that, given when your

17    conference is scheduled, if I deny your motion for a temporary

18    restraining order and, therefore, you're unable to get the ad in

19    the Metro, then you won't be able to advertise in WMATA's

20    facilities for the conference.  But that doesn't mean you won't

21    be able to advertise.  You just won't be able to advertise

22    within the WMATA system.

23    MR. SPITZER:  That's true, Your Honor, and the Supreme

24    Court has addressed that exact situation where a party has said,

25    as WMATA has said here, well, you can advertise elsewhere.

1      Here's the quote that goes back all the way to 1939 but has been

2      repeated many times.  "One is not to have the exercise of his

3      liberty of expression in appropriate places based on the plea

4      that it may be exercised in some other place."  That's *Schneider*

5      *against State* at 308 U.S.

6           And a good example of that rule is the well-known case of

7      *Grace against United States*, which had to do with demonstrations

8      on the Supreme Court sidewalk in 1983.  The government, the

9      federal government, said they don't need to demonstrate on the

10     east sidewalk in front of the Supreme Court; they can

11     demonstrate right across the street on the west sidewalk across

12     First Street.  And the Supreme Court said, no, they can

13     demonstrate on the west side, but if they want to demonstrate on

14     the east side, they have a right to do so, there's no reason to

15     prohibit them from that.  And the fact that they can demonstrate

16     across the street is simply irrelevant.  So I think that

17     principle is clear.

18          And WMATA offers a second reason why, in their view, we

19     wouldn't suffer irreparable harm.  They say on page 20 of their

20     opposition, "Plaintiff offers nothing more than speculation that

21     advertising in WMATA's transit system would increase conference

22     attendance."  And I thought that was a very surprising thing for

23     WMATA to say.  They charge a lot of money for their ads, and I

24     hope they think they're charging for more than speculation.  And

25     I think Your Honor should take that with a large grain of salt.

1    WMATA advertising, in fact, is quite effective, and that's why

2    the ACLU is willing to spend a lot of money to put ads on WMATA.

3         So if I may turn to the merits, why the ACLU is likely to

4    succeed on the merits here.  There are two reasons, and the

5    first one is the plain language of the regulation, the

6    guidelines.  The courts have been emphatic in recent years in

7    reminding us that the way to interpret a statute or a regulation

8    is to begin with the plain language and to end with the plain

9    language if the plain language answers the question.

10        And here I think it does.  The guidelines prohibit

11   advertisements intended to influence members of the public

12   regarding issues.  They prohibit advertisements intended to

13   influence public policy.  In WMATA's own brief back last fall

14   opposing the preliminary injunction motion for Mr. Yiannopoulos,

15   they explained, "WMATA's board made a final decision to close

16   the advertising space to ads that are issue oriented."  There's

17   nothing about these ads -- and I've brought a blow-up so we can

18   all see it.

19             THE COURT:  Well, here's what I -- is that

20   alternative C?

21             MR. SPITZER:  Yes.

22             THE COURT:  So here's my questions and my issues with

23   regard to alternative C.  That looks on its face to be very

24   content neutral.  It's simply informing the general public about

25   the conference.  But it directs the reader to a website,

1    aclu.org/conference, and as WMATA points out, if you go to that

2    conference website, it doesn't say "come join in our efforts to

3    celebrate the Constitution and ensure that the Constitution is

4    followed and is not encroached upon" and something that's

5    universal that sort of is noncontroversial.  It talks about

6    mobilizing against the Trump administration.  It talks about

7    taking a political stance.

8         How can the statements on the website regarding the purpose

9    of the conference be separated from the ad for the conference?

10   That was my problem with the Milo Yiannopoulos book, which was

11   the book directed the viewer to delve further and into the

12   advocacy that the book maintained, which was some very, very

13   controversial, far-right political advocacy.

14         MR. SPITZER:  So in our view, Your Honor, there's a

15   difference between the purpose of the advertisement and the

16   purpose of the conference, between the purpose of the

17   advertisement and the purpose of an organization.  Metro's rules

18   are aimed at advertisements.  They presumably are aimed at the

19   reaction of riders when they see the advertisement.  And the

20   rider who sees this advertisement doesn't know what's on several

21   pages of a website.

22         It's certainly true that the conference itself will be

23   talking about political issues and will be expressing a view --

24         THE COURT:  Well, how would you describe the primary

25   purpose of the conference?

1        MR. SPITZER:  I think the purpose of the conference is

2    to educate and energize ACLU members about a variety of issues.

3        THE COURT:  And to increase the number of members; am

4    I right?  Because that's the other thing.  If you register for

5    the conference, you're registering as a member of the ACLU.

6        MR. SPITZER:  Right.  I wouldn't say that's the

7    primary purpose.  I think that's a secondary purpose.  I'm

8    told -- and I don't know this firsthand, but I'm told it's not

9    an unusual thing.  In many organizations, register for a

10   conference, and you get essentially a complimentary --

11       THE COURT:  Right.  I'm not suggesting there's

12   anything nefarious involved, but I ask that question -- I'm not

13   trying to hide the ball here -- to flesh out whether this is

14   more in the nature of advocacy.

15       MR. SPITZER:  The conference is, but I think the

16   advertisement is not.  And I'll finish up with my plain language

17   point in a moment and get to the other point, which I think

18   maybe addresses more directly Your Honor's concern.

19       But I think WMATA did not adopt a policy that says we shall

20   have no advertising by entities that elsewhere engage in

21   advocacy or elsewhere intend to influence public policy.  To

22   take one example we discussed in the earlier papers and you

23   discussed in your opinion, Lockheed, it doesn't take much

24   research to find out, spent more than $14 million on lobbying

25   last year.  Lockheed has a clear point of view about increasing

1    the defense budget and buying Lockheed airplanes.  But Metro

2    looks at their advertisement, and they say, no, we don't

3    incorporate all that, we don't put all that into the

4    advertisement, it's just an advertisement about an airplane.

5    And I have several more examples that I will try to get to.

6            THE COURT:  Except the difference is Lockheed is an

7    airplane manufacturer.  It's in the business of making and

8    selling airplanes.  It may expend what seems to be a tremendous

9    amount of money lobbying the government to make sure that the

10   government has a healthy appetite for its products.

11       The ACLU, WMATA could argue, notwithstanding its efforts on

12   behalf of people on the right and the left, and that is a

13   well-established history that you have, but this conference, the

14   ACLU is an organization that brings lawsuits, that lobbies, that

15   engages in political activity, as you said, for the particular

16   perspective in mind.

17       And the conference is about advancing those goals, is it

18   not?

19            MR. SPITZER:  It is.

20            THE COURT:  All right.  And so whereas I think it's

21   possible to separate Lockheed, the business that Lockheed is in,

22   which is the business of airplane making and selling, it's not

23   as easy to separate out what the ACLU does from its conference.

24   The conference is to further the agenda of the organization.

25            MR. SPITZER:  Well, with respect, Your Honor, when

1     Lockheed advertises at the Pentagon Metro Station, I think the

2     intent of its ad, it's not advertising at Grosvenor.  It's

3     advertising at the Pentagon Metro Station.  It's not just

4     saying, hey, we make airplanes.  It's saying, hey, procurement

5     officers at the Department of Defense, buy our airplanes, buy

6     our airplanes, spend more money on defense.  So I don't think

7     it's quite as dichotomous as the question might suggest.

8          But let me move along to my second point, which is that

9     even if you don't just consider the ad on its face as being what

10    the policy is addressed to, WMATA's application of its rules is

11    arbitrary and capricious and is in this case, too.

12         Sometimes, as in Lockheed, WMATA just looks at an ad.

13    Sometimes it looks at a website that's on the ad.  Sometimes it

14    looks at a website that's not on the ad.  Sometimes, and I think

15    what's happening here, is it says, well, this organization has

16    viewpoints, and therefore, the organization becomes a prohibited

17    advertiser.  They say that, I think, pretty clearly on page 13

18    of their opposition where they say they shouldn't have to accept

19    ads from certain entities because a group's, quote, political

20    messages and leanings are well known, closed quote.  In other

21    words, you can't advertise because you have a viewpoint, whether

22    it's expressed in the ad or not, and that, I think, is quite

23    problematic because it's a speaker-based discrimination, which

24    the Supreme Court has warned us against, and the reason they've

25    warned us against it is because it so easily becomes a

viewpoint-based discrimination because different speakers have different viewpoints.

And so let me give you three examples, if I may.  And the first one was a centerpiece of the Roman Catholic Archdiocese litigation.  The archdiocese pointed to an ad by the Salvation Army which WMATA had accepted.  WMATA vigorously defended that ad in that litigation.  It's an ad to put a dollar in the bucket in the Salvation Army's campaign.  The Salvation Army, if you go to their home page and just one click away from the home page, if you click on "about us," it takes you to their mission statement.

THE COURT:  I noticed that about the opinion also, Mr. Spitzer.

MR. SPITZER:  And the mission statement says, "The Salvation Army is an evangelical part of the Universal Christian Church.  Its message is based on the bible.  Its mission is to preach the gospel of Jesus Christ and to meet human needs in his name."  And they have a separate guideline that says no religious messages.  And yet, although the Salvation Army has a very clear religious message, it was not computed to their advertisement saying put money in the bucket.  So it's quite inconsistent.

Another example we discussed in our papers, the UDC Law School ad.  I suppose not everyone knows that UDC Law School is not just any old law school.  Certainly, many Metro commuters

know and the web site makes it clear that UDC Law School has a
very clear point of view about the purpose of law and about what
it's training its students to do.  It's not just training its
students to practice law.  And frankly, you don't go to law
school to learn how to hold a sign in a demonstration.  You can
do that without going to law school.

So Metro says, speaking of the ACLU's ad on page 14 of its
opposition, "WMATA customers who avail themselves of that
opportunity," meaning the ACLU conference, "would be subject to
plaintiff's political advocacy.  Consequently, the ad is
intended to influence members of the public regarding issues on
which there are varying opinions and intended to influence
public policy."

But the same could be said about WMATA customers who avail
themselves of the opportunity to go to UDC Law School.  For
three years, they're going to be indoctrinated with UDC's very
particular philosophy of what kind of a lawyer you should be.
It's not just learning torts and contracts.

And a third example is -- well, I discussed Lockheed
already.  So I don't need to discuss that again.  One ad as a
Metro rider I've seen, I think, a very large number of ads in
recent months for Catholic University of America, "attend
Catholic University," and shows pictures of students in
classrooms.  And there's nothing objectionable about the ad.
But of course, Catholic University of America also has a

particular point of view on various issues.  You can't have an

abortion rights club at Catholic University, and Metro, I think,

properly does not impute that to these ads.

So yes, the ACLU is an advocacy organization, but just

being an advocacy organization doesn't mean we shouldn't be

allowed to speak to Metro's advertising platforms because of who

we are.  And I do think that's what's happening.

Ultimately, what I think is going on here is sort of an

unconscious bias in favor of the mainstream.  If your

organization's position is one that people sort of aren't --

THE COURT:  Don't care about?

MR. SPITZER:  Yes.  If it's Lockheed, if it's the

Salvation Army, if it's Catholic University, well, okay, it's

sort of a mainstream opinion.  But if it's not in the

mainstream, then all of a sudden Metro's paying special

attention and imputing things to your ad, and that is precisely

a form of viewpoint discrimination.

Ultimately, Metro comes down, I think, to saying we have to

have some discretion.  And of course, in applying any rule,

there are going to be some close cases, and a decision-maker

like Your Honor is going to have to exercise judgment sometimes

in a close case.  But the amount of discretion that Metro has

arrogated to itself here and is applying -- which it seems to us

is contrary to the guidelines on their face.  If you just

applied the guidelines on their face, I think it would be pretty

1    simple.  But the kind of discretion they're applying here in

2    terms of how deeply to dig into an organization's other

3    activities and an organization's viewpoints that are not visible

4    to the Metro rider, I think that discretion is too much.

5         And Metro cites two cases saying a transit authority or an

6    organization has to have some discretion.  And so let me just

7    cite two cases to Your Honor.  One is from the Fourth Circuit

8    from our neighboring Montgomery County, and it's called *Child*

9    *Evangelism Fellowship of Maryland Against Montgomery County*

10   *Public Schools*, 457 F.3d 376.  And that involved a curious

11   forum.  The Court called it the take-home flyer for -- kids in

12   the public schools were allowed to take home certain fliers in

13   their backpacks to show their parents.  And the Court viewed

14   that as a limited or nonpublic forum, just as the parties agree

15   we are dealing with a limited or nonpublic forum here.  And the

16   Court says, "Viewpoint neutrality" -- which is a necessary

17   criterion of a nonpublic forum.  "Viewpoint neutrality requires

18   not just that the government refrain from explicit viewpoint

19   discrimination but also that it provide adequate safeguards to

20   protect against the improper exclusion of viewpoints."  That's

21   at page 384.

22        And the Court finds that because the policy provides

23   Montgomery County Public Schools with unlimited power to

24   withdraw approval of any file -- of any flyer that it determines

25   undermines the intent of the policy, which was to allow

communications without disrupting the educational environment,
that policy is too much discretion, there's no meaningful
restraint on Montgomery County Public Schools' discretion to
withdraw approval of a flyer for any reason it chooses,
including viewpoint discrimination, and struck the policy down.

And the other case I would cite is from the Sixth Circuit.
WMATA relies on a case cited in their brief called *American
Freedom Defense Initiative against SMART*, Suburban Mobility
Authority.  But *SMART*, in turn, talks about an earlier Sixth
Circuit case which had struck down a transit authority policy,
and here's how it distinguishes the earlier case.  And the
earlier case is *United Food and Commercial Workers against
Southwest Ohio Regional Transit Authority*, 163 F.3d 341, and it
says the policy in the earlier case disallowed advertising that
addressed controversial public issues.  "We found unbridled
discretion had been vested in the decision-makers to determine
what was controversial.  This discretion allowed for the
arbitrary rejection of advertisements based on viewpoint."

I think those two cases are quite parallel to what we're
seeing here, although Metro's policy on its face, I think, could
and should be applied in a nonarbitrary and capricious way,
either an advertisement has public policy advocacy or
controversial issue advocacy or religious advocacy or it
doesn't.

Metro has chosen, I think in violation of the policy its

1    board adopted, to apply a very broad and standard list

2    discretion in determining what it wants to impute to an

3    advertisement.  And in doing so, I think it acts in a way that's

4    contrary to what the Fourth Circuit and the Sixth Circuit would

5    allow.

6        If I have any time left, I'd love to reserve it for

7    rebuttal.

8            THE COURT:  Okay.  All right.  Actually, my question

9    is not going to be for you but for Mr. Pierce.  Thank you,

10   Mr. Spitzer.

11           MR. SPITZER:  Thank you.

12           MR. PIERCE:  Thank you, Your Honor.  Good afternoon

13   again.  Just so you know, I am not lead counsel in this case.  I

14   was forced into this by the last-minute activities of the

15   plaintiffs.

16           THE COURT:  Did you have a good weekend?

17           MR. PIERCE:  Bear with me.

18           THE COURT:  I did not.

19       (Laughter.)

20           MR. PIERCE:  We should have been honoring the fallen

21   yesterday.

22           THE COURT:  Mr. Pierce, suppose -- first of all, I'm

23   going to jump right in because I do have more questions for you.

24       If this simply said, you know, "come to our ACLU

25   conference" and there was not a website URL, if it didn't list

1    their website, if it simply said "come to our conference at the

2    convention center June 10th to 12th," would WMATA have the same

3    problem?

4         MR. PIERCE:  Sure, Your Honor.

5         THE COURT:  Why?

6         MR. PIERCE:  One, you can't divorce the conference and

7    the advocacy that occurs in the conference from the ad.  We

8    didn't do that in the Milo case --

9         THE COURT:  But Milo had direct -- it encouraged the

10   viewer, the reader, to check out the book.  It was inextricably

11   intertwined with the advocacy in the book.

12        MR. PIERCE:  And this ad does as well, Your Honor,

13   because if you notice, at the top of the ad, it says, "You

14   belong here."

15      And by the way, before we get into it, I'm now a little

16   confused about what they want to do.  This is not the ad in

17   their papers that they said they wanted.

18        THE COURT:  I thought this was called "alternative C."

19        MR. PIERCE:  No.  This, in my opinion, is C.  If you

20   look at what they ask for in their brief, they wanted B, which

21   has a different link to it which says "aclu.org/dc."  This

22   link -- and I don't know if Your Honor has Internet access, but

23   I just did it on our computer.  This link doesn't even work.

24   But the link that actually works for that particular ad goes

25   through --

1          THE COURT:  Well, I will say this:  On page 3 of the

2    ACLU's memorandum that's document 31-2, that ad that is on the

3    easel is photographed as advertisement C.

4          MR. PIERCE:  That's photographed as advertisement C,

5    but if you look at the brief, they say the Court should force

6    WMATA to do advertisement B.  And advertisement B, which you

7    have there, I think you've gotten to the page, if you look at

8    the actual link to it, it first starts -- and I'll hand this up

9    to the Court.  It first starts with "you belong here," and if

10   you look in the background there of that ad, it says, "Muslim

11   ban.  Stop profiling Muslims.  Refugees welcome."  The "you

12   belong here" is a direct reference to their advocacy on

13   immigration, and that's what they're asking you to approve,

14   unless he's now saying this ad --

15         THE COURT:  Well, let's stop here.  Let's just say I

16   know a little bit about those cases.  I agree that "you belong

17   here" in conjunction with those photographs could be read that

18   way.  But in the one that's being shown here, and unless

19   Mr. Spitzer tells me that they're actually asking for B, not C,

20   I'm going to take this argument as -- is it C that you're asking

21   for, Mr. Spitzer?

22         MR. SPITZER:  Your Honor, WMATA says they never

23   received B.  And I don't know how that happened.  We believe

24   that we sent it in last Monday.  But they say they never

25   received it, and I take them at their word.  We send it to our

1    ad buyer.  Our ad buyer sends it to their ad buyer, who then

2    sends it to WMATA for approval.  So somewhere in that chain, B

3    apparently didn't get transmitted, and that's why I proceeded to

4    C.  We would prefer B, if Your Honor thinks it's legitimately

5    before you, but since we didn't submit it, apparently --

6         THE COURT:  Well, I have to tell you, I think your

7    quest is more difficult with B, because I think B does -- I

8    think "you belong here" as a statement inviting people to come

9    to any conference is fairly neutral.  It says come; you should

10   come to our conference.

11        "You belong here" with the photographs in the background, I

12   tend to agree with Mr. Pierce.  I think it's more -- that more

13   links the "you belong here" to the immigration advocacy that the

14   ACLU takes.  But if it's C, which is the photograph, the mock-up

15   that's on the easel, I actually don't think your argument that

16   "you belong here" is so closely tied to the ACLU's immigration

17   cases is well taken.

18        So the brief that does say B or alternatively C, I'm going

19   to address my argument to C, since, as Mr. Spitzer points out,

20   WMATA says they didn't get B.

21        MR. PIERCE:  Whether we got B or C, both are

22   rejectionable.  And Your Honor, we can't divorce ourselves from

23   the website, because as the Court stated in the Court's ruling

24   on the Milo matter, you have to look beyond the ad.  So the

25   website is like the book in the ad.  It's very analogous.  And

1   why I tell you that "you belong here" is another piece of

2   advocacy that's connected to that website, if you keep going

3   into that website -- I'm going to hand this up for the record --

4   you've got to register.  So whether that works or the D.C. --

5   the aclu.org/dc works, if you had that ad in our trains or buses

6   and the person clicks on their phone, they're going to see all

7   of that advocacy.

8       And let's just remind us what this conference is about.

9   You pointed out already what one of the issues was, which is

10  that the organization advocates and lobbies legislators at the

11  federal and local levels to advance civil liberties and civil

12  rights.  And we may all agree that that's a laudable thing to

13  do, but it's advocacy, and that kind of advocacy under our

14  guidelines which have been approved by several courts now

15  doesn't meet the guidelines.

16          THE COURT:  Here's the thing, and this is why I think,

17  Mr. Pierce, I have to tell you, I think WMATA's guidelines, well

18  intentioned though they may be -- and I rule on constitutional

19  issues all the time.  I'm hard-pressed to find some kind of

20  clear principle or lines in WMATA's application of its

21  guidelines.  I know it's not what I'm being asked to decide

22  here, but I have to tell you, I share Mr. Spitzer's concern.

23      I read that opinion.  I don't see the difference between

24  the Salvation Army's -- the approval of the Salvation Army's ad

25  as opposed to the Catholic Church ad.  I don't know if --  as I

1   sit here, I couldn't tell you.

2       WMATA has agreed to run the David C. Clark School of Law.

3   David C. Clark School of Law is a public interest-focused law

4   school.  If you want to be a public interest lawyer -- and I say

5   "public interest lawyer" tending towards the left of the

6   spectrum -- then you go to David C. Clark.

7       Would WMATA run an ad for the Antonin Scalia School of Law

8   in Virginia and all that they advocate?  I don't know.

9       I mean, I really think it's just sort of what does the --

10  what was the company?  Bowersox?  It seems like sometimes they

11  catch an ad and say there's a problem with this and sometimes

12  they don't, and it really does seem like it's very random.  And

13  I don't understand the application.

14          MR. PIERCE:  I'd rather deal with the issues in this

15  particular case --

16          THE COURT:  I know, but I'm telling you, that's one of

17  the problems I'm having.

18          MR. PIERCE:  But the hypotheticals that you give,

19  they're easy to understand, recognizing that they're

20  hypotheticals.  In the UDC Law School case, which you already

21  ruled on, that is advertising coming to law school.  The Antonin

22  Scalia ad, if there was one --

23          THE COURT:  But it's close.  I looked at that David

24  Clark School of Law ad, and they had signs with "black lives

25  matter."  That, to me, was an indication of what the political

bent of the David Clark School of Law was, and that passed

muster.  And if that passes muster, why doesn't this conference

pass muster?

MR. PIERCE:  Just to go back, just so you know with

the David Clark UDC Law ad, WMATA itself never saw that ad.  I

suspect that that went through OUTFRONT and then got posted.

THE COURT:  See, and that's my problem.  How are these

standards applied?

MR. PIERCE:  The case law is clear, Your Honor, that

WMATA is allowed to have some discretion and maybe even make a

mistake.  That is -- they're human beings.  That doesn't mean

you throw out all of the policies when you have before you an ad

and a conference that is clear advocacy.

THE COURT:  Mr. Pierce, could the ACLU put up any ad?

Not for its conference.  Given what you have seen on the ACLU

website, could the ACLU put up any ad in Metro that says "ACLU,

join us"?

MR. PIERCE:  Again, you're asking me to do a

hypothetical?

THE COURT:  No, it's not a hypothetical, because what

I'm concerned with here is that you are moving into viewpoint

discrimination.

MR. PIERCE:  I'm going to answer it.

THE COURT:  Okay.

MR. PIERCE:  We certainly don't have viewpoint

discrimination because we reject all kinds of ads of all kinds

of viewpoints.

THE COURT:  Except Salvation Army, an Evangelical

Christian organization?

MR. PIERCE:  With the Salvation Army, Your Honor, what

was the Salvation Army's purpose of that ad?  To raise money.

If we took the position that every charitable organization that

wanted to raise money would be barred from the ad, no charitable

organization would be able --

THE COURT:  The Catholic Church is a charitable

organization.

MR. PIERCE:  I'm sorry?

THE COURT:  The Catholic Church is a charitable

organization.

MR. PIERCE:  But again, let's focus on the ad.  The

Catholic Church ad was about Advent.  They were arguing about a

religious principle that they had, something that they wanted

folks to come and partake in, which is advocacy.  It's in the

religious category, not guidelines 9 and 14.

We're here dealing with guidelines 9 and 14, which say any

ad that is intended to influence members of the public regarding

an issue on which there are varying opinions is barrable.  You

can bar that ad.  And it also says if it's intended to influence

public policy.

They're not questioning the guidelines themselves.  They're

1   questioning the inconsistent, in their view, application.  And

2   let's look at what they say is inconsistent.  We just talked

3   about the David Clark School of Law ad.  Let's talk about the

4   other one that they said, which is the squirt.org ad, which is

5   nothing but a -- I'm not going to go through it.  It's already

6   in the brief.  But it's a dating site for gay and bisexual men.

7        THE COURT:  I think it tends to bypass dating

8   altogether.

9      (Laughter.)

10        THE COURT:  If you're talking about an area where

11   there are differing opinions, law and philosophy aside, that's

12   an area in which there's a lot of --

13        MR. PIERCE:  But there's no advocacy.

14        THE COURT:  But it had a website; right?

15        MR. PIERCE:  It did have a website, and we looked to

16   the website.  And let me just close it out on that, Your Honor.

17   If we went to that website, the statement that they're claiming

18   is somehow advocacy is not all the stuff you just made reference

19   to, but the statement is committed to encouraging men in their

20   local communities to resist sexual repression and homophobia and

21   to explore and enjoy a full expression of their sexual selves.

22   Now, that is buried in the fourth paragraph of the website, and

23   it's advocating nothing but sex, in my humble opinion.  And

24   there's no public policy issue fight about that.

25        And Your Honor, the proof of WMATA's consistency is when

1    that ad did stretch into advocacy, when it said -- when they

2    proposed stating "make America gay again," which is a spin on a

3    very prominent piece of advocacy about a president of the United

4    States, WMATA rejected it under its guidelines.  That is

5    absolute consistency.

6            THE COURT:  With "you belong here"?

7            MR. PIERCE:  Your Honor, you cannot -- all due

8    respect, you cannot divorce "you belong here" from the website,

9    because if that ad just said "you belong here," they have to

10   have some way to register; right?  So they go, they look up ACLU

11   conference.  You get this.  You first get the "you belong here.

12   Register."  The ACLU logo is actually on this ad.  "Muslim ban."

13   This is clearly an ACLU advocacy event.  "Stop profiling

14   Muslims.  Refugees welcome."

15       And then to top it off, if you just scroll down a little

16   bit -- you can't see this, but you get the "you belong here"

17   with a target and an arrow going at it.  Your Honor, that is

18   advocacy.

19           THE COURT:  Well, I think that's to direct the reader

20   to where to press the little link button.

21           MR. PIERCE:  Your Honor, it has nothing to do with

22   that.  I wish I could show it to you.  You just slide your

23   cursor down, and all of a sudden, this shoots up in the

24   background.  "You belong here."  They're connecting it -- with

25   the background, they're connecting it to the immigration issue.

1    They're trying to drive traffic to their organization so they

2    can increase their ability to advocate on an issue that they are

3    well known to be fighting about.

4        And it's not issue discrimination.  Quite frankly, I think

5    they may be right about the issue of immigration and what folks

6    ought to be doing.  But that's not what we're here for.  We're

7    here in a nonpublic forum, in a limited-purpose forum -- by the

8    way, most of their cases in their brief talk only about public

9    forums.  The case he talked about on the Supreme Court steps,

10   the steps are a public forum.  It's not a nonpublic forum.  The

11   case should be ignored.

12       We're here in a nonpublic forum where we're given, under

13   the First Amendment, rights to monitor and approve of our ads

14   in a way that we think will improve the operations of Metro, to

15   make sure customers aren't offended, to control our workplace.

16   The case law is replete with support for that kind of approach

17   in a nonpublic forum.

18           THE COURT:  I understand, but here's the thing.

19   You've suggested in your pleadings that you're entitled to

20   consider the advocacy-related history of the advertisement

21   sponsor.  And how is that any different from choosing disfavored

22   speakers on the basis of their current or prior political

23   involvement?

24       I mean, you are -- you know, you're right, it is not a

25   public forum.  You're entitled to have regulations, and you have

1    resolutions.  And you're also right that ACLUF is not in here

2    challenging the regulations.

3        But what I'm having a hard time understanding is what you

4    seem to be saying is any organization that could be

5    controversial we're not going to advertise.

6            MR. PIERCE:  That is not what we're saying,

7    Your Honor.

8            THE COURT:  But isn't that the effect?  If you're

9    trying to make people not offended in Washington, D.C., you're

10   going to have a very, very hard time, because everybody is

11   offended about something.  And so what the result of those

12   regulations seems to be is that anything that might cause

13   anybody any angst or distress or offense is not going to be

14   allowed, and therefore, we're just going to have pictures of

15   kittens in the Metro.  This is a city where everybody's

16   advocating something.

17           MR. PIERCE:  There are plenty of ads on the Metro,

18   tons of them.

19           THE COURT:  Commercial goods.

20           MR. PIERCE:  Commercial-related ads.  There's no

21   advocacy on the Metro.  That is perfectly legal under the First

22   Amendment.

23       And, Your Honor, the notion that we are somehow

24   discriminating against a particular organization is just --

25   there's no evidence of that.  What we're doing is we're limiting

1    advocacy.

2           THE COURT:  So if the ACLU --

3           MR. PIERCE:  And let's look at the reverse.  Just bear

4    with me for just a second, Your Honor.

5           THE COURT:  Okay.

6           MR. PIERCE:  Let's just look at the reverse.  If we

7    allow this ad, then tomorrow the Ku Klux Klan could put an ad up

8    that says "Ku Klux Klan conference in D.C.  You belong here."

9    Now, we know that that is absolute advocacy.  If the Democratic

10   National Committee -- let's go to the other side.  If the

11   Democratic National Committee puts up an ad that says there's a

12   conference here, that is advocacy for that organization.

13          THE COURT:  All right.  Forget conferences.  So is it

14   your position that if the ACLU simply wanted to put up an ad

15   saying "the ACLU, we're a great organization," they wouldn't be

16   allowed to advertise?

17          MR. PIERCE:  I can't -- here's what I would say to

18   Your Honor.  I would like to see that ad.  I would like WMATA's

19   process to go through that ad and make that determination.  I

20   could sit here and speculate with you about what we would accept

21   and what we wouldn't.

22      This morning as I was coming to work, I was thinking, well,

23   maybe if the ACLU put up an ad about the weather, that might --

24          THE COURT:  The difference that I see with the DNC,

25   the DNC is a political party.  The Ku Klux Klan is a party that,

1    by their very name, advocates a certain position.

2         The ACLU, it is an advocacy organization, but it engages in

3    advocacy on both sides of the spectrum.  I mean, Milo

4    Yiannopoulos was not -- would not be the kind of person that

5    would be normally --

6         MR. PIERCE:  They advocate for broad First Amendment

7    and civil liberty rights.

8         THE COURT:  Right.  But given that they are an

9    advocacy organization, it seems to me that, under Metro

10   guidelines, they couldn't advertise anything, not just their

11   conference.  They couldn't say "join us, ACLU, give us money,

12   ACLU."  I suspect very strongly they would get rejected --

13        MR. PIERCE:  I don't know the answer to that question,

14   and thankfully, we don't have that question in front of us.

15   We've got this question.  This question says "you belong here,"

16   and it links you to the conference.  That particular link

17   doesn't work, but a link that would work screams of advocacy,

18   and that's where we are.

19        THE COURT:  So take out the "you belong here."  And

20   I'm not suggesting that ACLU would agree to any of this, but I'm

21   trying to test the limits of your policy here.

22        Take out "you belong here."  You have "ACLU Conference,

23   Walter Reed Washington Conference Center, Washington, D.C.,

24   June 10 to 12, featuring the speakers listed," nothing else,

25   except maybe "ACLU" in the bottom right, no link.  Although in

1    this day and age, I understand that's probably impossible.  No

2    link.

3        Is that allowable?  You don't know?

4        MR. PIERCE:  I'm not in the habit of asking judges

5    questions, but I'll answer that with a question.  How do they

6    register for the conference?  They have to go to the website.

7        As I've shown already and as the papers show and as he has

8    admitted, the website is nothing but advocacy.  They admit

9    themselves that the conference is advocacy, that the ACLU is

10   advocacy.

11       So if you just take that at its face value, it is intended

12   to influence members of the public regarding an issue on which

13   there are varying opinions, and the ad is intended to influence

14   public policy.

15       THE COURT:  Okay.  So say a university -- say a

16   university wants to have a symposium, a conference, where

17   they're going to have a series of lectures that included

18   lectures regarding public policy, without mentioning the titles

19   in the advertisement, lectures that have viewpoints similar to

20   the viewpoints that the ACLU is advancing.

21       Would that mean that the university would be attempting to

22   influence public policy, or would it merely be sponsoring an

23   educational event?

24       MR. PIERCE:  Again, it's a hypothetical that I would

25   like to run through WMATA's process to make a determination.

1    I'm just going to speak for myself right now.  If this is a

2    school that is trying to -- its ultimate goal is to bring

3    admissions to the school, like the UDC, like the Anton Scalia

4    Law School that you mentioned, like Catholic University that

5    Mr. Spitzer mentioned, then I think that ad probably flies.

6        THE COURT:  The Scalia School of Law has, again like

7    David Clark, a particular political bent.  So it would be

8    advertising come to our law school, we favor this political --

9    this is -- we're a conservative law school, and we espouse a

10    conservative viewpoint and a conservative jurisprudence.

11        Advocacy?

12        MR. PIERCE:  Again, another hypothetical, but I'll

13    enter the debate here for just a second.  Again, I'd like to run

14    that ad through the WMATA process.  That's why we have a

15    process, so we could look at it carefully.

16        For purposes of your hypothetical, if that ad is doing more

17    about driving students to the law school, a commercial, neutral,

18    advocacy-neutral activity, the fact that the law school has a

19    bent is probably not an issue.  If the ad is talking about we're

20    a great advocacy law school about conservative issues and the ad

21    links to a website that is full of conservative ideas, the

22    reverse could be true as well.  Maybe that's a problem.  I don't

23    know the answer to that question, Your Honor.

24        But there's a process here, and I'll take us back.  We've

25    got an ad here that is proven, by their admission and just a

mere look at the website of the conference that it is promoting,
we have an ad here that is pure advocacy.

And, Your Honor, I remind the Court -- and the Court knows
this.  Just as a reminder, we're at a heightened standard here.
This isn't a status quo TRO or injunction proceeding.  What they
are trying to do is force WMATA to place this ad now, as soon as
possible.  That takes it to a heightened standard.  I don't
think it meets it even at a lower standard, but certainly at a
heightened standard, this district has stated several times, it
does not -- because it's reversing the status quo, it should be
denied.

Your Honor, there are a couple of other points that I just
want to make.

THE COURT:  And I just have one last question for you,
Mr. Pierce.  In your pleadings, you make a distinction between
intended political messages and incidental messages in a given
advertisement.

So how would you characterize the primary purpose of the
ACLU membership and why?

MR. PIERCE:  I don't have to characterize it.  It says
what it is.  "The ACLU membership is a advocacy organization
which, among other things, advocates and lobbies legislators at
the federal and local level to advance civil liberties and civil
rights."  And to go a little further, Mr. Spitzer stood up here
and told you that the conference is advocacy.

1      So, Your Honor, I think we're -- all the standards that

2  must be applied here, this is an advocacy-based ad, whether you

3  have the backup pictures or not.  If you go to that website and

4  you look at all of the things that we put in our brief that it

5  is advertising, including things like "the rule of law in the

6  age of Trump," "the war on immigrant women at the border,"

7  "voting rights for the resistance," "white people have to do

8  something," "race in America," it goes on and on.  It is a pure

9  advocacy piece.

10     And, Your Honor, there's a couple of things that I want to

11 just address before -- I know you're about to tell me to sit

12 down.  This whole issue of us claiming that they manufactured

13 it, "manufactured" may be a strong word, but I believe that's

14 what happened, because, Your Honor, every conference I've ever

15 been to, and I suspect every conference anyone in this room has

16 been to, takes a long time to plan, and I suspect they rented

17 that convention center probably two years ago.  I also suspect

18 that when they filed this case and the Milo case, they knew they

19 were going to have a conference in June of this year.  And I

20 also suspect that when you ruled a couple of months in the Milo

21 case in the PI hearing, they knew they were going to have a

22 conference.

23     Yet, they wait for a holiday weekend, when we told them the

24 first thing Friday morning that our lead counsel was out on

25 vacation --

1           THE COURT:  Well, no, no.  They applied to put the ad

2      in.  They didn't wait for the holiday weekend --

3           MR. PIERCE:  They waited for the holiday weekend to

4      file this TRO.  They could have filed this months ago when they

5      knew what they were going to do with the conference.  And I'm

6      not casting an aspersion --

7           THE COURT:  What date did the ad get rejected?

8           MR. PIERCE:  I think the first submission was on

9      May 11.  I think it may have gotten rejected on May 16.

10          So, Your Honor, they had plenty of time to do this, not to

11     burden us with this proceeding when they knew that it would be

12     hard for us to be prepared for it.  So I would say on that one

13     equity, the equity lies with WMATA.

14          I would also like to talk about this irreparable harm

15     business.  I don't see anything in their brief that goes into

16     detail about what the harm is going to be if they aren't allowed

17     to advertise --

18          THE COURT:  The harm is they don't get to advertise

19     for their conference.

20          MR. PIERCE:  Your Honor, they have numerous choices

21     for ads.  They can even put an ad at the bus stops, which the

22     D.C. government owns.

23          THE COURT:  Mr. Spitzer's point is well taken, which

24     is the Supreme Court said that simply because there are

25     alternative sources for your protest or your statement doesn't

mean that you're not entitled to them.  And they will be

irreparably harmed if they're not able to get their ads placed

in time for their conference.

MR. PIERCE:  Your Honor, it's a balancing test.  So if

you look at the harm that is going to be impugned upon them, the

guessing of the harm that I think that they're doing about not

having ads on the Metro and on a Metro bus versus the harm

that's going to occur to WMATA if you make a ruling now --

THE COURT:  I don't think I do a balancing test on the

First Amendment.

MR. PIERCE:  You do a balancing test on the TRO and

the injunction proceeding.

THE COURT:  Right.  But there's a constitutional

violation or there isn't.

MR. PIERCE:  There is a TRO or there isn't.  And in

this particular instance, Your Honor, the harm to WMATA, which

means that its policy gets eviscerated if you rule, is far

greater than the harm to the ACLU.  And let me explain that,

because some of it is not necessarily in our brief.

So one thing that has to happen, we have to remove other

ads that we have contracts for.  So you've got a contract

problem when somebody says, hey, wait a minute, you removed my

ad because the Court forced you to, that's a breach of contract.

So it could be.  We've got to deal with that.  We have to deal

with the -- what I would suspect would be the numerous other

1    groups who are going to be planning conferences here.  As you

2    point out, D.C. is about advocacy.  They're going to then come

3    in and say, oh, well now the judge approved that piece of

4    advocacy, now approve my piece of advocacy.  And it's any number

5    of conferences that I've already gone through.

6         THE COURT:  The reality of the matter is, regardless

7    of how I rule, somebody's going to be filing an emergency appeal

8    in 24 hours to stop it or start it or -- you know.  And so

9    the -- we know how the wheels turn in this case.  But you'd have

10   to remove ads even if you had approved the ACLU's ads; right?

11   If your company had said, okay, these are okay, you would have

12   to move ads to put in the new ones.

13        MR. PIERCE:  Again, we rejected the ad.  So we didn't

14   go through and figure out what the space availability is.  We

15   haven't done any of that.  My point is just that it requires a

16   lot of effort for WMATA to put the ad on, and the harm that --

17   the two harms, this harm, the WMATA harm, completely outweighs

18   their harm for any number of reasons.

19        THE COURT:  And your point with regard to the next

20   organization's going to want their ads, that's happening anyway.

21   I mean, the Court of Appeals said the Catholic Church ad

22   couldn't come up.  That didn't stop Mr. Yiannopoulos from filing

23   his lawsuit.  I said WMATA could turn down that ad.  That didn't

24   stop the ACLU.

25        I mean, the problem is, you know, your guidelines seem to

1    be so interestingly applied that people aren't quite sure.

2    Everybody was ready to take their shot.

3         MR. PIERCE:  And, Your Honor, let them take their

4    shot.  If you have a ruling that says that this ad can go on,

5    it's a lot stronger shot is my point.  We have no problem with

6    them submitting their ads.  We want people to do that.  We want

7    people to advertise.  But when our process goes through and we

8    reject an ad, it's a different -- it may be a different result,

9    and people may be more encouraged if Your Honor allows an ad on

10   the Metro that is clearly advocacy like this one.

11       Your Honor, the only other thing I would say is, I don't

12   know if Your Honor is ruling now, but if by chance -- and I

13   don't think there's any basis for this, but if by chance the

14   Court thinks that this TRO should issue, then, Your Honor, I

15   would ask for an immediate stay of it so that -- as you point

16   out, so that an appeal can be taken, and we will take it as

17   quickly as possible.  I assume that they would do the same thing

18   on the reverse.

19       And, Your Honor, also, there's a footnote in their brief

20   about a $10 bond.  Uh-uh.  There needs to be more of a bond than

21   that, because we have to go through -- we may have problems with

22   current advertisers who are currently on the system.  We may

23   have -- we have the rush printing and rush posting.  And so,

24   Your Honor, with all of that, I would ask for several hundred

25   thousand dollars in bonding.

1        Again, I'm just saying that for the record because I may

2   not be able to get back up here again.  I do not think the TRO

3   should issue under the heightened standard that the Court has to

4   apply.  This is clear advocacy.  You cannot --

5           THE COURT:  Why do you want a higher bond?  Do you

6   think ACLU isn't good for it?  From everything I've read,

7   they're having a banner year or two of fund-raising.

8           MR. PIERCE:  I just want to be protected, Your Honor.

9           THE COURT:  All right.  I understand.

10           MR. PIERCE:  Thank you, Your Honor.

11           THE COURT:  Thank you, Mr. Pierce.  Mr. Spitzer.

12           MR. SPITZER:  Thank you, Your Honor.  I'll be as brief

13   as I can.  Number 1, I want to make it 100 percent clear that

14   the ACLU is in favor of advertising for kittens on the Metro

15   system, even though some people prefer dogs.

16           THE COURT:  I'm not a cat person.  That will probably

17   get me hate mail.  Sorry.

18           MR. SPITZER:  Number two, with respect to

19   manufacturing the emergency, of course this conference was

20   planned well in advance, and the ACLU has been publicizing it on

21   social media nationwide for several months.  And about a month

22   ago, just a month before the conference, ACLU realized that

23   there was still space for more registrants -- the Walter Reed

24   Washington Convention Center is a big place -- and decided to

25   advertise locally because people who live locally wouldn't have

1    to make traveling arrangements and lodging arrangements, and so

2    maybe we could fill up the space with local people.  That's why

3    really -- if the space had been filled with registrations a

4    month ago, there wouldn't have been a need to advertise locally,

5    and there was, therefore, no need to plan on that.

6        The idea came up -- and this is in a footnote in our

7    Saturday morning opposition to their request for an extension of

8    time.  The idea of advertising on Metro first came up internally

9    on May 9, I think I said in that footnote.  It was approved

10   internally on May 10, maybe it was May 8 to May 10, and the ad

11   was submitted the next day, May 11.  And the lawyers knew

12   nothing about any of this as it was going on.  I knew there was

13   a conference, but I had no idea what the marketing people -- the

14   marketing people are in New York, and they don't talk to me and

15   I don't talk to them, until this weekend.  So we didn't know

16   about it when we asked for the stay.  We certainly didn't know

17   about it a year ago when we filed the lawsuit.

18       In terms of the chronology here, the first ad was

19   apparently rejected by WMATA on May 16, a Wednesday.  We didn't

20   hear about it until late on May 17 when they told OUTFRONT and

21   OUTFRONT told OpAD and OpAD told the ACLU.  It's really a game

22   of telephone.  I didn't learn about it, none of the lawyers

23   learned about it until Friday afternoon, May 18.

24       And our advice was maybe they're bothered by that

25   background picture with the megaphone and the signs, let's

submit alternatives.  And the next business day, Monday -- so we heard about the rejection Friday, the 18th.  Monday, the 21st, we submitted alternatives, we thought B and C but turns out they only got C.  So we submitted that the next business day.

They knew we were in a rush, and our ad buyer kept bugging OUTFRONT, please get a decision.  We wanted our ads to be posted on Metro already.  And yet, Metro took its time, and according to their papers, they finally notified us on the 25th, which was Friday.  And the first we learned that we'd been rejected actually was in the papers filed in this case Friday night.

So we didn't do -- I regret, we regret and I regret making Your Honor work this weekend, making our friends on the other side work this weekend, making us work this weekend.  Nobody wants to do that, but we don't think we're to blame.

Number 3, I think the D.C. Circuit has opined in the *League of Women Voters* case that there is not a heightened standard for affirmative injunction.  It was uncertain before that.  There was some cases in the district court, in this court saying that there would be a heightened standard.  But the latest word from the D.C. Circuit and no contrary word since then is that there is not a heightened standard for an affirmative injunction.

Number 4, I think there's nothing in the record to suggest that other advertisers' ads would have to be taken down to make room for the ACLU.  I could ride on the Metro in the next half hour and take a dozen pictures showing ads of Metro's own public

1    service ads.  Metro -- I don't know if Your Honor rides Metro

2    enough to take judicial notice of this, but Metro is full of

3    advertisements that are Metro's own public service ads.  They

4    would not -- and I can submit a declaration if it's useful later

5    this afternoon.  Metro would not have to take down any other

6    paid advertising to put up our ads.  I don't know if that's also

7    true on the sides of buses because I don't see that many buses

8    go by.

9         In terms of a bond for a stay, of course, this is a paid

10   contract that we're asking Metro to go forward with where we

11   signed a contract, we committed ourselves to --

12             THE COURT:  I'm not concerned about the bond.

13             MR. SPITZER:  -- pay a lot of money, and we'll pay the

14   money if they run the ad.

15             Two more things.  One is, I think it's quite telling

16   that experienced counsel for WMATA hasn't the faintest idea

17   whether the ACLU could place any ad on WMATA and can't answer

18   the Court's other hypotheticals about a university putting on a

19   seminar.  I think that goes a long way to proving that the

20   regulations are applied in such an arbitrary and capricious way

21   that nobody knows, even Metro's own lawyer doesn't know what the

22   answer would be to a fairly specific hypothetical.

23        That's not the way it's supposed to work when it comes to

24   the First Amendment, and that leads to my final point, which is

25   that even though this is a limited or nonpublic forum and so the

1    rules about content-based regulations are different and the

2    rules about time, place, and manner are not the same, one thing

3    that is the same, the Supreme Court has made it quite clear, is

4    the viewpoint discrimination point.  Even in a nonpublic forum,

5    the same prohibition on viewpoint discrimination applies as

6    applies in a traditional public forum.

7         And so the fact that it's a different kind of forum for

8    that purpose doesn't matter.  They're engaging, we think, in

9    viewpoint discrimination, and that is absolutely not allowed in

10   any kind of a public forum.

11        Thank you very much.

12             THE COURT:  Thank you, Mr. Spitzer.

13        All right.  I recognize that time is of the essence in this

14   case, and I will endeavor to get out a ruling as soon as I can.

15   Obviously, I'm sure whichever side does not prevail is going to

16   want an emergency stay.  So I will take that into account.

17        Thank you all for accommodating my schedule, and I will

18   rule expeditiously.  Thank you.

19             (Proceedings adjourned at 5:17 p.m.)

20

21

22

23

24

25

\* \* \* \* \* \*

CERTIFICATE

      I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*Bryan A. Wayne*
BRYAN A. WAYNE